# EXHIBIT 7

Ⓐ Neutral

As of: October 21, 2020 9:11 PM Z

# *Coach, Inc. v. 1941 Coachoutletstore.com*

United States District Court for the Eastern District of Virginia, Alexandria Division

January 5, 2012, Decided; January 5, 2012, Filed

1:11cv309 (JCC/JFA)

**Reporter**

2012 U.S. Dist. LEXIS 1311 *; 2012 WL 27918

COACH, INC., et al., Plaintiffs, v. 1941 COACHOUTLETSTORE.COM et al., each an Internet Domain Name, Defendants.

**Prior History:** *Coach, Inc. v. 1941 Coachoutletstore.com, 2011 U.S. Dist. LEXIS 150693 (E.D. Va., Nov. 25, 2011)*

## Core Terms

domain, default, recommends, joinder, joined, notice, occurrence

**Counsel:** **[*1]** For Coach, Inc., Coach Services, Inc., Plaintiffs: Philip James Meitl, Bryan Cave LLP (DC), Washington, DC.

**Judges:** James C. Cacheris, UNITED STATES DISTRICT COURT JUDGE.

**Opinion by:** James C. Cacheris

## Opinion

**MEMORANDUM OPINION**

This matter is before the Court on Coach, Inc. and Coach Services, Inc.'s (collectively, Coach or Plaintiffs) Objections to the Magistrate Judge's Proposed Findings of Fact and Recommendations (the Objection) [Dkt. 54] issued by Magistrate Judge Anderson on November 25, 2011 [Dkt. 53]. For the following reasons, the Court will grant Plaintiffs' Objection.

### I. Background

Coach seeks injunctive relief against multiple domain name defendants pursuant to the *in rem* provisions of the Anticybersquatting Consumer Protection Act, *15 U.S.C. § 1125(d)* (ACPA). The facts in this case were thoroughly presented in Magistrate Judge Anderson's Proposed Findings of Fact and Recommendations [Dkt. 53] and thus the Court only provides a review.

On March 25, 2011, Coach filed a Complaint alleging violations of the ACPA against 419 defendant domain names. [Dkt. 1.] (*Id.*) Then, on April 1, 2011, Coach filed an Amended Complaint naming 473 domain names as defendants. [Dkt. 2.] On April 8, 2011, Coach filed an *ex parte* **[*2]** motion for an order authorizing service of process by email and a notice for a hearing date. [Dkt. 3.] Magistrate Judge Anderson issued an order three days later advising Coach that it should, among other things, "be prepared to present argument as to why it is proper to join over 400 domain name defendants in a single action." [Dkt. 6.] After obtaining a continuance to file a supplemental memorandum [Dkt. 13], Coach filed a supplemental position paper [Dkt. 14] and notice of supplemental authority [Dkt. 18] on April 26, 2011, and April 28, 2011, respectively.

On April 29, 2011, Magistrate Judge Anderson denied Coach's motion for service by email, but granted Coach leave to file a second amended complaint. [Dkt. 20.] During a hearing on April 29, 2011, Magistrate Judge Anderson expressed concern about the appropriateness

2012 U.S. Dist. LEXIS 1311, *2

of joining all of the domain names in one action. (Tr. April 29, 2011 Proceedings [Dkt. 23] at 7:10-9:12.) In response to that concern, on July 1, 2011, Coach filed a Second Amended Complaint [Dkt. 25] dividing the domain name defendants into sub-groups. The Second Amended Complaint lists 360 domain name defendants and divides them into 11 subgroups. (Second Am. Compl. **[*3]** [Dkt. 25] ¶ 10.) Coach asserts that the groups are based on similarities in the postal addresses, email addresses, and/or registrar of the domain names. (*Id.* ¶¶ 11-21.)

On July 6, 2011, Coach filed an *ex parte* motion for an order to publish notice of the action and a memorandum in support. [Dkts. 26-27.] On July 8, 2011, Magistrate Judge Anderson issued an order of publication directing Coach to provide notice of this action in accordance with the ACPA. [Dkt. 28.] Coach complied, publishing notice of this action in *The National Law Journal* on July 25, 2011. None of the domain name defendants filed a response, claim, or other pleading.

On August 18, 2011, Coach filed a motion for entry of default. [Dkt. 31.] And on August 29, 2011, the Clerk of the Court entered an order of default against the 360 domain name defendants. [Dkt. 35.] Coach then filed a motion for entry of final judgment [Dkt. 36] and then an amended motion for entry of final judgment on August 30, 2011 [Dkt. 37].

On September 6, 2011, Magistrate Judge Anderson ordered Coach to provide "the legal authority it relies upon to support the joining of these defendants in one action . . ." [Dkt. 39.] And on September 20, 2011, **[*4]** the Court directed Coach to notice the hearing on its motion for default judgment. [Dkt. 40.] Coach responded on September 23, 2011, filing a motion for entry of default judgment, a memorandum in support, and a notice of hearing for September 29, 2011. [Dkts. 41-43.] On September 2011, Coach filed two notices of voluntary dismissal, dismissing with prejudice Coach's claims against four of the 360 domain name defendants. [1] [Dkts. 49-50.] The claims against those four domain name defendants were dismissed on September 27, 2011. [Dkt. 51.] On September 29, 2011, Magistrate Judge Anderson held a hearing on Coach's motion for default judgment. None of the remaining 356 domain name defendants (the Domain Name Defendants) appeared.

On November 25, 2011, Magistrate Judge Anderson filed the Proposed Findings of Fact and Recommendations (the R&R). [Dkt. 53.] In it, Magistrate Judge Anderson recommends a finding that joinder of all of the Domain Name Defendants does not satisfy the requirements of *Federal Rule of Civil Procedure 20*. (R&R [Dkt. 53] at 17.) **[*5]** The R&R also recommends a finding that joinder is appropriate as to 11 domain names (the "Merry/Liny" domain names) and recommends that the remaining 345 domain name defendants be severed from the instant action. (*Id.*) Finally, the R&R proceeds to recommend default judgment be entered against each of the 11 Merry/Liny domain names. (*Id.* at 26-27.)

On December 10, 2011, Plaintiffs filed Objections to the Magistrate Judge's Proposed Findings of Fact and Recommendations (the Objection). [Dkt. 54.]

Plaintiffs' Objection is now before the Court.

## II. Standard of Review

Pursuant to the Federal Magistrate's Act, the parties may serve and file written objections to the magistrate judge's proposed findings and recommendations within ten days after being served with a copy of the magistrate judge's recommended disposition. [2] *28 U.S.C. § 636(b)(1)*; *see also* *Fed. R. Civ. P. 72(b)*. A district judge is required to make a de novo determination only of those specific portions of a report and recommendation to which objection is made. *28 U.S.C. § 636(b)(1)(C)*. A district judge also "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate," *id.; see also* **[*6]** *Beck v. Angelone, 113 F. Supp. 2d 941, 947 (E.D. Va. 2000)*, appeal dismissed by *261 F.3d 377 (4th Cir.)*, cert. denied, *534 U.S. 987, 122 S. Ct. 417, 151 L. Ed. 2d 321 (2001)*, and may receive further evidence or recommit the matter to the magistrate with instructions. *28 U.S.C. § 636(b)(1)(C)*.

## III. Analysis

Coach contests the R&R's finding that all 356 Domain Name Defendants are improperly joined together pursuant to *Federal Rule of Civil Procedure 20*, and that

---

[1] Coach listed one of the four domain names twice in the first notice of voluntary dismissal. This mistake was corrected in the second notice.

[2] As a preliminary matter, the Court finds that Plaintiffs timely noted the Objection to the R&R pursuant to the extension of time.

2012 U.S. Dist. LEXIS 1311, *6

the claims of 345 of those Domain Name Defendants should be severed from this action. (Objection [Dkt. 54] at 2.) Coach primarily argues that *Rule 20* is "clearly inapplicable to this litigation," and requests this Court to enter default judgment against all of the 356 Domain Name Defendants. (*Id.*) In the alternative, Coach requests that if this Court severs the 345 Domain Name Defendants, the Court also waive any additional filing and/or publication costs associated with such a decision. (*Id.* at 21.)

*Rule 20* governs permissive joinder of parties and states,

> Persons — as well as a vessel, cargo, or other **[*7]** property subject to admiralty process in rem — may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action.

*Fed. R. Civ. P. 20(a)(2)* (2011). Coach's main contention is that the ACPA displaces *Rule 20* in light of snippets of legislative history, most of which only suggest that Congress wanted an effective and efficient method for addressing cybersquatting. [3] Yet, Coach does not point to a single provision in the ACPA that provides for special treatment for joinder in *in rem* domain name proceedings. Nor does Coach cite to a single case where a court has found that the ACPA does away with the requirements of *Rule 20*.

Coach places emphasis on *Porsche Cars North America, Inc. v. Porsche.net, 302 F.3d 248 (4th Cir. 2002)*, arguing that, as it "allowed Porsche to bring a single suit against 128 defendant domain names," it is "illustrative of Congress' intent to allow ACPA claims to proceed in a single cause of action against multiple defendant domain names." (Objection at 13.) But there is no disagreement that the ACPA permits a single *in rem* proceeding against *multiple* defendant domain

names. The R&R recommends grouping multiple (eleven) domain names and suggests that "there may be other groups of domain names that could satisfy the same transaction or occurrence test if an individualized analysis were performed." (R&R at 17 n. 7.) Rather, the issue before the Court is whether the Federal Rules of Civil Procedure place limits on the *number* of defendant domain names that may be joined together, i.e., whether *Rule 20* governs the size and scope of the groups of domain names. Neither Coach's argument, nor the Fourth Circuit's opinion in *Porsche*, speaks **[*9]** to that issue. [4] For these reasons, the Court finds that the ACPA does not displace *Rule 20*.

In addressing *Rule 20*'s dual requirements for joinder of defendants, Magistrate Judge Anderson found that the claims asserted against all 356 Domain Name Defendants involve a common question of law - the validity of Coach's Trademarks. (R&R at 9.) Magistrate Judge Anderson, however, after conducting a thorough review of the related case law and information provided about the Domain Name Defendants, concluded that the joinder of all Domain Name Defendants does not meet *Rule 20*'s second requirement - that the right to relief asserted against the defendants was "with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences." (*Id.* at 15.) The R&R states that "the evidence presented is insufficient **[*10]** to establish that Coach's claims against *all* of the domain name defendants are related, that they arise from the same transaction or occurrence, or that there is any joint action among *all* the defendant domain names that warrants relief under the ACPA in a single action." (R&R at 15.) As a result, the R&R recommends that this Court, pursuant to *Fed. R. Civ. P. 21*, sever 345 Domain Name Defendants *sua sponte*. [5] (*Id.* at 12.)

Coach spends almost no time contending that joinder of the Domain Name Defendants is appropriate under *Rule*

---

[3] While there are concerns about judicial economy, Coach overstates the extent that it suggests that the effect of the R&R would be a 35 percent increase in this Court's docket. (*See* Objection at 16.) This is because the R&R does not require an additional 345 *individual* suits (the number Coach uses **[*8]** in its calculation). Rather it recommends that the domain name defendants be joined in *groups* that satisfy the transaction or occurrence test. (*See* R&R at 17.)

---

[4] The Fourth Circuit in *Porsche* did not specifically address joinder, nor did it discuss Congressional intent as it relates to combining multiple defendant domain names in a single action. Instead, the Fourth Circuit addressed arguments about due process and the timing of objections related to in rem jurisdiction. *See Porsche Cars North America, Inc., 302 F.3d at 262*.

[5] *Rule 21* states: "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." *Fed. R. Civ. P. 21* (2011).

2012 U.S. Dist. LEXIS 1311, *10

*20*. [6] Coach does state that "[b]ecause a default has been entered against all of the Defendants, the allegations contained in Coach's Complaint - including those regarding the interrelatedness of the Domain Name Defendants and those alleging that the Domain Name Defendants are 'run by the same entity . . . or small number of entities' - cannot now be contested and deemed admitted and true." (Objection at 20.) It is **[*11]** true that "'[t]he defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established.'" *Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001)* (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975))*. However, "[a] defendant's default does not in itself warrant the court in entering a default judgment. There must be a sufficient basis in the pleadings for the judgment entered." *DIRECTV, Inc. v. Pernites, 200 F. App'x 257, 258 (4th Cir. 2006)* (quoting *Nishimatsu, 515 F.2d at 1206*). "Further, a 'defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.'" *Id.* In reviewing the R&R, the Court applied the facts to *Rule 20*'s legal standard. In doing so, it found that the evidence only establishes that the Domain Name Defendants are run by a number of entities, [7] and those entities should be sued independently under *Rule 20*.

However, even if the Second Amended Complaint contains insufficient claims to support joinder of all 356 Domain Name Defendants, the Federal Rules of Civil Procedure only apply to the extent that they "affect any party's substantial rights." [8] *Fed. R. Civ. P. 61* (2011). Moreover, the Court's authority to act *sua sponte* is provided by *Rule 21*, which requires that the Court add

or drop parties "on just terms." [9] *Fed. R. Civ. P. 21*. Although Coach does not cite to these rules, they control in this case and require all 356 Domain Name Defendants to remain joined in a single action. This is because each Domain Name Defendant is individually subject to default. And, "there is no prejudice to any defaulting defendant, whose liability may be established upon default irrespective **[*13]** of the presence of any other defendant." *Lyons P'ship, L.P. v. D&L Amusement & Entm't, 702 F. Supp. 2d 104, 112 (E.D.N.Y. 2010)*. As a result, the Court finds that it must disregard any potential defects related to joinder, as they do not affect any party's substantial rights, and the Court's correction of those defects under *Rule 21* would not be on just terms.

Thus, the Court rejects Magistrate Judge Anderson's finding that joinder is inappropriate and that the claims against 345 of the Domain Name Defendants should be severed from the instant action. The Court finds that all 356 Domain Name Defendants shall remain joined in this action. The Court accepts and adopts Magistrate Judge Anderson's remaining findings, which are related to a default judgment against **[*14]** the eleven Merry/Liny Domain Name Defendants. And, it makes those same findings for the remaining 345 Domain Name Defendants. Thus, this Court concludes that the registrants' actions have violated the ACPA and default judgment shall be entered in favor of Plaintiffs with respect to the 356 Domain Name Defendants.

## IV. Conclusion

For the reasons stated above, the Court will grant Plaintiffs' Objection to Magistrate Judge Anderson's R&R regarding the joinder of the Domain Name Defendants.

An appropriate Order will issue.

/s/ James C. Cacheris

UNITED STATES DISTRICT COURT JUDGE

January 5, 2012

Alexandria, Virginia

---

[6] Coach emphasizes that there are cases in the Eastern District of Virginia that have involved multiple domain name defendants. Yet, Coach does not cite **[*12]** to discussions of joinder in those cases, nor does Coach make any arguments about the appropriateness of the joinder of the specific defendants in those cases. That there are cases joining large numbers of domain name defendants is not an argument as to why joinder is appropriate in this case.

[7] In particular, this Court notes that "Coach divided the [356] domain names into 11 seemingly unrelated sub-groups." (R&R at 14.)

[8] *Federal Rule Civil Procedure 61* states, in part, "[a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."

[9] *Federal Rule Civil Procedure 21* states, "[m]isjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party."

2012 U.S. Dist. LEXIS 1311, *14

**End of Document**

 Caution
As of: October 21, 2020 9:03 PM Z

# *Desai v. ADT Sec. Servs., Inc.*

United States District Court for the Northern District of Illinois

July 18, 2011, Decided; July 18, 2011, Filed

11 C 1925

**Reporter**
2011 U.S. Dist. LEXIS 77457 *; 2011 WL 2837435

Desai vs. ADT Security Services, Inc.

**Subsequent History:** Motion granted by, Request denied by *Desai v. ADT, 2012 U.S. Dist. LEXIS 68807 (N.D. Ill., May 11, 2012)*

Motion denied by, in part, Dismissed by, in part *Desai v. ADT Sec. Sys., 2012 U.S. Dist. LEXIS 137708 (N.D. Ill., Sept. 26, 2012)*

Related proceeding at *Charvat v. Travel Servs., 2015 U.S. Dist. LEXIS 472 (N.D. Ill., Jan. 5, 2015)*

Summary judgment granted by, in part, Motion denied by, Motion to strike denied by, As moot *Desai v. ADT Sec. Sys., 2015 U.S. Dist. LEXIS 11519 (N.D. Ill., Jan. 30, 2015)*

## Core Terms

telephone, joined, indispensable

**Counsel:** **[*1]** For Vishva Desai, Plaintiff: Alexander Holmes Burke, LEAD ATTORNEY, Burke Law Offices, LLC, Chicago, IL; Matthew Mccue, LEAD ATTORNEY, Law Office Of Matthew Mccue, Framigham, MA; Brian Kevin Murphy, Murray Murphy Moul & Basil, LLP, Columbus, OH; Edward A. Broderick, PRO HAC VICE, Broderick Law, P.C., Boston, MA; John W. Barrett, Jonathan Rehe Marshall, Bailey & Glasser Llp, Charleston, WV; Matthew P. McCue, PRO HAC VICE, Law Office Of Matthew Mccue, Framingham, MA.

For Philip J. Charvat, Plaintiff: Matthew Mccue, LEAD ATTORNEY, Law Office Of Matthew Mccue, Framigham, MA; Brian Kevin Murphy, Murray Murphy Moul & Basil, LLP, Columbus, OH; Jonathan Rehe Marshall, Bailey & Glasser Llp, Charleston, WV; Alexander Holmes Burke, Burke Law Offices, LLC, Chicago, IL.

For ADT Security Services, Inc., Defendant: Jason Lawrence Pyrz, Polsinelli Shughart, P.C., Chicago, IL; John W. Barrett, Bailey & Glasser Llp, Charleston, WV; John A. Leja, Polsinelli Shughart PC, Chicago, IL; Michael E Baughman, PRO HAC VICE, Pepper Hamilton, LLP, Philadelphia, PA; Robert L. Hickok, Pepper Hamilton LLP, Philadelphia, PA.

**Judges:** Elaine E. Bucklo.

**Opinion by:** Elaine E. Bucklo

# Opinion

## STATEMENT

Plaintiffs Vishva Desai ("Desai") and Philip Charvat **[*2]** ("Charvat") sued ADT Security Systems ("ADT") for violation of the Telephone Consumer Protection Act ("TCPA"), *47 U.S.C. § 227*, alleging that they received unsolicited pre-recorded telephone calls promoting ADT's products. Plaintiffs do not maintain that the calls were necessarily made by ADT. Instead, they allege that the calls were made "by or on behalf of ADT, and/or

with ADT's knowledge, consent, approval and/or acquiescence." Compl. at 2. They argue that, so long as the calls were made on ADT's behalf, ADT can be held liable. They also contend that ADT can be held liable for the calls of its representatives on the basis of general agency principles.

ADT moves to dismiss the suit on several grounds. First, ADT argues that it can be held liable only if it "made" or "initiated" the calls in question. As ADT points out, the TCPA provisions invoked by plaintiffs make it unlawful (subject to exceptions not relevant here, "to **make** any [unauthorized] call . . . to any cellular telephone service," *47 U.S.C. § 227 (b)(1)(A)(iii)* (emphasis added), or "to **initiate** any telephone call to any residential telephone line," *47 U.S.C. § 227 (b)(1)(B)* (emphasis added). The "on behalf of" language **[*3]** that plaintiffs rely upon is found in a separate subsection of the Act, *§ 227(c)(5)*, which addresses violations of regulations regarding the Do-Not-Call list. ADT therefore argues that it cannot be held liable for calls merely made on its behalf. ADT also argues that there is no ground for holding it liable on the basis of traditional agency principles.

One problem with ADT's position is that it would frustrate the TCPA's overriding purpose. *See, e.g., Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 954 (9th Cir. 2009)* ("The TCPA was enacted to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile machines and automatic dialers. The TCPA was enacted in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls. The consumers complained that such calls are a nuisance and an invasion of privacy.") (quotation marks and citations omitted). On ADT's view, a party could benefit from violations of the TCPA with impunity, so long as the task of actually making the phone **[*4]** calls were delegated to another entity.

Nor does the statutory test suggest that liability should be limited to parties that actually made the offending phone calls. On the contrary, subsection(b)(1)(B)'s prohibition on "initiating" phone calls, as opposed to subsection (b)(1)(A)(iii)'s prohibition on "making" calls, clearly indicates that liability does not require a party to make a call. The term "initiate" is broad enough to include cases where, as plaintiffs allege of ADT here, a party has encouraged or otherwise prompted its authorized dealers to make calls on its behalf. To be

sure, ADT staunchly denies that it encouraged its dealers to make such calls. Indeed, ADT claims that it specifically forbade its authorized dealers from violating the TCPA and other laws. But whether this is so is a factual matter that cannot be resolved on a *Rule 12(b)(6)* motion.

ADT next argues that the suit must be dismissed under *Fed. R. Civ. P. 12(b)(7)* for failure to join indispensable parties in accordance with *Fed. R. Civ. P. 19*. "*Rule 19* sets up a two-step inquiry. First, the court must determine whether a party is one that should be joined if feasible." *Thomas v. United States, 189 F.3d 662, 667 (7th Cir. 1999)*. **[*5]** (citations omitted). "To answer that question, the court must consider (1) whether complete relief can be accorded among the parties to the lawsuit without joinder, (2) whether the absent person's ability to protect its interest in the subject-matter of the suit will be impaired, and (3) whether any existing parties might be subjected to a substantial risk of multiple or inconsistent obligations unless the absent person joins the suit." *Id.* "Only if the court concludes, based on those factors, that the party should be included in the action but it cannot be, must it go on to decide whether the litigation can proceed at all in the party's absence." *Id.* "If there is no way to structure a judgment in the absence of the party that will protect both the party's own rights and the rights of the existing litigants, the unavailable party is regarded as "indispensable" and the action is subject to dismissal upon a proper motion under *Federal Rule of Civil Procedure 12(b)(7)*." *Id.* "In ruling on a Rule 12(B)(7) motion to dismiss for failure to join an indispensable party under *Rule 19*, the court must accept the allegations of the complaint as true." *Bab Systems, Inc. v. Pilatus Inv. Group, Inc., No. 05 C 3038, 2005 U.S. Dist. LEXIS 25737, 2005 WL 2850119, at *4 (N.D. Ill. Oct. 27, 2005)*. **[*6]** "The court may, however, look outside of the pleadings and consider extrinsic evidence." *Id.* "The burden is on the party bringing the *Rule 12(b)(7)* motion to show that joinder necessary under *Rule 19*. *Mamacita, Inc. v. Colborne Acquisition Co., LLC., No. 10 C 6861, 2011 U.S. Dist. LEXIS 25146, 2011 WL 881654, at *8 (N.D. Ill. Mar. 11, 2011)*

In light of the factual record before me, ADT has failed to meet its burden. *See, e.g., Anderson v. Hall, 755 F. Supp. 2, 5 (D.D.C. 1991)* (denying *Rule 12(b)(7)* motion to dismiss because factual record was unclear as to whether party was indispensable). The question whether the parties in question are necessary or indispensable depends on the nature of their relationship with ADT. As already noted, this question is fiercely contested. Indeed, even ADT's own arguments

2011 U.S. Dist. LEXIS 77457, *6

on this point are decidedly tentative. It argues that it is "unclear whether joinder will be possible" because the identities of the entities that made the calls "are not pleaded and not definitively known." Mem. at 13. It also argues that personal jurisdiction is "likely" to pose difficulties in the case of the parties who made the alleged calls to plaintiff Charvat. ADT claims that since the calls to Charvat were **[*7]** placed to Ohio, and since "it appears that the entities responsible for the calls are not located in Illinois, there may be significant personal jurisdiction issues to suing them here." Mem. at 13. ADT has failed to show that the third parties are indispensable under _Rule 19_.

Lastly, ADT moves to dismiss Charvat's claims on the ground that they have been improperly joined with Desai's. ADT claims that the calls took place on different dates, were made by different callers, and were received in different states (Desai in Illinois, Charvat in Ohio). ADC also accuses Charvat of forum shopping, noting that he has filed numerous TCPA suits in the past, and originally filed suit on the basis of the instant claims in Ohio. "_Rule 20(a)_ provides for permissive joinder when two requirements are met: (1) the cases to be joined must contain a right to relief arising out of the same transaction or occurrence, or series of transactions or occurrences; and (2) there must be a question of law or fact common to all the plaintiffs." _Rudd v. Lux Products Corporation Emerson Climate Technologies Braeburn Systems, LLC, No. 09-cv-6957, 2011 U.S. Dist. LEXIS 4804, 2011 WL 148052, at *1 (N.D. Ill. Jan. 12, 2011)_. Notably, the standard **[*8]** under _Rule 20_ is a liberal one. _Eclipse Mfg. Co. v. M and M Rental Center, Inc., 521 F. Supp. 2d 739, 744 (N.D. Ill. 2007)_. "In assessing whether the requirements of _Rule 20(a)(2)_ are met, courts must accept the factual allegations in a plaintiff's complaint as true." _Deskovic v. City of Peekskill, 673 F. Supp. 2d 154, 159 (S.D.N.Y. 2009)_. Here, plaintiffs' claims are alleged to have arisen out of the same series of occurrences (the calls all sought to promote ADT goods and services are alleged to be part of the same "massive illegal telemarketing campaign"); and the claims turn on common questions of law and fact (e.g., the nature of the relationship between ADT and the third-party callers, and whether, in virtue of that relationship, ADT can be held vicariously liable for the third parties' actions). As a result, Charvat's claims are not improperly joined and I decline to dismiss them.

**End of Document**

Martin Trainor

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ESTÉE LAUDER COSMETICS LTD.          )
and MAKE-UP ART COSMETICS INC.,      )
                                     )
        Plaintiffs,                  )
                                     )     Case No. 20 C 845
   v.                                )
                                     )     Judge John Z. Lee
THE PARTNERSHIPS and                 )
UNINCORPORATED ASSOCIATIONS          )
IDENTIFIED ON SCHEDULE "A,"          )
                                     )
        Defendants.                  )

## ORDER

Plaintiffs Estée Lauder Cosmetics Ltd. and Make-Up Art Cosmetics Inc. ("MAC") allege claims of trademark infringement against 75 online retailers. *See* Compl., ECF No. 1. Given the dozens of Defendants in this case, the Court instructed the Plaintiffs to file a memorandum of law as to why joinder is appropriate under Rule 20 of the Federal Rules of Civil Procedure. ECF No. 14. The Court has reviewed that memorandum and, for the following reasons, finds that joinder is improper. As detailed below, the Plaintiffs may attempt to cure the deficiency by filing an amended complaint. Moreover, in light of this Order, Plaintiffs' motions [16][21] are stricken without prejudice. Their motion for leave to file under seal [24], however, is granted.

## I.    Background

MAC, an Estée Lauder subsidiary, has an exclusive license to use several federally registered trademarks in connection with various cosmetics and related beauty products. Compl. ¶ 6. Since at least 2000, Estée Lauder has generated a

significant portion of its business through operating a website that promotes and sells genuine MAC products.  *Id.* ¶ 14.

MAC and Estée Lauder ("the Plaintiffs") bring claims under the Lanham Act, alleging that the Defendants, "either individually or jointly," run e-commerce stores in foreign jurisdictions that advertise and sell counterfeit MAC products to customers in the United States.  *Id.* ¶ 17.  The Defendants' stores, the Plaintiffs state, "often share unique identifiers" such as common design elements, allegedly evincing that Defendants "are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products using infringing and counterfeit versions of the MAC Trademarks."  *Id.* ¶ 28.

Shortly after this case was filed, the Court *sua sponte* raised the issue of whether joinder of the Defendants is appropriate, asking the Plaintiffs for a memorandum of law in support of their position.  ECF No. 14, *see* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."); *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) (faulting the district court for not scrutinizing the propriety of joinder in case with twenty-four defendants).  The Court now turns to that issue.

## II.    <u>Legal Standard</u>

Federal Rule of Civil Procedure 20(a)(2) provides that multiple defendants may be joined in a single action if (1) the claims against them are asserted "with respect to or arising out of the same transaction, occurrence, or series of transactions or

2

occurrences," and (2) there is a "question of law or fact common to all defendants." Fed. R. Civ. P. 20(a)(2)(A)–(B).

In considering whether the "transaction or occurrence" requirement is met, courts must "consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds." *Ross v. Bd. of Educ. of Twp. High Sch. Dist. 211*, 486 F.3d 279, 284 (7th Cir. 2007). Though "there is no formalistic test" to apply, *id.*—with questions of fairness being paramount—courts typically find that there is a shared "transaction or occurrence" only where there is a "logical relationship between the separate causes of action." *In re EMC Corp.*, 677 F.3d 1351, 1358 (Fed. Cir. 2012); *In re Price*, 42 F.3d 1068, 1073 (7th Cir. 1994). Such a relationship, in turn, exists where there is a "substantial evidentiary overlap in the facts giving rise to the cause of action against each defendant," thus allowing for efficiencies through joinder. *In re EMC Corp.*, 677 F.3d at 1358.

To this point, courts in this district "have consistently held" that joinder is improper under Rule 20(a)(2) where "multiple defendants are merely alleged to have infringed the same patent or trademark." *ThermaPure, Inc. v. Temp-Air, Inc.*, No. 10 C 4724, 2010 WL 5419090, at *4 (N.D. Ill. Dec. 22, 2010); *see, e.g.*, *Slep-Tone Entm't Corp. v. Roberto*, No. 12 C 5750, 2013 WL 5748896, at *2–3 (N.D. Ill. Oct. 22, 2013); *Spread Spectrum Screening, LLC v. Eastman Kodak Co.*, No. 10 C 1101, 2010 WL 3516106, at *2 (N.D. Ill. Sept. 1, 2010). "That makes sense: . . . . When defendants are not connected to one another, there is no evidentiary overlap in proving what one

3

defendant did and what another did.  Or, when viewed from the defense perspective, there is nothing that one defendant could advance in defending a case that would be dependent on an unrelated codefendant." *Estée Lauder Cosmetics Ltd. v. The P'ships and Unincorporated Ass'ns Identified on Schedule A*, 334 F.R.D. 182, 187 (N.D. Ill. 2020) (Chang, J.).

Plaintiffs bear the burden at the outset of the case to plausibly allege that joinder of defendants is proper under Rule 20(a)(2).  *See, e.g.*, *Turley v. Gaetz*, 625 F.3d 1005, 1011 (7th Cir. 2011); *reFX Audio Software Inc. v. Does 1-85*, No. 13 C 1790, 2014 WL 1293816, at *7 (N.D. Ill. Mar. 24, 2014).  In evaluating whether this burden has been met, "courts must accept the factual allegations in a plaintiff's complaint as true." *Desai v. ADT Sec. Servs., Inc.*, 2011 WL 2837435, at *3 (N.D. Ill. July 18, 2011) (quoting *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 159 (S.D.N.Y. 2009)). This assumption of truth does not extend, however, to conclusory or speculative statements.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008).

Upon finding that joinder of defendants is improper under Rule 20(a)(2), the Court may sever the parties on its own or order the plaintiff to cure the deficiency. *See* Fed. R. Civ. P. 21; *UWM Student Ass'n v. Lovell*, 888 F.3d 854, 863 (7th Cir. 2018).

### III.   <u>Analysis</u>

The Court first turns to the Plaintiffs' contention that joinder would be proper even if the Defendants operate their e-commerce stores entirely independently of each other.  *See* Pls.' Mem. in Supp. of Joinder at 3, ECF No. 25 ("Well-pleaded allegations

in Plaintiffs' complaint establish that Defendants are working in a similar manner and during the same time period to sell counterfeit MAC Products . . . . This establishes a logical relationship supporting joinder." (citing *Bose Corp. v. P'ships and Unincorporated Ass'n Identified on Schedule "A*," No. 19 C 7467, 2020 WL 814869 (N.D. Ill. Feb. 19. 2020))).

This argument, which appears to adopt the reasoning propounded in *Bose Corp.*, concedes that parallel sellers of counterfeit goods—that is, counterfeiters engaged in similar conduct but without any relationship with, or connection to, each other—do not engage in the same "transaction" as defined under Rule 20(a)(2). Pls.' Mem. in Supp. of Joinder at 2. But, seizing on the disjunctive "or" in Rule 20(a)'s "transaction or occurrence," the argument proffers that those sellers may nevertheless be part of the same "occurrence" from the perspective of the plaintiff. After all, the Plaintiffs say, it is not one particular infringer that materially harms its business interests, but instead the "occurrence" of a "swarm" of infringers operating in similar ways at similar times. *Id.* at 3, *see Bose Corp.*, 2020 WL 814869 at *5 ("From the *plaintiff's perspective* (which is the appropriate perspective at the pleading stage) it is irrelevant whether the swarm [of infringers] is intentionally coordinated or simply a product of forces enabled by the internet.").

Although this argument is not without some appeal, the Court is not prepared to abandon the principle that similar conduct alone is insufficient to establish joinder of defendants. That would not only flout what courts in this district have "repeatedly recognized" over several decades, *Slep-Tone Entm't Co.*, 2013 WL 5748896 at *3, but

it would also render toothless the limits contained in Rule 20(a)(2), gutting the demand of a shared "transaction or occurrence" and replacing it with significantly more lenient standard requiring only that one defendant's alleged conduct merely resemble the alleged conduct of their co-defendants in time and manner. As a result, joinder would be permitted under Rule 20(a) even though none of its intended purposes—such as avoiding delay and expense where there is evidentiary overlap, *see Eclipse Mfg. Co. v. M and M Rental Center, Inc.*, 521 F. Supp. 2d 739, 744 (N.D. Ill. 2007)—would be served. Furthermore, it is difficult to fathom a principled basis for cabining such a rule to trademark-infringement cases, creating the potential for unintended consequences in how a wide range of cases are litigated.

Nevertheless, Plaintiffs submit that each parallel trademark infringer *necessarily* benefits from the others' presence—with each additional infringer, the argument goes, the likelihood that any one of them will be caught decreases—and thus they should each be considered as acting cooperatively as part of the same set of "transactions or occurrences." Pls.' Mem. in Supp. of Joinder at 8. Although it is conceivable that in *some* cases two independent infringers may uniquely and concretely benefit from the existence of each other, the Court cannot accept the Plaintiffs' sweeping suggestion for *all* cases and *all* defendants. Here too, the Plaintiffs' logic suffers from the absence of a limiting principle; in almost any context, given finite enforcement resources, the more people or entities that commit a violation, the less likely it is that any given violator will be caught.

Plaintiffs also invoke practical considerations to support their permissive reading of Rule 20. For one, they argue, foreign online retail infringers in trademark cases like this are unlikely to appear and, thus, unlikely to be prejudiced by joinder. *See* Pls.' Mem. in Supp. of Joinder at 11. Granted, this may be true at the liability stage; by failing to appear, a properly served defendant will be deemed liable by default whether or not they have been joined with other defendants. *See* Fed. R. Civ. P. 55(a).

But plaintiffs in such trademark cases typically pursue statutory damages against all of the many defaulting defendants, given the difficulty in calculating actual damages. *See Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693, 697–98 (7th Cir. 2009). And when a court is asked to award statutory damages en masse as to dozens, or even hundreds, of defendants in a single case, it deprives each defendant of a more tailored judgment. *See H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1048 (E.D. Wis. 2008) (noting that statutory damages under the Lanham Act are "meant to be tailored to the facts of the case at hand" with careful consideration of various "relevant analytical factors"); *Coach, Inc. v. Treasure Box, Inc.*, No. 3:11CV468, 2014 WL 888902, at *1–5 (N.D. Ind. Mar. 6, 2014) (deciding on an amount of statutory damages under the Lanham Act through diligently considering testimony, the awards issued in more than a dozen analogous cases, "the profits reaped by the infringer; the revenues lost by the plaintiff; the value of the trademarks; whether the infringing conduct was willful; the duration of the infringement; and the potential deterrent effect on the defendant and others"). For

this reason, joinder of alleged counterfeiters that lack any affiliation is hard to square with the "fundamental fairness" that is central to the Rule 20(a) inquiry. *Chavez v. Illinois State Police*, 251 F.3d 612, 632 (7th Cir. 2001).

Moving to their next argument, Plaintiffs, in a nod to judicial economy, suggest that this judicial district will be swamped with single-defendant trademark infringement cases unless they are permitted to join parallel infringers in one lawsuit. Pls.' Mem. in Supp. of Joinder at 12. But, if a defendant likely will not appear to contest such an individual lawsuit—as Plaintiffs claim—the cases would be far from a heavy lift for their assigned judges. What's more, increased docket activity seems an acceptable and easily surmountable burden to ensure a consistent application of Rule 20 and minimize prejudice to defendants, particularly when hundreds of thousands of dollars may be at stake. *See* 15 U.S.C. § 1117(c) (permitting plaintiffs, in cases of willful use of a counterfeit mark, to elect to recover statutory damages of up to $2,000,000 per counterfeit mark per type of goods sold).

The Court thus embraces the longstanding procedural tenet that joinder under Rule 20(a) cannot be premised solely on independent, parallel conduct. Instead, the plaintiff must show some additional cooperation, coordination, or relationship between each joined defendant. And, although conclusory assertions of such a link between defendants are insufficient, *cf. Arreola*, 546 F.3d at 797, a plaintiff can meet its burden at the pleading stage by coupling such assertions with specific factual allegations that indicate cooperation, coordination, or collusion. Examples of such facts include, *inter alia*, shared physical or email addresses, substantially

identical product descriptions or web pages, or (to import a concept from elsewhere in trademark law) websites that share a distinctive "look and feel," *see, e.g.*, *Conference Archives, Inc. v. Sound Images, Inc.*, No. 3:2006-76, 2010 WL 1626072, at \*4 (W.D. Pa. Mar. 31, 2010) (discussing, in the trade-dress context, the "look and feel" of a website, which includes technical elements such as colors, orientation, and code elements).

Of course, such facts will not definitively establish coordination or any other kind of relationship between the defendants; for instance, defendants with nearly identical product descriptions may in fact share no ties, with each simply copying the same description from elsewhere. *See Estée Lauder*, 334 F.R.D. at 188–89. But, at least at the pleading stage, plaintiffs need not allege facts that definitively establish a link between the defendants; they need only allege facts that plausibly establish such a link. *See reFX Audio Software Inc.*, 2014 WL 1293816, at \*7. And specific factual assertions consistent with a narrative of cooperation or other connection, viewed in the light most favorable to the plaintiff, are enough to achieve plausibility. *See generally Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020).

In the end, the Court will rely on its judgment and common sense to determine whether cooperation, coordination, or other ties have been plausibly alleged, *see Iqbal*, 556 U.S. at 679, and generic allegations that necessarily implicate large numbers of infringers will not pass muster. For instance, the fact that multiple defendants lack proper contact information on their websites, *see*

Pls.' Mem. in Supp. of Joinder at 1, suggests little by itself about possible ties between those defendants, instead hinting at what must be true for the vast majority of counterfeiters—that they hope not to be caught. Similarly, that the product descriptions of two defendants *lack* certain words or phrasing, *see id.*, is potentially probative only if such omissions are exceedingly uncommon among counterfeiters of the goods in question.

With these guideposts in mind, the Court turns to the facts here. While the Plaintiffs assert that the Defendants are "an interrelated group of counterfeiters acting in active concert," Compl. ¶ 28, they do not clearly put forth allegations that *each* Defendant has ties to *every other* Defendant. Moreover, much of what they do present is generic and would likely apply to counterfeiters at large, including the fact that none of the Defendants' websites include "credible information" regarding their physical addresses, *id.* ¶ 7. And although Plaintiffs aver that Defendants "are in constant communication with each other" on various chatting websites, based "[o]n information and belief," *id.* ¶ 26, they offer no facts from which the Court can infer such a relationship.

Indeed, Plaintiffs hedge and suggest that many of the Defendants are not in fact linked but were merely counterfeiting in a similar manner during the same period. *See* Pls.' Mem. in Supp. of Joinder at 8. Relatedly, while the Plaintiffs add that certain of the Defendants share unique identifiers, Plaintiffs also imply that many of the Defendants do not, *id.* at 8.

10

In short, the Court finds that Plaintiffs have not met their burden to show that joinder of every Defendant is proper in this case. Plaintiffs are given until July 17, 2020 to file an amended complaint that includes only those Defendants that are alleged to have coordinated, collaborated, or are otherwise connected with each other. Consistent with the principles articulated in this order, Plaintiffs must allege specific facts indicating ties between each Defendant, including shared, or substantially shared, identifiers that do not encompass a significant portion of either all e-commerce counterfeiters generally or all MAC counterfeiters specifically.

## IV.    Conclusion

For the foregoing reasons, the Court finds that the Defendants are not properly joined. Plaintiffs may attempt to cure this deficiency by filing an amended complaint no later than July 17, 2020.

ENTERED:  6/22/20

_____

John Z. Lee

United States District Court Judge

```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
2                              EASTERN DIVISION

3
   GOLD'S GYM LICENSING LLC,          )
4                                     )
                        Plaintiff,    )
5  -vs-                               )
                                      )
6  THE PARTNERSHIPS AND               )  Case No. 19 C 7446
   UNINCORPORATED ASSOCIATIONS        )
7  IDENTIFIED ON SCHEDULE "A",        )  Chicago, Illinois
                                      )  December 3, 2019
8                        Defendant.   )  11:19 a.m.

9
                          TRANSCRIPT OF PROCEEDINGS
10           BEFORE THE HONORABLE JOAN H. LEFKOW

11  APPEARANCES:

12  For the Plaintiff:    GREER, BURNS & CRAIN LTD.
                          BY:  MR. JUSTIN R. GAUDIO
13                        300 S. Wacker Drive
                          Suite 2500
14                        Chicago, IL  60606

15

16

17

18

19

20

21

22  Court Reporter:       KELLY M. FITZGERALD, CSR, RMR, CRR
                          Official Court Reporter
23                        United States District Court
                          219 South Dearborn Street, Room 1420
24                        Chicago, Illinois  60604
                          Telephone:  (312) 818-6626
25                        kmftranscripts@gmail.com
```

Case: 20-19-07-1874-06 Document #: 23-32 Filed: 03/09/20 Page 22 of 119 PageID #: 62350

1  (Proceedings heard in open court:)

2  THE CLERK:  19 C 7446, Gold's Gym v. The

3  Partnerships.

4  MR. GAUDIO:  Good morning, Your Honor.  Justin Gaudio

5  on behalf of plaintiff.

6  THE COURT:  Good morning.

7  So you're here asking for extension of the temporary

8  restraining order, and I -- it dawned on me that you haven't

9  told me why you can join all these defendants in one case.  So

10  I'll grant your motion, but I want you to submit a brief on

11  joinder between now and then.

12  MR. GAUDIO:  Sure.  We'll do that.  We expect to be

13  in for a preliminary injunction in two weeks, so we'll submit

14  a brief with that filing.

15  THE COURT:  All right.

16  MR. GAUDIO:  Thank you.

17  THE COURT:  So we'll give you 14 more days.  So the

18  brief should be in by -- could you do it in ten days, or like

19  give me a couple of days to look at it before?

20  MR. GAUDIO:  Sure.  Sure.

21  THE COURT:  So it would be 12 days, I guess.

22  MR. GAUDIO:  The end of next week, does that work?

23  THE COURT:  That's good.  Well, how about the 12th?

24  MR. GAUDIO:  That's fine.

25  THE COURT:  All right.

1           MR. GAUDIO:  Thank you.

2           THE COURT:  Good.

3      (Which were all the proceedings heard.)

4

5                       CERTIFICATE

6      I certify that the foregoing is a correct transcript from

7    the record of proceedings in the above-entitled matter.

8    */s/Kelly M. Fitzgerald*                *December 3, 2019*

9    _____        _____

10   Kelly M. Fitzgerald                    Date
     Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GOLD'S GYM LICENSING LLC, | Case No. 19-cv-07446 |
| Plaintiff, | |
| | **Judge Joan H. Lefkow** |
| v. | |
| | **Magistrate Judge Sunil R. Harjani** |
| OPERATORS OF DROPSHIPPING FAST SHIP STORE, et al., | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM ESTABLISHING THAT JOINDER IS PROPER

Plaintiff Gold's Gym Licensing LLC ("Gold's Gym" or "Plaintiff") submits the following supplemental brief in response to this Court's request at the December 3, 2019 hearing

### INTRODUCTION

Plaintiff filed this action to protect its U.S. trademark rights and consumers from China-ecommerce stores selling products using infringing and counterfeit versions of Plaintiff's federally registered trademarks ("Counterfeit Gold's Gym Products"). As part of a coordinated effort to sell Counterfeit Gold's Gym Products, Defendants use templates with common design elements that intentionally omit any contact information or other information for identifying Defendants. [34] at ¶ 25. Since no discovery has taken place and there are no reasonable means for learning the true names of Defendants, Schedule A to the Second Amended Complaint[1] lists seventy-five ecommerce Internet store seller aliases used by Defendants ("Seller Aliases"). Defendants in this case are not identifiable and cannot be differentiated.

---

[1] Plaintiff's Second Amended Complaint is being filed concurrently with this Memorandum.

Well-pleaded allegations in Plaintiff's Second Amended Complaint establish that Defendants are working in a similar manner and during the same time period to sell Counterfeit Gold's Gym Products, establishing a logical relationship supporting joinder. Joinder at this stage is consistent with hundreds of factually similar cases[2] and comports with the strongly encouraged policy of "entertaining the broadest possible scope of action consistent with fairness to the parties." *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966); s*ee also Weifang Tengyi Jewelry Trading Co. Ltd v. The Partnerships, et al*., No. 1:18-cv-04651 (N.D. Ill July 5, 2018) (unpublished) (Docket No. 150) ("[Plaintiff's] claims against [Defendants] rest in substantial part on the same legal and factual grounds as [Plaintiff's] claims against the other defendants, including that [Defendants] were involved in a counterfeiting network with the other defendants. Given the nature of [Plaintiff's] claims, joinder is proper under Civil Rule 20(a)(2)."); *Otter Products, LLC, et al. v. James Chen, et al.*, No. 16-cv-06807 (N.D. Ill. Aug. 31, 2016) (Shadur, J.) (allowing lawsuit to proceed against ecommerce Internet store operators using 107 seller aliases after supplemental briefing on joinder).[3] Importantly, such cases have proven effective at substantially reducing online counterfeiting and preventing consumer confusion.

---

[2] Similar cases against multiple ecommerce store seller aliases have been filed across the country for nearly a decade. *See, e.g. Farouk Systems, Inc. v. Eyou Int'l Trading Co., Ltd., et al.,* No. 4:10 CV 2672 (S.D. Tex. Aug. 2, 2010); *The North Face Apparel Corp., et al. v. Fujian Sharing Import & Export Ltd. Co., et al.,* No. 10 CIV 1630 (S.D.N.Y. Mar. 16, 2010); *Spin Master LTD. v. 21CCN, et al*., No. 18-cv-11086 (S.D.N.Y. Sept. 6, 2018); *Louis Vuitton Malletier v. aaalvshop.com, et al*., No. 19-cv-61986 (S.D. Fla. Nov. 21, 2019); *Volvo Car Corporation, et al. v. The Unincorporated Associations Identified in Schedule A*, No. 18-cv-00977 (E.D. Va. Feb. 6, 2019); *CCA and B, LLC v. Douyong toy, et al*., No. 19-cv-01851 (N.D. Ga. Apr. 25, 2019); *Airigan Solutions, LLC v. Abagail, et al*., No. 19-cv-00503 (W.D. Pa. Aug. 29, 2019); *Talavera Hair Products, Inc. v. Taizhou Yunsung Elec. Appliance Co., Ltd., et al*., No. 18-cv-00823 (S.D. Ca. Apr. 30, 2018), including hundreds of cases in the Southern District of New York and the Southern District of Florida. *See* Declaration of Justin R. Gaudio ("Gaudio Dec.") at ¶ 16.

[3] Gaudio Dec. at ¶ 17.

## I.     LEGAL STANDARD

### A.     Permissive Joinder Under Fed. R. Civ. P. 20(a)

The Supreme Court has stated that under the Federal Rules of Civil Procedure, "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *In re EMC Corp.*, 677 F.3d 1351, 1358 (Fed. Cir. 2012) (quoting *Gibbs*, 383 U.S. at 724). Above all, the Seventh Circuit has noted that the purpose of a liberal Rule 20(a) joinder requirement "is to enable economies in litigation." *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000).

As to the first prong of Fed. R. Civ. P. 20(a)(2), Courts have applied this "transaction or occurrence" requirement using a "case-by-case approach" based on a "flexib[le] . . . standard [that] enables the federal courts to promote judicial economy by permitting all reasonably related claims for relief by or against different parties to be tried in a single proceeding under the provisions of Rule 20." *In re EMC Corp.*, 677 F.3d at 1358. The Seventh Circuit has not fashioned a definitive standard for determining what constitutes a single transaction or occurrence. *See Bailey v. N. Trust Co.*, 196 F.R.D. 513, 515 (N.D. Ill. 2000) (explaining that "no hard and fast rules have been established" in this context). Similarly, the phrase "transaction or occurrence" is not defined in Rule 20(a); however, courts have looked to the similar "transaction or occurrence" test for compulsory counterclaims in Rule 13(a). *Mosley*, 497 F.2d at 1333; *PTG Nev., LLC v. Doe*, 2016 U.S. Dist. LEXIS 83546, at *7 (N.D. Ill. June 28, 2016). For the purposes of Rule 13(a), the Supreme Court has stated that "[t]ransaction is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Moore v. N.Y. Exch.*, 270 U.S. 593, 610 (1926); *see also Burlington N.R. Co. v. Strong*, 907 F.2d 707, 711 (7th Cir. 1990) (applying "logical relationship" test to determine whether the "transaction or occurrence" is the same for purposes of Rule 13(a)).

Factors considered by Courts in this District include whether the alleged conduct occurred during the same general time period, involved the same people and similar conduct. *Lozada v. City of Chicago*, 2010 U.S. Dist. LEXIS 89231, at *7 (N.D. Ill. Aug. 30, 2010). Other Circuits have applied the "logical relationship" test to interpret "same transaction or occurrence" as it appears in Rule 20(a) and found that "all reasonably related claims for relief by or against different parties" can be tried in a single proceeding. *Mosley*, 497 F.2d at 1333. Absolute identity of all events is unnecessary. *Id.*; *see also Alexander v. Fulton County,* 207 F.3d 1303, 1323 (11th Cir. 2000)).

### B. This Court Must Accept the Factual Allegations in Plaintiff's Second Amended Complaint as True

"In assessing whether the requirements of Rule 20(a)(2) are met, courts must accept the factual allegations in a plaintiff's complaint as true." *Desai v. ADT Sec. Services, Inc.*, 2011 U.S. Dist. LEXIS 77457, at *8 (N.D. Ill. July 18, 2011). A court must construe the complaint "in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences" in favor of the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The plaintiff must only put forth enough "facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's allegations. *Brooks v. Ross*, 578 F.3d 574, 581 (7th. Cir. 2009).

## II. WELL-PLEADED ALLEGATIONS ESTABLISH JOINDER

Plaintiff's well-pleaded allegations supporting joinder include:

- On information and belief, Defendants either individually or jointly operate one or more of the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Gold's Gym to learn Defendants' true identities and the exact interworking of their counterfeit network. [34] at ¶ 17.

4

- Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies.  [34] at ¶ 21.

- On information and belief, Defendants have engaged in fraudulent conduct when registering the Seller Aliases by providing false and/or misleading information to Internet based e-commerce platforms.   [34] at ¶ 23.

- On information and belief, Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Counterfeit Gold's Gym Products.  [34] at ¶ 24.

- Even though Defendants operate under multiple fictitious aliases, stores at the Seller Aliases share unique identifiers, such as design elements, similarities of the price, description of the goods offered for sale, and of the Counterfeit Gold's Gym Products themselves offered for sale.  [34] at ¶ 25.  For example, ecommerce Internet stores at the Seller Aliases include notable common features, including use of the same accepted payment methods, check-out methods, meta data, lack of contact information, identically or similarly priced items and volume sales discounts, the same incorrect grammar and misspellings, and the use of the same text and images.  *Id*.  Additionally, Counterfeit Gold's Gym Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Gold's Gym Products were manufactured by and come from a common source and that Defendants are interrelated.  *Id*.

- On information and belief, Defendants use templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other Seller Aliases they operate or use.  [34] at ¶ 26.

5

- On information and belief, Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn, kaidianyo.com and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits. [34] at ¶ 27.

- On information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products using infringing and counterfeit versions of the Gold's Gym Trademarks in the same transaction, occurrence, or series of transactions or occurrences. [34] at ¶ 29.

Plaintiff's specific factual allegations that Defendants are working in a similar manner and during the same time period to sell Counterfeit Gold's Gym Products collectively show a logical relationship supporting joinder. *See In re EMC Corp.*, 677 F.3d at 1359-60.

To support Plaintiff's allegations, each Seller Alias was individually reviewed and analyzed[4] to verify that it was selling Counterfeit Gold's Gym Products and included unique identifiers.[5] For example, a well-pleaded fact supporting joinder is that on information and belief, Defendants either individually or jointly operate one or more of the Seller Aliases listed in Schedule A. [34] at ¶ 17. A well-pleaded fact is that the Seller Aliases lack any contact

---

[4] When able to identify the operator with reasonable certainty, Plaintiff's counsel has brought action against that operator in a single case. *See, e.g., Oakley, Inc. v. Zapals Corp. Ltd.*, No. 18-cv-07530 (N.D. Ill. Feb. 6, 2019) (case brought by Plaintiff's counsel against operator of website zapals.com); *Eye Safety Systems, Inc. v. Shenzhen Vakind Technology Co., Ltd.*, No. 19-cv-00098 (N.D. Ill. May 13, 2019) (case brought by Plaintiff's counsel against operator of website newfrog.com); *Oakley, Inc. v. TMart Limited*, No. 19-cv-04330, No. 19-04330 (N.D. Ill. Aug. 20, 2019).

[5] Plaintiff's allegations are referring to unique identifiers, not just general common elements found on e-commerce stores. The Court should avoid speculating that the unique identifiers are a coincidence and that Defendants are merely acting similarly, but independent of each other. The Court must construe the complaint "in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences" in favor of the plaintiff. *Tamayo*, 526 F.3d at 1081.

information in the storefronts or product listings and that Defendants engaged in fraudulent conduct when registering the Seller Aliases by providing false and/or misleading information to Internet based e-commerce platforms. [34] at ¶¶ 23, 25–26. None of the Seller Aliases have contact information nor do they correspond to any type of identifiable entity. Gaudio Dec. at ¶ 2. On information and belief, Defendants utilize websites such as sellerdefense.cn, kaidianyo.com and kuajingvs.com to implement strategies for operating under multiple Seller Aliases without being detected. Gaudio Dec. at ¶ 18. Seller Aliases Shop5371151 Store and Shop5375102 Store have both been AliExpress members since August 30, 2019, the same date. Gaudio Dec. at ¶ 4. Another well-pleaded fact is that the ecommerce stores at the Seller Aliases have the same design elements and descriptions of the goods offered for sale. [34] at ¶ 25. The product listings for the Seller Aliases Shop 526089 Store, Shop 5371151 Store, and Shop 5375102 Store have virtually identical design elements. Gaudio Dec. at ¶ 4. Another well-pleaded fact is that the stores at the Seller Aliases use the same text and images and that Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. [34] at ¶ 21. Seller Aliases Shop3243044 Store, Shop5372251 Store, and Warm Hoodie Store, for example, use identical product titles. Gaudio Dec. at ¶ 6. The product listings for the Seller Aliases Travel 2019 Store, Outdoor Road Explore Store, DoSports Store, and YK Outdoor Store have the same product images. *Id*. at ¶ 5. The Seller Aliases China-X Store and KT discount Store also use the same image in the product listing. *Id*. at ¶ 7. The product listings for Seller Aliases Shop5364087 Store and Shop5369208 Store have the same product image, product title and price. *Id.* at ¶ 3.

Well-pleaded facts in Plaintiff's Second Amended Complaint establish that Defendants are an interrelated group of counterfeiters acting in active concert, and are knowingly and willfully manufacturing, importing, distributing, offering for sale, and selling products bearing counterfeit

versions of the GOLD'S GYM Trademarks in the same transaction, occurrence, or series of transactions or occurrences. These facts must be taken as true and support a finding that joinder is proper.

## III. ATTEMPTS TO DEFINE BOUNDARIES FOR A SINGLE TRANSACTION OR OCCURRENCE ARE ARBITRARY AND UNRELIABLE

As explained above, there is no controlling Seventh Circuit authority defining a single transaction or occurrence for purposes of joinder. Attempts to narrowly define what constitutes a "single transaction or occurrence" have proven to be arbitrary and unreliable. For example, in *SanDisk LLC v. tinabeet, et al.*, No. 18-cv-08335 (N.D. Ill. Mar. 8, 2019), the Court[6] found that joinder of two defendants was proper only "because of the date/time stamp within minutes of each other and the almost identical (except 1 digit) return-address labels." *SanDisk LLC v. tinabeet, et al.*, No. 18-cv-08335 (N.D. Ill. Mar. 8, 2019) (Docket Entry 30). However, the two defendants in that case ended up not being related and one of the defendants operated another seller alias that was severed into a different case. Gaudio Dec. at ¶ 8. This resulted in two separate cases with the same parties instead of a single case. In addition to this example, Plaintiff's counsel has encountered dozens of other situations where seller aliases lack narrow, specific identifiers but are commonly owned. *Id.* at ¶ 9. Moreover, another well pleaded allegation is that, on information and belief, Defendants are in constant communication with each other and regularly participate in chat rooms and through websites such as those listed above regarding tactics for evading shut down and detection. [34] at ¶ 27. Defendants would quickly evolve in a coordinated fashion to avoid what a court found as a "single transaction or occurrence" to frustrate enforcement efforts.

---

[6] The Court in *SanDisk LLC* is the only court in this District that takes such a narrow view on joinder.

## IV.    WELL-PLEADED ALLEGATIONS PERTAINING TO HIGH LEVEL MARKET TRENDS AND COORDINATION FURTHER ESTABLISH JOINDER

As illustrated above, Plaintiff's well-pleaded allegations establish that ecommerce counterfeiters like Defendants have the following profile: (1) a non-descriptive seller alias that does not correspond to any legal entities; (2) nonexistent or false contact information; and (3) unique commonalities with other seller aliases offering for sale counterfeit products. However, Defendants in this case, and other similar cases, are part of a coordinated effort to sell Counterfeit Gold's Gym Products and are constantly communicating and developing tactics for operating multiple accounts, evading detection, and keeping informed regarding pending litigation and potential new lawsuits. As a result, it is not possible to link all or clusters of seller aliases together using arbitrary commonalities. Likewise, Plaintiffs are not required to show and provide evidence that each of the Seller Aliases is commonly owned at the pleading stage. Rather, Plaintiffs are only required to plead allegations, which must be accepted as true, that Defendants are properly joined, meaning that any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences. Fed. R. Civ. P. 20; *Brooks v. Ross*, 578 F.3d 574, 581 (7th. Cir. 2009).

High level, observable market trends show that ecommerce counterfeiters fitting the above profile have evolved in a coordinated fashion in response to Plaintiff's, and other brands', enforcement efforts. For example, the counterfeiters changed as a group the way they market and advertise a certain type of product in response to brand owners' enforcement efforts. When Estée Lauder Cosmetics Ltd. and Make-Up Art Cosmetics Inc. filed a case against ecommerce counterfeiters in 2016, many counterfeiters were using their MAC trademarks in their product listings. Gaudio Dec. at ¶ 19. In response to these enforcement efforts, the counterfeiters stopped using the MAC trademarks in the product listing images. *Id*. Instead, a generic product is shown

9

in the listing, and a product bearing a counterfeit version of the MAC trademarks is shipped to the consumer. *Id.*

There are dozens of similar examples for other brands represented by Plaintiff's counsel that confirm coordination. In another example, counterfeiters stopped selling specific types of products in response to enforcement efforts, even though the market demand for that product has not changed. In 2017, counterfeit wall mount brackets bearing the BOSE trademarks were a common item sold by ecommerce counterfeiters. Gaudio Dec. at ¶ 20. Following Bose Corporation's enforcement efforts, the number of counterfeit wall mount brackets bearing the BOSE trademarks offered for sale sharply dwindled. *Id.* Similarly, "goat skull rings" bearing counterfeits of the CHROME HEARTS trademarks were a commonly counterfeited item. *Id.* at ¶ 21. Following Chrome Hearts' enforcement efforts, the "goat skull rings" essentially disappeared from the marketplace platforms eBay.com, Aliexpress.com, and Wish.com. *Id.* However, when Chrome Hearts' investigators expanded their scope to include listings on Amazon.com, they found numerous "goat skull rings," indicating that these products did not disappear on the other platforms due to decreased demand, but rather to avoid enforcement. *Id.*

In 2018, Plaintiff's counsel filed a case on behalf of Audi AG against online counterfeiters offering for sale "ghost" light projectors, who were prominently using the registered AUDI word mark and/or logo in the product listings. *See Volkswagen AG, et al. v. DXZ Official Store, et al.*, No. 18-cv-06611 (N.D. Ill. Dec. 13, 2018). After this case specifically directed to "ghost" light projectors, ecommerce counterfeiters stopped using the registered AUDI word mark and/or logo in the product listing, instead obscuring with "LOGO." Gaudio Dec. at ¶ 22.

Coordination between ecommerce stores like those operated under the Seller Aliases is also evidenced by keywords used by ecommerce counterfeiters. As shown by third-party websites,[7] ecommerce stores like the Seller Aliases use specific wording in the product description, written in English, that is designed to ensure that the product can be easily found by a search engine without calling attention to the brand name. *See e.g., River Light V, L.P. v. Zhangyali*, 2016 U.S. Dist. LEXIS 111301, at *9 (N.D. Ill. Aug. 22, 2016) (ecommerce store using the words "double T" and "branded" but not "Tory Burch.").

There are market-wide patterns of specific keywords used by ecommerce counterfeiters, who then stop using those keywords in response to enforcement efforts. For example, counterfeiters previously used the keywords "Crow Hearts" in product titles for counterfeit Chrome Hearts products, but do not anymore. Gaudio Dec. at ¶ 23.

In another example, the keywords "spring ring" previously led to results showing many rings bearing counterfeit BVLGARI trademarks. Gaudio Dec. at ¶ 24. Now, a search for the keywords "spring ring" shows results for rings that do not bear counterfeit BVLGARI trademarks, but are otherwise visually identical to genuine Bvlgari rings. *Id.* Finally, the keywords "round bow" flats previously led to results for shoes bearing the TORY BURCH trademarks, but do not anymore. *Id.* at ¶ 25.

In sum, there is no other explanation for the above high level, observable market trends between ecommerce counterfeiters fitting the above profile other than a coordinated effort between

---

[7] *See, e.g., How to find brands and codes on Aliexpress – Hidden Offer*, Alimaniac, alimaniac.com/aliexpress-articles/brand-codes-coupons-aliexpress-tricks-find-replica; *How to find brands with Aliexpress Brand Finder List 2018*, Trust Sellers, trustsellers.com/how-to-find-brands-on-aliexpress-brand-finder; *Guide to Finding Branded Items Replicas on AliExpress 2019 (Updated December)*, Best Chinese Replicas, bestchinesereplicas.com/guide-branded-items-replicas-aliexpress-2019/; *How to find Original Brands in AliExpress + Chinese Alternatives – Complete Guide*, Alix Blog, alixblog.com/en/find-brands-aliexpress/.

an interrelated group of counterfeiters working in active concert in the same transaction, occurrence, or series of transactions or occurrences. Plaintiff's well-pleaded allegations, which must be accepted as true, establish that joinder is proper.

## V.    WELL-PLEADED ALLEGATIONS SATISFY FED. R. CIV. P. 20(A)(2)(B)

Plaintiff's well-pleaded allegations also satisfy Fed. R. Civ. P. 20(a)(2)(B), which provides that joinder is proper if "any question of law or fact common to all defendants will arise in the action." In this case, each of the Defendants is alleged to be knowingly and willfully selling, offering for sale, distributing, and/or advertising products using counterfeit versions of the GOLD'S GYM Trademarks. [34] at ¶ 29. In addition, the methods Plaintiff will use to investigate, uncover, and collect evidence about any infringing activity will be the same or similar for each Defendant. While each Defendant may later present different factual evidence to support individual legal defenses, prospective factual distinctions do not defeat the commonality in facts and legal claims that support joinder under Fed. R. Civ. P. 20(a)(2)(B) at this stage in the litigation. *See First Time Videos, LLC v. Does 1–500*, 276 F.R.D. 241, 251–52 (N.D. Ill. 2011) (Castillo, J.).

## VI.    JOINDER IS CONSISTENT WITH FAIRNESS, CONVENIENCE AND JUDICIAL ECONOMY

Joinder at this stage also serves the important interests of convenience and judicial economy, leading to a just, speedy, and inexpensive resolution for Plaintiff, Defendants and this Court. Joinder does not create any unnecessary delay nor does it prejudice any party. On the other hand, severance is likely to cause delays and prejudice Plaintiff and Defendants alike. Defendants may be required to defend identical, concurrent lawsuits if severed prematurely into separate cases (which is exactly what happened in *SanDisk* above). Additionally, the Federal Rules of Civil Procedure only apply to the extent that they "affect any party's substantial rights." Fed. R. Civ. P. 61; *see also Coach, Inc. v. 1941 Coachoutletstore.com*, 2012 U.S. Dist. LEXIS 1311, at *12 (E.D.

Va. Jan. 5, 2012). Plaintiff anticipates that Defendants will be individually subject to default, and "there is no prejudice to any defaulting defendant, whose liability may be established upon default irrespective of the presence of any other defendant." *Id.*

Further, the resources of the Court, other judges in this District, and other Districts will be substantially taxed if Plaintiff's claims against Defendants are severed into multiple separate lawsuits. Importantly, such impediments would also reduce the ability of Plaintiff and other brand owners to effectively protect their trademarks in a cost-effective manner and to prevent consumer confusion. Online counterfeiting is a rampant and widespread issue for brand owners because in recent years marketplace platforms have emphasized opening and marketing their services to Chinese sellers seeking to sell directly to U.S. consumers. Gaudio Dec. at ¶ 11. In the 2018 fiscal year alone, the U.S. government seized counterfeit goods worth more than $1.3 billion based on MSRP of genuine goods, and China and Hong Kong together accounted for more than 87 percent of all seizures. *Id.* at ¶ 12. The breadth and variety of counterfeit products sold on these marketplace platforms make it difficult and expensive for brand owners to effectively address the issue. *Id.* at ¶ 13. For example, one major U.S.-based company provided the United States Senate Finance Committee with evidence showing that 72 percent of products sold through online marketplaces and marketed as genuine products were in fact counterfeit. *Id.* Additionally, counterfeiters regularly create new seller aliases to continue selling online. The leader of Alibaba's Anti-Counterfeiting Special Task Force noted that "[a]fter we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online … Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed

cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us."  Gaudio Dec. at ¶ 26.

Cases like the present case are one of the few effective mechanisms for stopping and deterring online counterfeiting.  For example, court filings show that Luxottica Group, S.p.A. (owner of the Oakley and Ray-Ban brands) reduced the number of counterfeit ecommerce stores from over 30,000 in 2016 to only 2,843 so far in 2019.  Gaudio Dec. at ¶ 10.  In sum, well-pleaded allegations establish joinder.  Plaintiff (as well as other brand owners) would be severely prejudiced if it was required to file separate lawsuits simply because Defendants registered a particular Internet Store using a different Seller Alias.  *Shambour v. Carver County*, 2014 U.S. Dist. LEXIS 110267, at *17 (D. Minn. Aug. 11, 2014) ("In the matter at hand, joinder is proper because the alleged acts similarly support a larger allegation of a systemic problem and the Court is persuaded that keeping Shambour's claims together is not only permissible but preferable.").

## CONCLUSION

For the reasons set forth above, joinder of Defendants is proper.  This approach is also consistent with other courts and comports with the strongly encouraged policy of entertaining the broadest possible scope of action consistent with fairness to the parties.

Dated this 12th day of December 2019.         Respectfully submitted,

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Allyson M. Martin
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
amartin@gbc.law

*Attorneys for Plaintiff Gold's Gym Licensing LLC*

14

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 12th day of December 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, I will electronically publish the documents on a website and I will send an e-mail to the e-mail addresses identified in Exhibit 4 to the Declaration of Jamie Wolfe and any e-mail addresses provided for Defendants by third parties that includes a link to said website.

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Allyson M. Martin
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
amartin@gbc.law

*Counsel for Plaintiff Gold's Gym Licensing LLC*

15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GOLD'S GYM LICENSING LLC,

            Plaintiff,

v.

OPERATORS OF DROPSHIPPING FAST
SHIP STORE, et al.,

            Defendants.

Case No. 19-cv-07446

**Judge Joan H. Lefkow**

**Magistrate Judge Sunil R. Harjani**

## PRELIMINARY INJUNCTION ORDER

THIS CAUSE being before the Court on Plaintiff Gold's Gym Licensing LLC's ("Gold's Gym" or "Plaintiff") Motion for Entry of a Preliminary Injunction, and this Court having heard the evidence before it hereby GRANTS Plaintiff's Motion for Entry of a Preliminary Injunction in its entirety against the defendants identified in Schedule A to the Second Amended Complaint and attached hereto (the "Defendants") and using at least the seller aliases identified in Schedule A (the "Seller Aliases").

THIS COURT HEREBY FINDS that it has personal jurisdiction over the Defendants since the Defendants directly target their business activities toward consumers in the United States, including Illinois. Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Seller Aliases through which Illinois residents can purchase products using infringing and counterfeit versions of the GOLD'S GYM Trademarks (a list of which is included in the below chart).

| REGISTRATION NUMBER | REGISTERED TRADEMARK | INTERNATIONAL CLASSES |
|---|---|---|
| 1,402,824 | GOLD'S | For: Athletic clothing, namely, shirts, shorts, tank tops, warm up suits, including pants and jackets, and posing trunks in class 025. |
| 1,214,046 | GOLD'S GYM | For: Athletic clothing-namely, shirts, shorts, tank tops, warm up suits, including pants and jackets, and posing trunks in class 025. |
| 2,053,953 | GOLD'S GYM | For: Weight lifting belts, weight lifting gloves, weight belt straps and wrist straps in class 028. |
| 2,068,400 | GOLD'S GYM | For: All purpose sport bags, tote bags and knapsacks in class 018.<br><br>For: Sweat bands and hats in class 025. |
| 5,017,462 | GOLD'S GYM | For: Electric food blender in class 007. |
| 5,140,099 | GOLD'S GYM | For: Containers, namely, bottles with internal agitators for mixing ingredients and shaker cups, sold empty; containers, namely, bottles with non-electric internal agitators for mixing ingredients, for beverages, liquid foods, and/or powdered foods, sold empty; non-electric food and beverage blenders and blender agitators; containers, namely, plastic or aluminum containers for use with beverages, liquid foods, dry and/or powdered foods, sold empty; insulated beverage containers, sold empty; drinking bottles for sports, sold empty; beverage sports bottles, sold empty; water bottles, sold empty; plastic water bottles, sold empty; aluminum water bottles, sold empty; cups; plastic water bottle holders and attached carabiner clip sold as a unit in class 021. |
| 5,549,133 | GOLD'S GYM | For: Footwear in class 025. |
| 4,645,424 | GOLD'S GYM EXPRESS | For: Clothing, namely, shirts, tank tops in class 025. |

2

| 5,142,058 | GOLD'SFIT | For: Clothing, namely, shirts and hats in class 025. |
|---|---|---|
| 2,062,562 |  | For: Cloth and synthetic goods, namely, all purpose sport bags, tote bags and knapsacks in class 018. |
| 3,249,465 |  | For: Clothing, namely shirts, tank tops, shorts, trunks, warm-up suits, pants, jackets, shoes, sweat bands and hats in class 025. |
| 3,296,366 |  | For: Clothing, namely shirts, tank tops, shorts, trunks, warm-up suits, pants, jackets, shoes, sweat bands and hats in class 025.<br><br>For: Gymnasium, exercise and fitness equipment, namely, weightlifting machines, exercise machines, exercise weights, weightlifting benches, exercise benches, exercise balls, balance boards, exercise treadmills, stationary bicycles, elliptical exercise machines, dumbbells, barbells in class 028.<br><br>For: Gymnasium services; fitness services, namely physical fitness consultation and instruction in class 041. |
| 5,017,465 |  | For: Electric food blender in class 007. |
| 5,140,101 |  | For: Containers, namely, bottles with internal agitators for mixing ingredients and shaker cups, sold empty; containers, namely, bottles with non-electric internal agitators for mixing ingredients, for beverages, liquid foods, and/or powdered foods, sold empty; non-electric food and beverage blenders and blender agitators; containers, namely, plastic or aluminum containers for use with beverages, liquid foods, dry and/or powdered foods, sold empty; insulated beverage |

3

| | | |
|---|---|---|
| | | containers, sold empty; drinking bottles for sports, sold empty; beverage sports bottles, sold empty; water bottles, sold empty; plastic water bottles, sold empty; aluminum water bottles, sold empty; cups; plastic water bottle holders and attached carabiner clip sold as a unit in class 021. |
| 2,002,430 |  | For: Athletic clothing, namely shirts, shorts, tank tops, warm up suits, pants, jackets, posing trunks, sweatshirts, and hats in class 025. |
| 4,645,427 |  | For: Clothing, namely, shirts, tank tops in class 025. |
| 1,968,266 |  | For: Athletic clothing, namely shirts, shorts, tank tops, warm-up suits, including pants, jackets and posing trunks in class 025. |
| 4,912,864 |  | For: Athletic clothing, namely, shirts, shorts, tank tops, warm up suits, including pants and jackets, sweatshirts, hoodies, t-shirts, long sleeved shirts, jerseys, polo shirts and posing trunks; sweat bands and hats in class 025. |
| 5,017,464 |  | For: Electric food blender in class 007. |
| 5,227,382 |  | For: Footwear in class 025. |

4

| | | For: Containers, namely, bottles with internal agitators for mixing ingredients and shaker cups, sold empty; containers, namely, bottles with non-electric internal agitators for mixing ingredients, for beverages, liquid foods, and/or powdered foods, sold empty; non-electric food and beverage blenders and blender agitators; containers, namely, plastic or aluminum containers for use with beverages, liquid foods, dry and/or powdered foods, sold empty; insulated beverage containers, sold empty; drinking bottles for sports, sold empty; beverage sports bottles, sold empty; water bottles, sold empty; plastic water bottles, sold empty; aluminum water bottles, sold empty; cups; plastic water bottle holders and attached carabiner clip sold as a unit in class 21. |
|---|---|---|
| 5,140,100 |  | |

THIS COURT FURTHER FINDS THAT all defendants are properly joined under Federal Rule of Civil Procedure 21(a)(2), which permits defendants to be joined in a single action if "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). "Although 'transaction or occurrence' is not defined in Rule 20(a), courts interpret this term as 'comprehend[ing] a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Lozada* v. *City of Chi.*, No. 10 C 1019, 2010 WL 3487952, at *2 (N.D. Ill. Aug. 30, 2010). "Courts determine the logical relatedness of separate occurrences by considering a variety of factors, including: 'whether the alleged conduct occurred during the same general time period, involved the same people and similar conduct . . . .'" *Id.* (citations omitted).

GOLD'S GYM alleges that defendants register their stores anonymously and thus typically cannot be identified without court process. (Dkt. 34 ¶ 17.) But all defendants' stores in this case "share unique identifiers," plausibly suggesting that they comprise a single "counterfeiting operation." (Dkt. 34 ¶ 3.) These include "design elements, similarities of the price, description of the goods offered for sale, . . . same accepted payment methods, check-out methods, meta data, lack of contact information, identically or similarly priced items and volume sales discounts, the same incorrect grammar and misspellings, and the use of the same text and images." (*Id.* ¶ 25.) GOLD'S GYM thus alleges that "Defendants use templates with common design elements" and "are in constant communication with each other and regularly participate in . . . chat rooms and through websites . . . regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits." (*Id.* ¶¶ 26–67.) GOLD'S GYM therefore concludes that "Defendants are an interrelated group of counterfeiters working in active concert . . . ." (*Id.* ¶ 29.) Together, these allegations establish that the claims against the defendants are "logically related," and the claims therefore arise out of a single transaction under Rule 20(a). The claims also involve common questions of law and fact, because all defendants are accused of willfully infringing Gold's trademark through online counterfeiting.

THIS COURT FURTHER FINDS that injunctive relief previously granted in the Temporary Restraining Order ("TRO") should remain in place through the pendency of this litigation and that issuing this Preliminary Injunction is warranted under Federal Rule of Civil Procedure 65. Evidence submitted in support of this Motion and in support of Gold's Gym's previously granted Motion for Entry of a Temporary Restraining Order establishes that Gold's Gym has demonstrated a likelihood of success on the merits; that no remedy at law exists; and that Gold's Gym will suffer irreparable harm if the injunction is not granted. Specifically, Gold's Gym

has proved a *prima facie* case of trademark infringement because (1) the GOLD'S GYM Trademarks are distinctive marks and are registered with the U.S. Patent and Trademark Office on the Principal Register, (2) Defendants are not licensed or authorized to use any of the GOLD'S GYM Trademarks, and (3) Defendants' use of the GOLD'S GYM Trademarks is causing a likelihood of confusion as to the origin or sponsorship of Defendants' products with Gold's Gym Furthermore, Defendants' continued and unauthorized use of the GOLD'S GYM Trademarks irreparably harms Gold's Gym through diminished goodwill and brand confidence, damage to Gold's Gym's reputation, loss of exclusivity, and loss of future sales. Monetary damages fail to address such damage and, therefore, Gold's Gym has an inadequate remedy at law. Moreover, the public interest is served by entry of this Preliminary Injunction to dispel the public confusion created by Defendants' actions.

As such, this Court orders that:

1. Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be preliminarily enjoined and restrained from:

   a. using the GOLD'S GYM Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Gold's Gym product or not authorized by Gold's Gym to be sold in connection with the GOLD'S GYM Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any product as a genuine Gold's Gym product or any other product produced by Gold's Gym, that is not Gold's

Gym's or not produced under the authorization, control or supervision of Gold's Gym and approved by Gold's Gym for sale under the GOLD'S GYM Trademarks;

c.  committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Gold's Gym, or are sponsored by, approved by, or otherwise connected with Gold's Gym;

d.  further infringing the GOLD'S GYM Trademarks and damaging Gold's Gym's goodwill; and

e.  manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Gold's Gym, nor authorized by Gold's Gym to be sold or offered for sale, and which bear any of Gold's Gym's trademarks, including the GOLD'S GYM Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof.

2.  Defendants and any third party with actual notice of this Order who is providing services for any of the Defendants, or in connection with any of the Seller Aliases or other seller aliases operated by Defendants, including, without limitation, any online marketplace platforms such as iOffer, eBay, AliExpress, Alibaba, Amazon, Wish.com, and Dhgate web hosts, sponsored search engine or ad-word providers, credit cards, banks, merchant account providers, third party processors and other payment processing service providers, and Internet search engines such as Google, Bing and Yahoo (collectively, the "Third Party Providers") shall, within five (5) business days after receipt of such notice, provide to Gold's Gym expedited discovery, including copies of all documents and records in such person's or entity's possession or control relating to:

8

a. the identities and locations of Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, including all known contact information, including any and all associated e-mail addresses;

b. the nature of Defendants' operations and all associated sales, methods of payment for services and financial information, including, without limitation, identifying information associated with the Seller Aliases and Defendants' financial accounts, as well as providing a full accounting of Defendants' sales and listing history related to their respective Seller Aliases;

c. any of the Seller Aliases;

d. any other seller aliases registered by Defendants; and

e. any financial accounts owned or controlled by Defendants, including their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, including such accounts residing with or under the control of any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, Inc. ("PayPal"), Alipay, Amazon Pay, Wish.com, or other merchant account providers, payment providers, third party processors, and credit card associations (e.g., MasterCard and VISA).

3. Upon Gold's Gym's request, those in privity with Defendants and those with notice of the injunction, including the Third Party Providers as defined in Paragraph 2, shall within five (5) business days after receipt of such notice:

a. disable and cease providing services being used by Defendants, currently or in the future, to engage in the sale of goods using the GOLD'S GYM Trademarks;

9

b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the GOLD'S GYM Trademarks; and

c. take all steps necessary to prevent links to the Seller Aliases identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Seller Aliases from any search index.

4. Defendants and any persons in active concert or participation with them who have actual notice of this Order shall be temporarily and preliminarily restrained and enjoined from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

5. Any Third Party Providers, including PayPal, Alipay, Wish.com, and Amazon Pay, shall, within two (2) business days of receipt of this Order, for any Defendant or any of Defendants' Seller Aliases:

a. locate all accounts and funds connected to Defendants or the Seller Aliases, including, but not limited to, any financial accounts connected to the information listed in Schedule A hereto, the e-mail addresses identified in Exhibit 4 to the Declaration of Jamie Wolfe, and any e-mail addresses provided for Defendants by third parties; and

b. restrain and enjoin any such accounts or funds that are not U.S.-based from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

6. Gold's Gym may provide notice of these proceedings to Defendants, including service of process pursuant to Fed. R. Civ. P. 4(f)(3), by electronically publishing a link to the Second Amended Complaint, this Order and other relevant documents on a website and by sending

an e-mail to the e-mail addresses identified in Exhibit 4 to the Declaration of Jamie Wolfe and any e-mail addresses provided for Defendants by third parties that includes a link to said website. The Clerk of the Court is directed to issue a single original summons in the name of "OPERATORS OF DROPSHIPPING FAST SHIP STORE and all other Defendants identified in the Second Amended Complaint" that shall apply to all Defendants. The combination of providing notice via electronic publication and e-mail, along with any notice that Defendants receive from payment processors, shall constitute notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and afford them the opportunity to present their objections.

7.  Plaintiff's Amended Complaint [10] and Exhibit 1 and 2 thereto [10-1], [10-2], Schedule A to the Complaint [9] and the Amended Complaint [10-3], Exhibit 4 to the Declaration of Jamie Wolfe [15], and the TRO [26] are unsealed.

8.  Any Defendants that are subject to this Order may appear and move to dissolve or modify the Order on two days' notice to Gold's Gym or on shorter notice as set by this Court.

9.  The $10,000 bond posted by Gold's Gym shall remain with the Court until a Final disposition of this case or until this Preliminary Injunction is terminated.

IT IS SO ORDERED.

DATED: December 18, 2019

_Joan H. Lefkow_

Joan H. Lefkow
United States District Judge

**Gold's Gym Licensing LLC v. Operators of DROPSHIPPING FAST SHIP STORE, et al. – Case No. 19-cv-7446**

# Schedule A

| No. | Seller Alias | No. | Seller Alias |
|---|---|---|---|
| 1 | dropshipping fast ship Store | 2 | fanfangxin Store |
| 3 | healthier Store | 4 | KAOSS Store |
| 5 | KT discount Store | 6 | MEUGLEMENT.NO888 Store |
| 7 | Mkass Lovers Clothes Store | 8 | Motion of thermal mass Store |
| 9 | Shanghai Dunyi Network Technology Co., Ltd. | 10 | Shop3566022 Store |
| 11 | Shop5372251 Store | 12 | Warm Hoodie Store |
| 13 | zhzh Store | 14 | zuoxiangru militarysport store |
| 15 | 2018fashionmen store | 16 | a to z store |
| 17 | Awesome Gym Store | 18 | bdlj888 store |
| 19 | China-X Store | 20 | DoSports Store |
| 21 | Fun Outdoor Store | 22 | Gym Fitness person Store |
| 23 | man heaven store | 24 | mapleking store |
| 25 | my stylish store | 26 | No Limits Fitness Store |
| 27 | Outdoor Road Explore Store | 28 | Romantic Li Store |
| 29 | Shop2128230 Store | 30 | Shop3083071 Store |
| 31 | Shop3243044 Store | 32 | Shop4033013 Store |
| 33 | Shop4516033 Store | 34 | Shop5085105 Store |
| 35 | Shop5146048 Store | 36 | Shop5217038 Store |
| 37 | Shop5262089 Store | 38 | Shop5269006 Store |
| 39 | Shop5337006 Store | 40 | Shop5364087 Store |
| 41 | Shop5369208 Store | 42 | Shop5371132 Store |
| 43 | Shop5371151 Store | 44 | Shop5372161 Store |
| 45 | Shop5375102 Store | 46 | Shop5376137 Store |
| 47 | shop5377083 store | 48 | Shop5383067 Store |
| 49 | STAY HIGH Store | 50 | Sunshiny Sister Store |
| 51 | the gym fighting beast store | 52 | TIAN DOU-2 Store |
| 53 | Travel 2019 Store | 54 | Trend Gym Store |
| 55 | USDH WATCHES Store | 56 | wanyonghong2 store |
| 57 | We Are famlily Store | 58 | YK Outdoor Store |
| 59 | Yuntobo Store | 60 | ywsnhmy official store |
| 61 | Alivegear | 62 | Soft-T |
| 63 | WendyShop | 64 | 24hbabyonline-dress |
| 65 | Ben's outdoor | 66 | cairuying |
| 67 | FllStore | 68 | JzChen |
| 69 | Metrosexual man Clothing Co. | 70 | sign |

| No. | Seller Alias |
|-----|--------------|
| 71 | smithereens |
| 73 | Sports Center |
| 75 | Yeboutique |

| No. | Seller Alias |
|-----|--------------|
| 72 | Sport_Guy |
| 74 | wang Fashion jewelry |
| | |

| No. | Seller Alias URL |
|-----|------------------|
| 1 | aliexpress.com/store/3259004 |
| 3 | aliexpress.com/store/343973 |
| 5 | aliexpress.com/store/3218047 |
| 7 | aliexpress.com/store/1900564 |
| 9 | aliexpress.com/store/807158 |
| 11 | aliexpress.com/store/5372251 |
| 13 | aliexpress.com/store/2780110 |
| 15 | aliexpress.com/store/4438035 |
| 17 | aliexpress.com/store/5079137 |
| 19 | aliexpress.com/store/4310022 |
| 21 | aliexpress.com/store/5021156 |
| 23 | aliexpress.com/store/2523011 |
| 25 | aliexpress.com/store/2659045 |
| 27 | aliexpress.com/store/4690051 |
| 29 | aliexpress.com/store/2128230 |
| 31 | aliexpress.com/store/3243044 |
| 33 | aliexpress.com/store/4516033 |
| 35 | aliexpress.com/store/5146048 |
| 37 | aliexpress.com/store/5262089 |
| 39 | aliexpress.com/store/5337006 |
| 41 | aliexpress.com/store/5369208 |
| 43 | aliexpress.com/store/5371151 |
| 45 | aliexpress.com/store/5375102 |
| 47 | aliexpress.com/store/5377083 |
| 49 | aliexpress.com/store/3195085 |
| 51 | aliexpress.com/store/3084067 |
| 53 | aliexpress.com/store/4682071 |
| 55 | aliexpress.com/store/3670027 |
| 57 | aliexpress.com/store/2901202 |
| 59 | aliexpress.com/store/4569032 |
| 61 | amazon.com/sp?marketplaceID=A1LLZN8IM225QA&seller=A1Q824V0I2N994 |
| 63 | amazon.com/sp?marketplaceID=A1Q824V0I2N994&seller=A2OJJWBK4JL90J |

| No. | Seller Alias URL |
|-----|------------------|
| 2 | aliexpress.com/store/4878006 |
| 4 | aliexpress.com/store/4655122 |
| 6 | aliexpress.com/store/4398014 |
| 8 | aliexpress.com/store/3193080 |
| 10 | aliexpress.com/store/3566022 |
| 12 | aliexpress.com/store/1904421 |
| 14 | aliexpress.com/store/3502003 |
| 16 | aliexpress.com/store/3177020 |
| 18 | aliexpress.com/store/3210033 |
| 20 | aliexpress.com/store/3188092 |
| 22 | aliexpress.com/store/3624098 |
| 24 | aliexpress.com/store/3513029 |
| 26 | aliexpress.com/store/1898897 |
| 28 | aliexpress.com/store/4052031 |
| 30 | aliexpress.com/store/3083071 |
| 32 | aliexpress.com/store/4033013 |
| 34 | aliexpress.com/store/5085105 |
| 36 | aliexpress.com/store/5217038 |
| 38 | aliexpress.com/store/5269006 |
| 40 | aliexpress.com/store/5364087 |
| 42 | aliexpress.com/store/5371132 |
| 44 | aliexpress.com/store/5372161 |
| 46 | aliexpress.com/store/5376137 |
| 48 | aliexpress.com/store/5383067 |
| 50 | aliexpress.com/store/5119069 |
| 52 | aliexpress.com/store/5148022 |
| 54 | aliexpress.com/store/5363143 |
| 56 | aliexpress.com/store/4431179 |
| 58 | aliexpress.com/store/4709058 |
| 60 | aliexpress.com/store/4451029 |
| 62 | amazon.com/sp?marketplaceID=A2BH97UXUB7YPP&seller=A3K9413JYQZ6G6 |
| 64 | ebay.com/usr/24hbabyonline-dress |

| No. | Seller Alias URL | No. | Seller Alias URL |
|-----|------------------|-----|------------------|
| 65 | wish.com/merchant/594e538314611013aedfa57b | 66 | wish.com/merchant/5a9a84f7a6f62e2375d95237 |
| 67 | wish.com/merchant/5915bc0eb3ee2b544b61a930 | 68 | wish.com/merchant/5965e73282a85420c2a2a224 |
| 69 | wish.com/merchant/551d47c05c1cbb24db60968e | 70 | wish.com/merchant/539166315aefb02d7021e5ce |
| 71 | wish.com/merchant/56383cee1fc1b1639e818b0b | 72 | wish.com/merchant/5a28f0f86ea4a77b3a53c781 |
| 73 | wish.com/merchant/584fd4c9b9e3474c9d4b1d4d | 74 | wish.com/merchant/5612225374ab8a6441cc7b11 |
| 75 | wish.com/merchant/5a91164cdb5f1f6f8ddd8b3b | | |


Positive
As of: October 21, 2020 9:00 PM Z

## *Lozada v. City of Chicago*

United States District Court for the Northern District of Illinois, Eastern Division

August 30, 2010, Decided; August 30, 2010, Filed

No. 10 C 1019

**Reporter**
2010 U.S. Dist. LEXIS 89231 *; 2010 WL 3487952

DAVID LOZADA, JONATHAN ARELLANO, CYNTHIA CARRASCO, CARLY CHAMBERS, ROGELIO CORRAL, DOUGLAS DeRHODES, JOSHUA GOLDBERG, LEX LEAKS, TONY LONG, ERIC PERINO, GERSON PINEDO, KEVIN STEPP, CORINTHIAUS TIBBS, JERRY CHICK, AND MICHAEL VAUGHN, Plaintiffs, v. CITY OF CHICAGO and CHICAGO POLICE OFFICER R. FIORITO, Star #11624, Defendants.

**Subsequent History:** Related proceeding at *Pinedo v. City of Chicago, 2011 U.S. Dist. LEXIS 22055 (N.D. Ill., Mar. 4, 2011)*

## Core Terms

arrests, occurrence, overtime, joinder

**Counsel:** [*1] For David Lozada, Plaintiff: Jon F Erickson, LEAD ATTORNEY, Laura K. Bautista, Michael D. Oppenheimer, Civil Rights Center, LLC, Chicago, IL; Barbara C. Long, Shiller*Preyar Law Offices, Chicago, IL; Brendan Shiller, Shiller Preyar Law Offices, Chicago, IL.

For Richard Fiorito, Star #11624, Defendant: Daniel Francis Gallagher, LEAD ATTORNEY, Dominick L Lanzito, Ghazal Sharifi, Lawrence S. Kowalczyk, Paul A OGrady, Querrey & Harrow, Ltd., Chicago, IL.

For City of Chicago, Defendant: Terrence Michael Burns, LEAD ATTORNEY, Paul A. Michalik, Dykema Gossett Rooks Pitts PLLC, Chicago, IL; Daniel Matthew

Noland, Dykema Gossett PLLC IL, Chicago, IL; Kimberly D. Fahrbach, Dykema Gossett Rooks Pitts PLLC, Lisle, IL.

**Judges:** Honorable Marvin E. Aspen, United States District Court Judge.

**Opinion by:** Marvin E. Aspen

## Opinion

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiffs filed an eight-count complaint against Defendants City of Chicago (the "City") and Chicago Police Officer R. Fiorito ("Fiorito"), alleging civil rights violations under *42 U.S.C. § 1983*. Count I alleges a pattern of racketeering activity, brought pursuant to *18 U.S.C. §§ 1962(b)*, *(c)*, and *(d)*; Count II alleges a *Monell* claim; Count III alleges [*2] indemnity under Illinois state law; Count IV alleges false arrest; Count V alleges denial of equal protection of the laws, in violation of the *Fourteenth Amendment of the Constitution of the United States*; Count VII alleges malicious prosecution[1]; Count VIII alleges intentional infliction of emotional distress; Count X alleges false imprisonment[2]; and

---

[1] Plaintiffs misnumbered the counts in their Complaint, omitting Count VI. (Compl. ¶¶ 73—74.) For purposes of clarity, we also omit Count VI.

[2] Plaintiffs again misnumbered the counts in their Complaint,

Count XI alleges civil conspiracy. Defendants filed the present two motions and, generally speaking, they ask that we sever allegedly misjoined parties from the case or, in the alternative, order separate trials on Plaintiffs' claims pursuant to *Rule 42(b)*. For the reasons stated below, we grant Defendants' motions in part.

## BACKGROUND

For purposes of this motion, we accept the following allegations in the Complaint as true. Fiorito arrested and charged each Plaintiff with Driving Under the Influence ("DUI") in fifteen separate incidents from August 2006 through **[*3]** August 2009. (Compl. ¶ 40.) None of the Plaintiffs were arrested in 2007. (*Id.*) In each case, Plaintiffs allege that Fiorito lacked probable cause to arrest and charge them with DUIs. (*Id.* ¶ 11.) Plaintiffs claim that, in making the false arrests, Fiorito failed to comply with proper procedures in his administration of the Standardized Field Performance Tests, falsified testimony and police reports to indicate that he had administered the field tests in compliance with proper procedures, falsified testimony and police reports to indicate that Plaintiffs had failed sobriety tests, uniformly prevented Plaintiffs from taking blood or breathalyzer tests or falsified reports that they had refused such tests, and purposefully used identical language in court and in police reports to describe Plaintiffs' drunken behavior at the time of their arrests. (*Id.* ¶¶ 12—17.)

Plaintiffs claim that their false arrests constituted part of Fiorito's "continuing course of conduct, in part motivated by both pecuniary gain and anti-gay animus." (*Id.* ¶ 6.) Plaintiffs allege that Fiorito, as a midnight shift officer who resisted changes in his shift, was guaranteed overtime pay when he appeared in court while **[*4]** not on shift. (*Id.* ¶ 29.) Court appearances never occurred during the midnight shift and Fiorito allegedly made an overwhelming number of arrests, resulting in regular appearances in court, allowing him to personally profit from his abuse of the overtime system. (*Id.* ¶¶ 29, 31.) Plaintiffs also allege, as part of Fiorito's continuing course of conduct, that he falsely arrested and routinely used derogatory language towards unimpaired drivers near lesbian and gay bars in "boystown," demonstrating his anti-gay animus. (*Id.* ¶¶ 23, 26.)

Plaintiffs further allege that Fiorito's continuing course of conduct "constitute[d] a pattern and practice" that the

City both implicitly and explicitly condoned, creating opportunities for Fiorito and other officers to abuse the overtime system. (*Id.* ¶¶ 26—31.) This alleged pattern and practice included: instituting a policy allowing officers to receive overtime pay for appearances in court when not on shift; failing to place limits on overtime pay; allowing traffic officers to appear in court without being subpoenaed or receiving notification to be there; and failing to limit officers' court appearances to their designated "key dates." (*Id.* ¶¶ 30—39.) **[*5]** With respect to Fiorito's conduct, Plaintiffs contend that the City acquiesced in Fiorito's resistance to using video cameras in his squad car, failed to provide any mechanism to prevent abuse of the overtime system or to identify officers making false arrests, and failed to properly investigate the accusation by other officers that Fiorito was abusing the overtime system. (*Id.*)

## ANALYSIS

Under *Federal Rule of Civil Procedure 21*, a court may not dismiss an action for misjoinder, but may sever a misjoined claim or party at any time during a lawsuit. *Fed. R. Civ. P. 21*; *see Wilson v. Peslak, No. 04 C 2345, 2005 U.S. Dist. LEXIS 10365, 2005 WL 1227316, at *1—2 (N.D. Ill. May 12, 2005)*. Although *Rule 21* does not set forth a standard for proper joinder, courts have applied the permissive joinder requirements of *Rule 20(a)*. *Wilson, 2005 U.S. Dist. LEXIS 10365, 2005 WL 1227316, at *2*; *see Bailey v. N. Trust Co., 196 F.R.D. 513, 515 (N.D. Ill. 2000)*. The purpose of *Rule 20* is "to enable economies in litigation" by "promot[ing] trial convenience and expedit[ing] the final determination of disputes, thereby preventing multiple lawsuits." *Gorence v. Eagle Food Ctrs., Inc., No. 93 C 4862, 1996 U.S. Dist. LEXIS 18806, 1996 WL 734955, at *3 (N.D. Ill. Dec. 19, 1996)*; *Elmore v. Henderson, 227 F.3d 1009, 1012 (7th Cir. 2000)*. **[*6]** District courts interpret *Rule 20* liberally to achieve its purpose and exercise "wide discretion" in deciding whether to sever a party. *Gorence, 1996 U.S. Dist. LEXIS 18806, 1996 WL 734955, at *3*; *Chavez v. Ill. State Police, 251 F.3d 612, 632 (7th Cir. 2001)*. Under *Rule 20(a)*, parties are properly joined where: (I) they assert claims "arising out of the same transaction, occurrence, or series of transactions or occurrences" and (ii) the claims raise "[a]ny question of law or fact common to all plaintiffs." *Fed. R. Civ. P. 20(a)*; *see Bailey, 196 F.R.D. at 515*.

The primary issue before us is whether Plaintiffs' claims "aris[e] out of the same transaction [or] occurrence, or series of transactions or occurrences." *Fed. R. Civ. P.*

---

omitting Count IX. (Compl. ¶¶ 83—84.) For purposes of clarity, we also omit Count IX.

2010 U.S. Dist. LEXIS 89231, *6

20(a). In determining whether a specific factual situation meets the transaction or occurrence requirements of *Rule 20(a)*, courts apply "a case by case approach." *Mosley v. Gen. Motors Corp., 497 F.2d 1330, 1333 (8th Cir. 1974)*; *Gorence, 1996 U.S. Dist. LEXIS 18806, 1996 WL 734955, at *3* (citing *Mosley* with approval); *Bailey, 196 F.R.D. at 515* (same); *Nelson v. Chertoff, No. 07 C 2991, 2008 U.S. Dist. LEXIS 82981, 2008 WL 4211577, at *6 (N.D. Ill. Sept. 10, 2008)* (same). Although "transaction or occurrence" is not defined in *Rule 20(a)*, courts **[*7]** interpret this term as "comprehend[ing] a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Mosley, 497 F.2d at 1333*; *see Bloomquist v. ZLB Behring, LLC, No. 06 C 6738, 2007 U.S. Dist. LEXIS 73137, 2007 WL 2903181, at *1 (N.D. Ill. Sept. 28, 2007)*. Courts determine the logical relatedness of separate occurrences by considering a variety of factors, including: "whether the alleged conduct occurred during the same general time period, involved the same people and similar conduct, and implicated a 'system of decision-making' or 'widely-held policy of discrimination.'" *Wilson, 2005 U.S. Dist. LEXIS 10365, 2005 WL 1227316, at *2* (quoting *Hawkins v. Groot Indus. Inc., 210 F.R.D. 226, 229 (N.D. Ill. 2002))*; *Martinez v. Haleas, No. 07 C 6112, 2010 U.S. Dist. LEXIS 31498, 2010 WL 1337555, at *3 (N.D. Ill. Mar. 30, 2010)*.

The Northern District of Illinois has come out on both sides of this issue. In support of their motions to sever, Defendants point to *Martinez v. Haleas*, which involved a strikingly similar factual situation alleging false arrest against defendants Chicago Police Officer Haleas and the City. *2010 U.S. Dist. LEXIS 31498, 2010 WL 1337555, at *1*. (City's Mot. ¶¶ 9—10, 14; Fiorito's Mot. at 4—5.) There, the court **[*8]** held that plaintiffs' claims did not constitute the same transaction or occurrence, or series of transactions or occurrences, since each claim would require individual discovery and fact finding, different testimony and witnesses, and separate questions for Haleas to answer. *Martinez, 2010 U.S. Dist. LEXIS 31498, 2010 WL 1337555, at *3—4*. With regard to the *Monell* claim, *Martinez* recognized the potential existence of common questions pertaining to the City's policies encouraging Haleas's misconduct. *2010 U.S. Dist. LEXIS 31498, [WL] at *3*. However, the court, preferring a coordinated pretrial proceeding to joinder, granted defendants' motions to dismiss for misjoinder. *Id.*

In response to Defendants' motions to sever, Plaintiffs

point to *Dean v. City of Chicago*, where eighteen plaintiffs filed suit against the same defendants as in the present case, alleging factually indistinguishable claims of false arrest against both the City and Officer Fiorito. *No. 09 C 1190, 2009 U.S. Dist. LEXIS 78443, 2009 WL 2848865, at *2 (N.D. Ill. Aug. 31, 2009)*. (Resp. at 2—3.) The court held that, although plaintiffs' claims did not constitute the same transaction or occurrence, they were still part of a series of transactions or occurrences for purposes of *Rule 20(a)*. *Dean, 2009 U.S. Dist. LEXIS 78443, 2009 WL 2848865, at *2*. **[*9]** In *Dean*, like in our case, plaintiffs' arrests were linked by several factors: each incident involved defendant Fiorito, the same arresting officer; each involved allegations of a common course of conduct by Fiorito to abuse the overtime system for personal gain; and each alleged a pattern and practice by defendant the City that encouraged Fiorito's improper practices. *2009 U.S. Dist. LEXIS 78443, [WL] at *3*. Although the arrests occurred two years apart, the court found that joinder of the plaintiffs' claims would "not delay the adjudication of the original plaintiffs' claims or those of any other plaintiff[,]" making joinder appropriate under *Rule 20(a)*. *2009 U.S. Dist. LEXIS 78443, [WL] at *2*.

While the approaches taken in *Martinez* and *Dean* both have their appeal, we find the analysis in *Martinez* to be more persuasive. Although Plaintiffs' arrests contained some alleged similarities, each arrest was a distinct occurrence on a specific date, at a particular location, and under unique circumstances. Many of Plaintiffs' claims such as false arrest and malicious prosecution are therefore entirely distinct from Plaintiff to Plaintiff. Although Plaintiffs' *Monell* claims create an alleged link between the arrests, even those claims depend on the **[*10]** unique facts of each Plaintiff's arrest because we must determine from those facts whether each Plaintiff's arrest fell within the alleged pattern and practice. Under these circumstances, we cannot say that Plaintiffs' arrests were part of the same series of transactions or occurrences. Accordingly, Plaintiffs' claims should heard as separate actions.

## CONCLUSION

For the reasons stated above, Defendants' motions to sever are granted. Plaintiffs Arrellano, Carrasco, Chambers, Corral, DeRhodes, Goldberg, Leaks, Long, Perino, Pinedo, Stepp, Tibbs, Chick, and Vaughn are dismissed from this action without prejudice as misjoined and are given leave to refile their claims as separate actions. Defendants' motion for separate trials

2010 U.S. Dist. LEXIS 89231, *10

is denied as moot. It is so ordered.

/s/ Marvin E. Aspen

Honorable Marvin E. Aspen

U.S. District Court Judge

Date: August 30, 2010

**End of Document**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

OAKLEY, INC.,

               Plaintiff,

    v.

FORFAR OUTDOORS STORE, et al.,

               Defendants.

Case No. 20-cv-02955

**Judge Thomas M. Durkin**

**Magistrate Judge Gabriel A. Fuentes**

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT

Plaintiff Oakley, Inc. ("Plaintiff" or "Oakley") submits the following supplemental memorandum in support of its Motion for Entry of Default and Default Judgment [51] under Fed. R. Civ. P. 55 against the defendants identified on Schedule A to the Amended Complaint (collectively, the "Defaulting Defendants") based on Oakley's action for infringement of U.S. Design Patent No. D842,363.

By choosing not to participate in this case, Defaulting Defendants have failed to produce any documents or information: (1) identifying each and every domain name, online marketplace account and/or financial accounts used by Defaulting Defendants, including the owner(s) and/or operator(s) of each Online Marketplace; (2) showing costs, cost allocations, revenues, and profits of Defaulting Defendants for the last five (5) years; or (3) relating to each and every purchase that Defaulting Defendants have made relating to the Oakley Design and/or the Infringing Products, including records of the products purchased, the sale prices, images of the products, records of suppliers and manufacturers of the products, records of steps taken by Defaulting Defendants to determine whether such products were new or genuine, and records of investigation notes

regarding purchase of the products, including the identity of the person(s) responsible for such investigation. *Id*. Limited information provided by PayPal, Inc. ("PayPal"), Alipay, and Wish.com ("Wish") for only some of the Defaulting Defendants indicates that the amount currently restrained in Defaulting Defendants' known financial accounts ranges from $0 - $8,923. Declaration of Justin R. Gaudio (the "Gaudio Declaration") at ¶ 2.

## **ARGUMENT**

### I. **PLAINTIFF IS ENTITLED TO DEFENDANTS' PROFITS, BUT NOT LESS THAN $250, PURSUANT TO 35 U.S.C. § 289**

In the case of design patent infringement, a patentee may recover the total profits made by a defendant under 35 U.S.C. § 289. Section 289 provides that "[w]hoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250…." 35 U.S.C. § 289.

Determining an award under Section 289 involves two steps: "First, identify the 'article of manufacture' to which the infringed design has been applied. Second, calculate the infringer's total profit made on that article." *Samsung Elecs. Co. v. Apple, Inc*., 137 S. Ct. 429, 434 (2016). The plaintiff has the initial burden to show the article of manufacture and the defendant's total profit on that article. *Nordock, Inc. v. Systems, Inc*., 2017 U.S. Dist. LEXIS 192413, at *7 (E.D. Wisc. 2017). However, if the defendant believes that the article of manufacture is different, it has the burden to produce evidence showing the article of manufacture. *Id*. The defendant also has the burden to produce evidence as to any deductions from the total profit identified by plaintiff. *Id*. The Supreme Court has made it clear that:

> The burden is the infringer's to prove that his infringement had no
> cash value in sales made by him. If he does not do so, the profits
> made on sales of goods bearing the infringing mark properly belong
> to the owner of the mark. There may well be a windfall to the trade-
> mark owner where it is impossible to isolate the profits which are
> attributable to the use of the infringing mark. But to hold otherwise
> would give the windfall to the wrongdoer.

*WMS Gaming, Inc. v. WPC Prods. Ltd*., 542 F.3d 601, 608 (7th Cir. 2008) citing *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-07, 62 S. Ct. 1022, 86 L. Ed. 1381, 1942 Dec. Comm'r Pat. 767 (1942).  "Although § 289 does not explicitly impose any burden on the defendant, this shift in the burden of production is consistent with the disgorgement of profits in other contexts."  *Nordock, Inc. v. Systems, Inc.*, 2017 U.S. Dist. LEXIS 192413, at *7-8. "[Patent holders] are entitled to an award best approximating their actual loss, and the infringers must bear the burden of uncertainty."  *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litigation*, 831 F. Supp. 1354, 1388 (N.D. Ill. 1993) (citations omitted).

In cases where defendants have failed to produce documents to characterize revenue, courts have entered a profits award for the entire revenue amount.  *See WMS Gaming, Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 608 (7th Cir. Ill. 2008) ("[t]he burden was therefore on PartyGaming to show that certain portions of its revenues…were not obtained through its infringement of WMS's marks."); *Chloe v. Queen Bee of Beverly Hills*, 2009 U.S. Dist. LEXIS 84133, at *15-17 (S.D.N.Y. Jul. 16, 2009) (entering profits award for  the entire revenue amount in trademark infringement case even though "records offer no guidance as to how much of this revenue stream related to [Plaintiff's] products [as opposed to other products not at issue in this case] or as to the costs incurred in acquiring and selling these products.").  Under normal circumstances, it is the infringer who bears the burden of "offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue." *Deckers Outdoor Corp. v. ShoeScandal.com,*

*Ltd. liability Co.*, No. CV 12-7382 ODW (SHx), 2013 U.S. Dist. LEXIS 168545, at *12 (C.D. Cal. Nov. 25, 2013), citing *Sunbeam Prods., Inc. v. Wing Shing Prods. (BVI) Ltd.*, 311 B.R. 378, 401 (S.D.N.Y. 2004) aff'd, 153 F. App'x 703 (Fed. Cir. 2005). "But if the infringer has failed to produce any evidence … the Court must determine the costs to be subtracted from revenue based on the evidence it has to determine profits." *See Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1447 (Fed. Cir. 1998).

Here, the Oakley Design claims "[t]he ornamental design for eyeglasses." [14-2]. In the case of a design for a single-component product, such as the Oakley Design, the "product is the article of manufacture to which the design has been applied." *Samsung Elecs. Co. v. Apple, Inc.*, 137 S. Ct. at 367. As such, the relevant article of manufacture is each of the Infringing Products sold by Defaulting Defendants.

Since Defaulting Defendants have chosen not to participate in these proceedings, Plaintiff has limited available information regarding Defaulting Defendants' profits from the sale of Infringing Products. Defaulting Defendants have failed to appear in this matter and have not produced any documents or information: (1) characterizing each of the transactions in their financial accounts, (2) disclosing other accepted payment methods; or (3) disclosing other Internet stores that they may be operating. As such, Defaulting Defendants have not met their burden to apportion gross receipts between infringing and non-infringing product sales, or to show any deductions. *WMS Gaming, Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 608 (7th Cir. 2008); *Nordock, Inc. v. Systems, Inc.*, 2017 U.S. Dist. LEXIS 192413, at *7.

Since Defaulting Defendants have not met their burden of apportioning gross sales or showing any deductions, the Court should award the greater of the amount restrained or $250.00 for each Defaulting Defendant. *Id.*; 35 U.S.C. § 289. The limited information provided by PayPal,

Alipay, and Wish for Defaulting Defendants indicates that the amount currently restrained in Defaulting Defendants' known financial accounts ranges from $0 - $8,923. Gaudio Declaration at ¶ 2. A breakdown by Defaulting Defendant of the amount currently restrained and Plaintiff's requested profit award under 35 U.S.C. § 289 is provided in the chart in Paragraph 3 of the Gaudio Declaration. *Id.* at ¶ 3.

## **CONCLUSION**

Plaintiff respectfully requests that the Court enter default and default judgment against each Defaulting Defendant, including a corresponding profit award under 35 U.S.C. § 289 against each Defaulting Defendant and a permanent injunction order prohibiting Defaulting Defendants from selling Infringing Products and transferring all assets in Defaulting Defendants' financial accounts, including those operated by PayPal, Alipay, and Wish to Plaintiff.

Dated this 19th day of October 2020.

Respectfully submitted,

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Jake M. Christensen
Thomas J. Juettner
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
jchristensen@gbc.law
tjjuettner@gbc.law

*Counsel for Plaintiff Oakley, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of October 2020, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, I will electronically publish the documents on a website and I will send an e-mail to the e-mail addresses identified in Exhibit 2 to the Declaration of Jason Groppe and any e-mail addresses provided for Defendants by third parties that includes a link to said website.

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Jake M. Christensen
Thomas J. Juettner
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
jchristensen@gbc.law
tjjuettner@gbc.law

*Counsel for Plaintiff Oakley, Inc.*

1     IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3    OTTER PRODUCTS, LLC, et al.,      )  No.  16 C 6807
                                       )
4                        Plaintiff,    )  Chicago, Illinois
                                       )  July 5, 2016
5    -vs-                              )  9:05 o'clock a.m.
                                       )
6    THE PARTNERSHIPS and              )
     UNINCORPORATED ASSOCIATIONS       )
7    IDENTIFIED on SCHEDULE "A",       )
                                       )
8                        Defendants.   )

9
            TRANSCRIPT OF PROCEEDINGS - MOTION
10       BEFORE THE HONORABLE MILTON I. SHADUR

11   APPEARANCES:

12   For the Plaintiffs:      GREER BURNS & CRAIN, LTD.
                              BY:  MR. KEVIN W. GUYNN
13                                 MS. MARY FETSCO
                              300 South Wacker Drive
14                            Suite 2500
                              Chicago, Illinois 60606
15

16

17

18

19

20

21

22

23   Court Reporter:         ROSEMARY SCARPELLI
                              219 South Dearborn Street
24                            Room 2304A
                              Chicago, Illinois  60604
25                            (312) 435-5815

| | |
|---|---|
| 1 | MR. GUYNN:  Otter Products. |
| 2 | THE COURT:  You are just seeking a special -- |
| 3 | MR. GUYNN:  TRO and service, but it is ex parte. |
| 4 | THE COURT:  You are not -- yeah.  Do you want to |
| 5 | call the case. |
| 6 | THE CLERK:  Okay.  16 C 6807, Otter Products versus |
| 7 | Partnerships and Unincorporated Associations. |
| 8 | MR. GUYNN:  Good morning, your Honor, Kevin Quinn |
| 9 | on behalf of the plaintiffs. |
| 10 | MS. FETSCO:  Mary Fetsco also on behalf of the |
| 11 | plaintiffs. |
| 12 | THE COURT:  Well, I have the motion for a special |
| 13 | method of service.  And you are talking about a TRO as well? |
| 14 | MR. GUYNN:  Yes, it is. |
| 15 | THE COURT:  I thought that the only motion that I |
| 16 | had was the one that I just mentioned. |
| 17 | MR. GUYNN:  Docket No. 10.  Docket No. 10 is a |
| 18 | motion for temporary restraining order. |
| 19 | THE COURT:  Well, for some reason I don't have |
| 20 | that.  Do you have a copy of it? |
| 21 | MR. GUYNN:  Yes, your Honor.  I have the motion, |
| 22 | the memorandum and the -- |
| 23 | THE COURT:  All right.  Let's take a look. |
| 24 | MR. GUYNN:  -- and the proposed order. |
| 25 | THE CLERK:  Okay. |

1           THE COURT:  Why don't you just take a seat for a
2    moment, if you would.
3           MR. GUYNN:  Sure.  Thank you.
4           THE COURT:  Well, this is -- you have just handed
5    me Otter Products.
6           THE CLERK:  Yeah.
7           THE COURT:  She had called Krantz I thought.
8           THE CLERK:  No, no, Otter Products.
9           THE COURT:  Oh, for heaven sake.  Well, wait just a
10   minute.  That I have, I can assure you, here.
11          What is the story on Krantz?
12          THE CLERK:  They are not here yet.
13          THE COURT:  Okay.  Here, you can hand them back.
14          And, counsel, why don't you step up again.  And if
15   we get anybody in on this other one, which is just a minor
16   procedural one, we will have to interrupt it.
17          MR. GUYNN:  Okay.
18          THE COURT:  I reviewed the complaint and all of the
19   other materials, and I found them quite troublesome.
20   Troublesome not in terms of substantive assertions but rather
21   because the only thing that supports the idea of being able
22   to sue 100 people and get away with one $400 filing fee is in
23   Paragraph 27 which is asserted on information and belief.
24   Now, frankly, you may have a belief.  There is nothing really
25   there to support an information aspect.  Indeed, you are

1    quite candid in saying you don't have the information.

2          Now, it doesn't seem to me that you can sue the

3    immediate world and -- on the premise that somehow all of

4    these people are interconnected.  You know, China is an

5    enormous, enormous country.  I need not tell you.  And it is

6    entirely within the realm of reason and indeed likelihood

7    that what you have got in this communist country are a lot of

8    entrepreneurs who are out there seeking to rip-off your

9    clients by copying with phoney stuff.

10          And indeed it is -- you know, if you think about

11    likelihood, the likelihood is that there may be one or a few

12    actual producers of these products, but there are a great

13    many, as I say, entrepreneurs who are out to do what

14    capitalist countries do all the time, and that is to make

15    profit for themselves.

16          Now, that being the case, it seems to me that to

17    couple, as you have, something over 100 direct defendants and

18    then another hundred in a second category and then maybe nine

19    -- you have got -- let me get this thing here --

20          MR. GUYNN:  We list seven domain names.

21          THE COURT:  Yeah.  You have I think seven domain

22    names -- is not really the right way to go about the thing

23    and does not support a situation in which an order gets

24    entered by a court that means that anybody who is discovered

25    afterwards and who is one of the rip-off people, one of the

1   culprits, is subject to a contempt, a violation for contempt
2   of the court order rather than being brought in in the first
3   instance.

4         Now, I am not going to tell you exactly how to run
5   your lawsuit, but it would seem to me that the appropriate
6   way to get at it is to choose a couple -- whether it is
7   through domain names or otherwise, a couple of likely
8   prospects which will enable you to get discovery and to get
9   it, we hope, swiftly so you can flesh out what at this point
10  is really -- I won't even call it a semi-educated guess, but
11  it is certainly a guess.  And that is -- that I find really
12  quite difficult.

13        Again, I don't see any reason that the Federal
14  Government should subsidize the ability to group 100, 200
15  defendants at a single $400 filing fee.  Now, I am not asking
16  you to balance the federal budget, don't misunderstand, but
17  it seems to me it is really not an appropriate approach to
18  the litigation.

19        Now, what can you tell me that would undercut that?
20        MR. GUYNN:  Okay, thank you.  You have put your
21  finger on -- on the position we find ourselves in where we --
22  we detect all of these counterfeits.  And there are literally
23  thousands of them.

24        THE COURT:  I am sure.  Don't misunderstand --
25        MR. GUYNN:  Yeah.

1    THE COURT:  -- I am not questioning the

2    allegations, the substantive allegations at all --

3            MR. GUYNN:  Right.

4            THE COURT:  -- in that regard.  I am accepting --

5    as I must, in connection with a complaint, I am accepting the

6    allegation.  And I think that they are more than plausible.

7    So, you know, I don't have any problems under Twombly or

8    Iqbal.  But the really issue is the one that I have

9    identified.

10           MR. GUYNN:  Yes.  And so when we look at these

11   websites and online marketplace accounts, what we find is

12   there are -- are a lot of similarities, either in the

13   pictures, in the way that they set them up.  And it looks to

14   us, from not knowing who is behind them, that there is some

15   interrelationship, some association, whether they are getting

16   information from a single source -- and there are all these

17   entrepreneurs who are otherwise independent, but they are

18   getting their information from one or a small number of

19   manufacturers.  But they are somehow interrelated.

20           And we have found in these cases when we do list a

21   large number of stores, that there are many stores operated

22   by a single entity.  And going into this we don't know who

23   those are.  And, sure, we would love to be able to take

24   discovery and get information, but the realty is that most of

25   the time --

1       THE COURT:  They jump ship after you have gotten --

2       MR. GUYNN:  Nobody shows up, right.  We have in

3   some instances, particularly where we have been able to

4   freeze substantial amounts of money, then somebody shows up

5   and we find out, oh, they have got six stores, you know, six

6   of these defendants are all in fact one person.

7       So, you know, what we are left with is looking at

8   these and making a judgment, okay, they are using the same

9   pictures, they are setting things up the same, let's list

10  them all.  If they think they are separate and different from

11  each other and distinct and are entitled to be tried

12  separately or have their own individual case, let them come

13  in and make that argument, and we will separate them out and

14  so on.

15      But going into this we just have no way of knowing

16  if we list these three, it turns 12 of them that we didn't

17  list in fact are owned by the same entity.  So that is where

18  we are left with.  And, you know, we try to make some

19  judgment on it, but you are right, a lot of it is -- is

20  uncertainty because hiding behind the --

21      THE COURT:  Again you see information and belief is

22  not just a phrase.  There are two separate things --

23      MR. GUYNN:  Right.

24      THE COURT:  -- that are called for.

25      MR. GUYNN:  And the information is the --

1           THE COURT:  You just confirmed that you have got a

2    belief, but you really don't have anything that would really

3    qualify as the information that would support the thing.  You

4    have got a strong suspicion, but again I have to run a

5    lawsuit.

6           MR. GUYNN:  I know.

7           THE COURT:  And --

8           MR. GUYNN:  The information that we have, the only

9    information that we have is the appearance of their website,

10   the appearance of the photos that they use, the way they set

11   up the prices, the way they describe things.

12          THE COURT:  Well, it is certainly -- look, it is

13   certainly likely that there are a limited number of -- I will

14   go back to the point that I was making -- a limited number of

15   sources that have generated the knockoff products.

16          MR. GUYNN:  Yes.

17          THE COURT:  And the difficulty is that to approach

18   that from the outside and in this fashion instead of being

19   able to get some information from the inside.

20          MR. GUYNN:  It is as if we are suing six dealers,

21   all of -- excuse me, all of one manufacturer, but we don't

22   know who the manufacturer is because they are hidden behind

23   layers.

24          THE COURT:  I know.  I know.

25          MR. GUYNN:  So we sue all of these dealers.  Are

1  they related through each other?  Well, they are through
2  their manufacturer.
3          THE COURT:  That, however, is not the kind of
4  relationship that supports a single lawsuit.  It really is
5  not.  In other words, the fact that they may be acquiring
6  from a single source does not, if you look at the -- at the
7  underlying concept -- I -- don't misunderstand, I think it is
8  a very difficult posture.  I understand that, but --
9          MR. GUYNN:  Declaration.
10         THE COURT:  -- see the problem is the rule under
11  Rule 20 that requires the same transaction, occurrence or
12  series of transactions or occurrences.  Basically that is the
13  real problem when they are -- when the likelihood again is
14  that so many of these -- and I would guess the vast majority
15  are operating in that sense separately, although they are all
16  deriving from the same source.
17         But we have the same problem in our Local Rule 40.4
18  when we talk about reassignment on grounds of relatedness.
19  The fact that they may have common questions of law, even
20  common questions of fact, do not support packaging even
21  separate lawsuits in that fashion.  And, you know, we husband
22  that quite carefully.  And you are talking about interactive
23  commercial websites and online marketplaces.
24         What about getting at the Internet stores
25  themselves in a way that would enable you to -- enable you

1　　perhaps to get information from that?  How do you get to the
2　　Internet source?
3　　　　　　　MR. GUYNN:  Well, that is -- that is what some of
4　　these named -- the way we have named or identified the
5　　defendants.  These two lists, the 107 and --
6　　　　　　　THE COURT:  And then the hundred.
7　　　　　　　MR. GUYNN:  Those are actually not additional.
8　　They are -- they are overlapping.
9　　　　　　　THE COURT:  Yeah.
10　　　　　　MR. GUYNN:  And again the difficulty for us is that
11　　these defendants use fictitious names when they register
12　　either their stores or their domains and, you know, they
13　　identify themselves -- No. 9 as 0380981.  You know, we don't
14　　know who that is.
15　　　　　　THE COURT:  Yeah.
16　　　　　　MR. GUYNN:  And they use different aliases for the
17　　several of their own stores.  And so that is -- you know,
18　　that is the difficulty.
19　　　　　　THE COURT:  Now, how do you proceed if you were to
20　　get -- if you were to get this kind of order against the 107
21　　names, how then do you proceed to get to the root of the
22　　really infringement?  Because you asked for temporary
23　　restraining order.  Okay?
24　　　　　　MR. GUYNN:  Yes.
25　　　　　　THE COURT:  And so suppose you were to get a TRO.

1   That really would not -- would not do the job for you unless
2   some further activity were to uncover the culprits.

3           MR. GUYNN:  Right.  So -- so what actually occurs
4   in these cases, we get -- we get the TRO.  We freeze any
5   financial accounts that we can find that are in the United
6   States, which usually are just the PayPal accounts.  We
7   transfer the -- the domain names to our control.  We put up a
8   page that says this site has been -- is under this lawsuit.
9   We --

10          THE COURT:  Suppose you get --

11          MR. GUYNN:  We e-mail.

12          THE COURT:  Suppose you get an order that basically
13  deals with the domain names as contrasted with the effort,
14  which is really not something that is likely to get you the
15  information from let's say naming the 100 defendants.  You
16  see the entry of a restraining order, as I say, has as its
17  legal consequence that you if catch up with somebody, you can
18  say, "Oh, you violated this order," rather than having to
19  bring them in.  But again the first problem is the one that I
20  have identified, to get -- to get the information.

21          Can't the use of the domain names as relief get you
22  a handle more likely than just naming all these defendants
23  that you had no way of identifying?

24          MR. GUYNN:  Well, we have -- we have an e-mail
25  address that they use, and we do send out the notice.  That

1    is the request for electronic service.  We send out the

2    summons, the complaint, the TRO order by e-mail to -- that is

3    the way these people operate, is by, you know, electronic

4    means.  And so we have found by sending out these notices

5    electronically, that way they get them.  They respond to us.

6    Sometimes they don't show up.  Sometimes they do show up.  We

7    have engaged in and reached settlements with ones that do

8    show up.

9              And as part of that settlement we ask them,

10   identify who is your source.  So occasionally we do -- are

11   able to track back up to sources.  But for the most part we

12   -- we don't always get there.  But we do -- we are able to

13   contact them at least from this side.  They don't always

14   respond back.  But we use the address that they use when they

15   are trying to sell things.

16             THE COURT:  And suppose that you do the -- make the

17   effort at search through the domain names as such.  Isn't

18   that a more effective way or more efficient way to do it, or

19   not?

20             MR. GUYNN:  We found that a lot of them have been

21   moving away from domain names.  When they have an Internet

22   store, whether it is on eBay or some other host site, there

23   is no domain to sort of take from them.  You can't take their

24   store.  And -- but by providing them notice and by their

25   e-mail address is how we reach them and notify them of what

1    they are doing improperly.

2              THE COURT:  Do you have any Court of Appeals'

3    opinions that essentially reward this kind of approach?

4    Because, as I say, I really find it troubling.  I need not

5    tell you that the knockoff business has a history to it.  You

6    know, there was a time when the only one that had to be

7    worried about that was Louis Vuitton.  And it has become more

8    sophisticated and more difficult for somebody in your

9    position to pursue.  And I appreciate that.

10             MR. GUYNN:  We have -- we have had this question

11   posed by other judges in this District.  And I would ask the

12   Court permission to provide an additional supplemental

13   memorandum on this exact point on joinder and --

14             THE COURT:  All right.  Why --

15             MR. GUYNN:  We have --

16             THE COURT:  -- I would like to get that, although

17   as you know none of us who sits in my position actually

18   enters precedential opinions, but they are -- to the extent

19   that they are persuasive, they can be utilized via -- you can

20   look at my opinions from here to Sunday and you will -- you

21   will rarely, if ever, find me citing another district court

22   or myself --

23             MR. GUYNN:  Right.

24             THE COURT:  -- frankly, because for just that

25   reason.  But I would welcome any input because on the one

1  hand I am terribly troubled by the problem that your client
2  faces.  On the other hand, you know, we have got to live with
3  the rules.
4            MR. GUYNN:  Yes.
5            THE COURT:  And what kind of time would you think
6  you would need for that?
7            MR. GUYNN:  Three days.
8            THE COURT:  All right.  I will tell you what I will
9  do.  You think that you can get it in by the end of the week?
10           MR. GUYNN:  Oh, sure.
11           THE COURT:  So wait just a minute.  Suppose that I
12  give you -- if you get it to me in hard copy by the end of
13  the week, I could give you, for example, either Tuesday the
14  12th or Thursday the 14th at 9:45.  Any preference as between
15  those?
16           MR. GUYNN:  Tuesday the 12th is fine.
17           THE COURT:  All right.  So that is the story.  I am
18  continuing the motion until Tuesday July 12th.  And you will
19  get me in the meantime a supplemental memo.
20           MR. GUYNN:  Good.  Thank you.
21           THE COURT:  Thank you.
22           MS. FETSCO:  Thank you.
23       (Which were all the proceedings heard.)
24
25

```
 1                           CERTIFICATE
 2          I certify that the foregoing is a correct transcript
 3     from the record of proceedings in the above-entitled matter.
 4
 5     s/Rosemary Scarpelli/        Date:  July 5, 2016
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

OTTER PRODUCTS, LLC and TREEFROG )
DEVELOPMENTS, INC.,                )        Case No. 16-cv-06807
                                   )
                  Plaintiffs,      )        **Judge Milton I. Shadur**
                                   )
        v.                         )        **Magistrate Judge Sheila Finnegan**
                                   )
JAMES CHEN, et al.,                )
                                   )
                  Defendants.      )
_____ )

## PLAINTIFFS' MEMORANDUM
## <u>ESTABLISHING THAT JOINDER IS PROPER</u>

Plaintiffs Otter Products, LLC ("OtterBox") and Treefrog Developments, Inc. ("Treefrog") (together, "Plaintiffs") submit this Memorandum establishing that joinder is proper pursuant to this Court's request at the July 5, 2016, hearing for Plaintiffs' Motion for a Temporary Restraining Order.

## <u>INTRODUCTION</u>

This action has been filed by Plaintiffs to combat China-based trademark counterfeiters offering to sell and selling products using counterfeit versions of Plaintiffs' federally registered trademarks (the "Counterfeit OtterBox and LifeProof Products") over the Internet to United States consumers, including consumers in Illinois. Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to operate their counterfeit network. [9] at ¶ 31. Since no discovery has taken place and there are no other reasonable means for learning the true names of Defendants, Defendants are identified by the one hundred and seven (107) aliases listed in Schedule A [9-4] that were used by Defendants to register and

operate the Defendant Domain Names and/or Online Marketplace Accounts (collectively, the "Defendant Internet Stores").

Plaintiffs' allegations and corresponding evidence establish that the Defendant Internet Stores share unique identifiers, such as Internet Store registration patterns, design elements, similarities of the Counterfeit OtterBox and LifeProof Products offered for sale and identical return addresses. As such, Plaintiffs' claims against Defendants are logically related and share an aggregate of operative facts, making joinder of Defendants appropriate. *See Mosley v. General Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974); *In re EMC Corp.*, 677 F.3d 1351, 1358-60 (Fed. Cir. 2012) (pertinent factual considerations for joinder include whether alleged acts of infringement occurred during same time period and existence of some relationship between defendants).

Moreover, each Defendant is individually subject to liability irrespective of the presence of any other Defendant, so there is no prejudice to any Defendant. Defendants can also easily be severed out into separate lawsuits if discovery shows that they truly are unrelated to the other named Internet Stores. Conversely, Plaintiffs would be severely prejudiced if they were required to file a separate lawsuit simply because Defendants registered a particular Internet Store using a different alias. Joinder at this stage is consistent with hundreds of similar cases against China-based Internet counterfeiters and comports with the strongly encouraged policy of "entertaining the broadest possible scope of action consistent with fairness to the parties." *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966). "Joinder of claims, parties and remedies is strongly encouraged." *Id*. Given Defendants' tactics and that no discovery has taken place, Rule 20(a) provides this Court with the flexibility to keep Defendants joined at this stage of the proceeding.

2

## ARGUMENT

### I.    LEGAL STANDARD

#### A.    Permissive Joinder Under Fed. R. Civ. P. 20

Fed. R. Civ. P. 20(a) governs the permissive joinder of parties and provides that multiple defendants may be joined in one action where: (A) "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences;" and (B) "any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2).  Above all, the Seventh Circuit has noted that the purpose of a liberal Rule 20(a) joinder requirement "is to enable economies in litigation."  *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000).  Courts evaluate whether the joinder requirements are met using a case-by-case approach based on a flexible standard that enables federal courts to promote judicial economy by permitting all reasonably related claims for relief by or against different parties to be tried in a single proceeding.  *In re EMC Corp.*, 677 F.3d at 1358.

As to the first prong of Fed. R. Civ. P. 20(a)(2), the Seventh Circuit has not fashioned a definitive standard for determining what constitutes a single transaction or occurrence.  *See Bailey v. N. Trust Co.*, 196 F.R.D. 513, 515 (N.D. Ill. 2000) (explaining that "no hard and fast rules have been established" in this context).  Similarly, the phrase "transaction or occurrence" is not defined in Rule 20(a); however, courts have looked to the similar "transaction or occurrence" test for compulsory counterclaims in Rule 13(a).  *Mosley*, 497 F.2d at 1333; *PTG Nev., LLC v. Doe*, 2016 U.S. Dist. LEXIS 83546, at *7 (N.D. Ill. June 28, 2016).  For the purposes of Rule 13(a), the Supreme Court has stated "[t]ransaction is a word of flexible meaning.  It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship."  *Moore v. N.Y. Exch.*, 270 U.S. 593, 610

3

(1926).  *See also Burlington N.R. Co. v. Strong*, 907 F.2d 707, 711 (7th Cir. 1990) (applying "logical relationship" test to determine whether the "transaction or occurrence" is the same for purposes of Rule 13(a)).  In the context of Rule 13(a), the Seventh Circuit has held that "there is no formalistic test to determine whether suits are logically related.  A court should consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds."  *Burlington*, 907 F.2d at 711.

Other Circuits have applied the "logical relationship" test to interpret "same transaction or occurrence" as it appears in Rule 20(a).  The Eighth Circuit has looked to the "logical relationship" between separate occurrences, finding that "all reasonably related claims for relief by or against different parties" can be tried in a single proceeding.  *Mosley*, 497 F.2d at 1333. Absolute identity of all events is unnecessary.  *Id.*  *See also Alexander v. Fulton County,* 207 F.3d 1303, 1323 (11th Cir. 2000)).  Similarly, the Federal Circuit has interpreted Rule 20(a) to find that "independent defendants satisfy the transaction-or-occurrence test of Rule 20 when there is a logical relationship between the separate causes of action."  *In re EMC Corp.*, 677 F.3d at 1358.  "The logical relationship test is satisfied if there is substantial evidentiary overlap in the facts giving rise to the cause of action against each defendant.  In other words, the defendants' allegedly infringing acts, which give rise to the individual claims of infringement, must share an aggregate of operative facts."  *Id.*  (citing *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997) ([t]he first prong, the 'same transaction' requirement, refers to similarity in the factual background of a claim"); *N.Y. Life Ins. Co. v. Deshotel*, 142 F.3d 873, 882 (5th Cir. 1998) (under Rule 13(a), "this Circuit gives weight to whether the claim and the counterclaim share an 'aggregate of operative facts'")).  The Federal Circuit identified the following pertinent factual considerations for courts to consider:

> Whether the alleged acts of infringement occurred during the same time period, the existence of some relationship among the defendants, the use of identically sourced components, licensing or technology agreements between the defendants, overlap of the products' or processes' development and manufacture, and whether the case involves a claim for lost profits.

*Id.* at 1359-60.

Courts in this District have also determined the logical relatedness of separate occurrences by considering whether the alleged conduct occurred during the same general time period and whether it involved the same people and similar conduct. *See, e.g.*, *Wilson v. Peslak,* 2005 U.S. Dist. LEXIS 10365, at *6 (N.D. Ill. May 12, 2005). Courts also deny motions to sever where plaintiffs allege that defendants have engaged in a common scheme or pattern of behavior. *See Alexander v. Fulton County*, 207 F.3d 1303, 1333 (11th Cir. 2000) (allegations of a 'pattern or practice' of discrimination may describe such logically related events); *In re Vitamins Antitrust Litig.*, 2000 U.S. Dist. LEXIS 7397, at *75-76 (D.D.C. May 9, 2000).

### B. This Court Must Accept the Factual Allegations in Plaintiffs' Amended Complaint as True

"In assessing whether the requirements of Rule 20(a)(2) are met, courts must accept the factual allegations in a plaintiff's complaint as true." *Desai v. ADT Sec. Services, Inc.*, 2011 U.S. Dist. LEXIS 77457, at *8 (N.D. Ill. July 18, 2011) (citing *Deskovic v. City of Peekskill*, 673 F.Supp.2d 154, 159 (S.D.N.Y. 2009)). A court must construe the complaint "in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences" in favor of the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The plaintiff must only put forth enough "facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's allegations. *Brooks v. Ross*, 578 F.3d 574, 581 (7th. Cir. 2009) (quoting *Twombly*, 550 U.S. at 556).

5

## II.  PLAINTIFFS' WELL-PLEADED ALLEGATIONS SATISFY FED. R. CIV. P. 20(A)(2)(A)

Plaintiffs' well-pleaded allegations include that Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products bearing counterfeit versions of the Plaintiffs' Trademarks in the same transaction, occurrence, or series of transactions or occurrences.  [9] at ¶ 27.  Furthermore, Plaintiffs' Amended Complaint includes factual allegations that Defendants are working in a similar manner and during the same time period to sell Counterfeit OtterBox and LifeProof Products, which collectively shows a logical relationship between the operators of the Defendant Internet Stores.  *Id.* at ¶¶ 29-34; *See In re EMC Corp.*, 677 F.3d at 1359-60.

These allegations are supported by well-pleaded facts related to unique identifiers between the Defendants and their corresponding Defendant Internet Stores, which were identified through individual investigation of each of the Defendant Internet Stores.  *See* Declaration of Kevin S. McPherson [13] at ¶¶ 24-30.  More specifically, each Defendant Internet Store was individually reviewed and analyzed to verify that it was selling Counterfeit OtterBox and LifeProof Products and included unique identifiers such that joinder was proper.  *Id.*  These unique identifiers include virtually identical layouts, Counterfeit OtterBox and LifeProof Products for sale that bear similar irregularities and indicia of being counterfeit to one another, similar domain name registration patterns, shopping cart platforms, accepted payment methods, check-out methods, meta data, domain redirection, lack of contact information, similarly priced items, incorrect grammar and spelling, similar hosting services, and the use of text and images copied from Plaintiffs' official OtterBox.com and LifeProof.com websites.[1]  *Id.*  Such well-

---

[1] As illustrated in the subsequent pages of this Memorandum and the Declaration of Justin R. Gaudio (the "Gaudio Declaration"), Plaintiffs' allegations are referring to unique identifiers, not just general common elements found on e-commerce websites.  The Court should avoid speculating that the unique identifiers

pleaded factual allegations establish that Plaintiffs' right to relief asserted against Defendants arises out of the same transaction, occurrence, or series of transactions or occurrences. The subsequent sections provide examples of the analysis performed by Plaintiffs in their pre-filing investigation demonstrating how the Defendant Internet Stores are properly joined in this lawsuit.

One well-pleaded fact supporting joinder is that the Defendant Internet Stores have virtually identical layouts, even though different aliases were used to register the respective domain names. [9] at ¶ 32. For example, Table 1 below shows a different registrant name, e-mail address and address for two of the Defendant Domain Names.

| Domain Name | Registrant Name | Registrant E-mail Address | Registrant Address |
|---|---|---|---|
| e-eletree.com | Xing Hui Zhi | 171956054@qq.com | Sai Ge Ke Ji Yuan 3Dong 6Lou L18,, |
| eletreecoop.com | YinSi BaoHu Yi KaiQi … | YuMing@YinSiBaoHu.AliYun.com | 3/F.,HiChina Mansion,No.27 Gulouwai Avenue,Dongcheng District |

**Table 1**

However, as shown in Figures 1A and 1B below, the websites at these domains have common layouts, identical images and the same checkout procedure. *See* Gaudio Declaration[2] at ¶ 2. Further, as shown in Figures 1C and 1D below, the Western Union payment method specifies an identical name and address. *See Id.* Unique shopping cart platforms, pricing schemes, accepted

---

are a coincidence and that Defendants are merely acting similarly, but independent of each other. The Court must construe the complaint "in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences" in favor of the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[2] Larger images of the screenshots shown in this Memorandum are attached as Exhibits to the Gaudio Declaration.

payment methods and check-out methods found on these sites also support a finding that joinder is proper. *See* [9] at ¶ 32. *See* Gaudio Declaration at ¶ 2.



**Figure 1A – e-eletree.com**



**Figure 1B - eletreecoop.com**



**Figure 1C – e-eletree.com**

**Figure 1D – eletreecoop.com**

Another well-pleaded fact supporting joinder is that the Defendant Internet Stores use the same domain name registration patterns. [9] at ¶ 32. For example, the Defendant Internet Stores at otterboxbest.com, otterboxnew.com and iotterbox.com have virtually identical layouts with similar unique design elements, but were registered using multiple different names and email addresses. *See* Gaudio Declaration at ¶ 3. Likewise, all three Defendant Internet Stores otterboxbest.com, otterboxnew.com and iotterbox.com share an identical Autonomous System Number ("ASN"), which identifies an Internet Protocol ("IP") network or a group of IP networks under the control of a common network administrator. *Id.* at ¶ 3. Finally, while the Defendant Internet Stores at insanamanah.com and shopfashiongift.com appear in many respects to be different websites, an examination of their domain name registration information reveals they are both currently hosted on the same name server "Dnspod.net." *Id.* at ¶ 4.

In rare instances where a Defendant Internet Store provides contact information such as an e-mail address or a phone number, it is nearly always different from the registrant e-mail address used to register the Defendant Domain Name. *See* Gaudio Declaration at ¶ 5. Taking eletreecoop.com for example, the domain name was registered to YinSi BaoHu Yi KaiQi, using the e-mail address YuMing@YinSiBaoHu.AliYun.com, and the phone number +86.1065985888; yet, the associated website lists contact name HUIZHI XING, with the e-mail address hkeletree@gmail.com and phone numbers +86-13603050104, +86-755-25160928 and +86-755-25160900. *Id.* *See* Figures 2A and 2B below. Common schemes used by Defendants to conceal their identities, including using multiple fictitious names, e-mail addresses, phone numbers and physical addresses to register and operate their network of Defendant Internet Stores supports a finding that joinder is proper. *See* [9] at ¶ 31.

```
Registrant Name: YinSi BaoHu Yi KaiQi (Hidden by Whois Privacy Protection Service)
Registrant Organization: YinSi BaoHu Yi KaiQi (Hidden by Whois Privacy Protection
Registrant Street: 3/F.,HiChina Mansion,No.27 Gulouwai Avenue,Dongcheng District,B
Registrant City: Beijing
Registrant State/Province: Beijing
Registrant Postal Code: 100120
Registrant Country: CN
Registrant Phone: +86.1065985888
Registrant Phone Ext:
Registrant Fax: +86.1065985438
```

**Figure 2A – WHOIS Registration Information for eletreecoop.com**

**Contact Us**

Welcome to the ELE TOWN (HK) CO., LIMITED - **www.eletown.com** Customer Support Center! If you have any questions, comments or suggestions, please contact with our customer service representatives.

**Email:**
hkeletree@gmail.com

**Phone Contact information:**
Tel:+86-13603050104
Tel:+86-755-25160928 (09:00 - 18:00 Mon - Sat)
Fax:+86-755-25160900

**Live Chat:**
Use the **Live Chat** to discuss online here:
**Skype**:ELETOWN.JIMMY

**Address:**
ELE TOWN (HK) CO., LIMITED
UNIT 04, 7/F BRIGHT WAY TOWER, NO. 33 MONG KOK ROAD, KOWLOON, HK
Tel: +86-755-21560926

**Figure 2B – eletreecoop.com**

10

Another well-pleaded allegation in Plaintiffs' Amended Complaint supporting joinder is that Counterfeit OtterBox and LifeProof Products for sale in the Defendant Internet Stores bear similar unique irregularities and indicia of being counterfeit to one another. [9] at ¶ 32. For example, the Defendant Online Marketplace Accounts identified at ebay.com/usr/icablelink_hk, ebay.com/usr/my_1234567, ebay.com/usr/toptreak, ebay.com/usr/case-mall, ebay.com/usr/ete-mall, ebay.com/usr/case-01 and ebay.com/usr/jenny-mall were registered using different account names and using different e-mail addresses. However, as shown in Figures 3A-3G below, the unique product images used at each of these Defendant Internet Stores are virtually identical. *See* Gaudio Declaration at ¶ 6.



Figure 3A -
ebay.com/usr/icablelink_hk

Figure 3B -
ebay.com/usr/my_1234567

Figure 3C -
ebay.com/usr/toptreak

Figure 3D -
ebay.com/usr/case-mall

Figure 3E -
ebay.com/usr/ete-mall

Figure 3F -
ebay.com/usr/case-01

Figure 3G -
ebay.com/usr/jenny-mall

Each of the protective cases, as pictured in Figures 3A through 3G above, are inconsistent with genuine OtterBox and LifeProof products.  *Id.*; [13] at ¶ 24.  Similar irregularities and indicia of being counterfeit suggest that the Counterfeit OtterBox and LifeProof Products were manufactured by and come from a common source, and that the Defendants are interrelated.  [9] at ¶ 32.  This is further supported by evidence that multiple Defendant Internet Stores shipped Counterfeit OtterBox and LifeProof Products from the same return address, even though their Defendant Internet Stores were operated under different aliases.  *See* Gaudio Declaration at ¶¶ 7-10.

As illustrated by the above examples, well-pleaded facts in Plaintiffs' Amended Complaint support allegations that the Defendants are an interrelated group of counterfeiters acting in active concert, and are knowingly and willfully manufacturing, importing, distributing, offering for sale, and selling products bearing counterfeit versions of the Plaintiffs' Trademarks in the same transaction, occurrence, or series of transactions or occurrences.  These facts must be taken as true and support a finding that joinder is proper.

## III.  PLAINTIFFS' WELL-PLEADED ALLEGATIONS SATISFY FED. R. CIV. P. 20(A)(2)(B)

In addition, Plaintiffs' well-pleaded allegations also satisfy Rule 20(a)(2)(B), which provides that joinder is proper if "any question of law or fact common to all defendants will arise in the action."  In this case, each of the Defendants is alleged to be knowingly and willfully manufacturing, importing, distributing, offering for sale, and selling products bearing counterfeit versions of the Plaintiffs' Trademarks.  [9] at ¶¶ 27-36.  In addition, the methods Plaintiffs will use to investigate, uncover, and collect evidence about any infringing activity will be the same or similar for each Defendant.  While each Defendant may later present different factual evidence to support individual legal defenses, prospective factual distinctions do not defeat the

commonality in facts and legal claims that support joinder under Rule 20(a)(2)(B) at this stage in the litigation. *See First Time Videos, LLC v. Does 1–500*, 276 F.R.D. 241, 251–52 (N.D. Ill. 2011).

## IV.    JOINDER IS CONSISTENT WITH FAIRNESS, CONVENIENCE AND JUDICIAL ECONOMY

Joinder at this stage is also consistent with fairness to the parties and is also in the interest of convenience and judicial economy because joinder will secure a just, speedy, and inexpensive conclusion for Plaintiffs, Defendants and this Court.  Joinder does not create any unnecessary delay nor does it prejudice any party.  On the other hand, severance is likely to cause delays and prejudice Plaintiffs and Defendants alike.  Delays will undoubtedly occur and the resources of the Court will be substantially taxed in the event that Defendants are prematurely severed.  Such obstacles would also make it highly unlikely that Plaintiffs and other brands could protect their trademarks in a cost-effective manner.

Defendants would also be disadvantaged if the case were to be prematurely severed, as joined defendants enjoy the benefit of seeing what defenses, if any, other defendants may assert. Furthermore, each named Defendant will still be considered individually for any ruling on the merits of Plaintiffs' claims, belying the notion that joinder will deny any Defendant individual justice.  Defendants also retain the right to raise any arguments in favor of severance at a later time.

Finally, even if this Court were to find that Plaintiffs' Amended Complaint contains insufficient allegations to support joinder of each Defendant, the Federal Rules of Civil Procedure only apply to the extent that they "affect any party's substantial rights." Fed. R. Civ. P 61; *see also Coach, Inc. v. 1941 Coachoutletstore.com*, 2012 U.S. Dist. LEXIS 1311, at *12 (E.D. Va. Jan. 5, 2012).  Furthermore, the Court's authority to act *sua sponte* is provided by Rule

21, which requires that the Court add or drop parties "on just terms." Fed. R. Civ. P. 21; *see also Id.* Like many similar previous cases, Plaintiffs anticipate that Defendants will choose to ignore these proceedings rather than face the full consequences for the damage they have caused and continue to cause to Plaintiffs. As such, each Defendant will be individually subject to default, and "there is no prejudice to any defaulting defendant, whose liability may be established upon default irrespective of the presence of any other defendant." *Coach, Inc. v. 1941 Coachoutletstore.com*, 2012 U.S. Dist. LEXIS 1311, *12-13 (E.D. Va. Jan. 5, 2012) (citing *Lyons P'ship, L.P. v. D & L Amusement & Entm't*, 702 F. Supp. 2d 104, 112 (E.D.N.Y. 2010)). Therefore, even if Plaintiffs' Amended Complaint is found to be lacking sufficient joinder allegations, there is no prejudice to any of the Defendants at this point.

## CONCLUSION

For the reasons set forth above, the well-pleaded factual allegations in Plaintiffs' Amended Complaint must be taken as true and establish that joinder is proper. This approach is also consistent with other courts and comports with the strongly encouraged policy of entertaining the broadest possible scope of action consistent with fairness to the parties. Finally, Defendants can move to sever at a later time should they choose to do so. As such, joinder of Defendants is proper at this stage of the proceedings.

Dated this 8th day of July 2016.      Respectfully submitted,

/s/ Justin R. Gaudio_____
Kevin W. Guynn
Amy Ziegler
Justin R. Gaudio
Jessica L. Bloodgood
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
kguynn@gbc.law
aziegler@gbc.law
jgaudio@gbc.law
jbloodgood@gbc.law

*Attorneys for Plaintiffs Otter Products, LLC and Treefrog Developments, Inc.*

# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

Otter Products, LLC, et al. )
         Plaintiff )
             )       Case No: 16 C 6807
       v. )
             )       Judge  Milton I. Shadur
The Partnerships and Unincorporated )
Associations )
         Defendants )

## **ORDER**

Status hearing held.  Plaintiffs' motion for entry of a preliminary injunction [39] is granted. Plaintiffs' oral motion to unseal all documents is granted.  The Clerk is directed to unseal all sealed documents in this case.  Status hearing set for 9/26/2016 at 9:00 a.m.  (For further details see Preliminary Injunction Order)

Date: 7/25/2016                 /s/  Judge Milton I. Shadur

⚠ Caution
As of: October 21, 2020 9:13 PM Z

# *Shambour v. Carver County*

United States District Court for the District of Minnesota

August 11, 2014, Decided; August 11, 2014, Filed

Civ. No. 14-566 (RHK/LIB)

**Reporter**
2014 U.S. Dist. LEXIS 110267 *; 2014 WL 3908334

Angela Kay Shambour, Plaintiff, v. Carver County, et al., Defendants.

**Subsequent History:** Affirmed by *Shambour v. Carver Cty., 2017 U.S. App. LEXIS 18456 (8th Cir. Minn., Sept. 25, 2017)*

**Prior History:** *Potocnik v. Anoka County, 2014 U.S. Dist. LEXIS 21845 (D. Minn., Feb. 21, 2014)*

## Core Terms

law-enforcement, impermissible, privacy, motor-vehicle, occurrences, driver's, accrues, joinder

## Case Summary

### Overview

HOLDINGS: [1]-Where plaintiff alleged that numerous government employees and the cities and counties employing them violated the Driver's Privacy Protection Act (DPPA), *18 U.S.C.S. §§ 2721-2725*, by allowing access to her Driver and Vehicle Services records, claims against the named defendants were dismissed because plaintiff failed to allege that their disclosures were for an impermissible purpose; [2]-As for allegations that unknown individuals accessed her information for an impermissible purpose, the claims survived dismissal because allegations that some of the 59 searches were

conducted at odd hours of the night and that each search for her records was conducted by name rather than by license plate number, supported a reasonable inference that her records were accessed in violation of the DPPA.

### Outcome
Motions to dismiss granted in part and denied in part.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN1*[⬇] **Motions to Dismiss, Failure to State Claim**

To avoid dismissal, a complaint must include enough facts to state a claim to relief that is plausible on its face. A formulaic recitation of the elements of a cause of action will not suffice. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.

2014 U.S. Dist. LEXIS 110267, *110267

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN2*[↓] **Motions to Dismiss, Failure to State Claim**

When reviewing a motion to dismiss, the court must accept the plaintiff's specific factual allegations as true but need not accept a plaintiff's legal conclusions. The complaint must be construed liberally, and any allegations or reasonable inferences arising therefrom must be interpreted in the light most favorable to the plaintiff. A complaint should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. Accordingly, a well-pleaded complaint will survive a motion to dismiss even if it appears that recovery is very remote and unlikely. Finally, the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.

Civil Rights Law > ... > Privacy Rights > Personal Information Disclosure by Government > Driver Privacy Protection Act

*HN3*[↓] **Personal Information Disclosure by Government, Driver Privacy Protection Act**

The Driver's Privacy Protection Act (DPPA), *18 U.S.C.S. §§ 2721-2725*, is a federal statute restricting the use and distribution of personal information contained in motor-vehicle records. The DPPA outlines fourteen permissible purposes for which government employees may access motor-vehicle records, including, for example, law-enforcement purposes. Any access for a purpose not enumerated by the statute constitutes a violation of the DPPA. *18 U.S.C.S. §§ 2721(b)*, *2722(a)*.

Civil Rights Law > ... > Privacy Rights > Personal Information Disclosure by Government > Driver Privacy Protection Act

*HN4*[↓] **Personal Information Disclosure by Government, Driver Privacy Protection Act**

See *18 U.S.C.S. § 2722(a)*.

Civil Rights Law > ... > Privacy Rights > Personal Information Disclosure by Government > Driver Privacy Protection Act

*HN5*[↓] **Personal Information Disclosure by Government, Driver Privacy Protection Act**

The language of the Driver's Privacy Protection Act, *18 U.S.C.S. §§ 2721-2725*, is clear: to violate the statute, a defendant must have acted with an impermissible purpose.

Civil Rights Law > ... > Privacy Rights > Personal Information Disclosure by Government > Driver Privacy Protection Act

*HN6*[↓] **Personal Information Disclosure by Government, Driver Privacy Protection Act**

Providing access to motor-vehicle records for law-enforcement purposes, however, is expressly allowed by the Driver's Privacy Protection Act, *18 U.S.C.S. §§ 2721-2725*. *18 U.S.C.S. § 2721(b)(1)*.

Civil Rights Law > ... > Privacy Rights > Personal Information Disclosure by Government > Driver Privacy Protection Act

*HN7*[↓] **Personal Information Disclosure by Government, Driver Privacy Protection Act**

Simply retrieving records without a permitted purpose is a violation of the Driver's Privacy Protection Act, *18 U.S.C.S. §§ 2721-2725*.

Evidence > ... > Presumptions > Particular Presumptions > Regularity

*HN8*[↓] **Particular Presumptions, Regularity**

The presumption of regularity applies to the official acts of public officers and provides that, in the absence of evidence to the contrary, courts will presume that public officers have discharged their official duties.

Martin Trainor

2014 U.S. Dist. LEXIS 110267, *110267

Governments > Legislation > Statute of Limitations > Time Limitations

*HN9*[ ] **Statute of Limitations, Time Limitations**

See *18 U.S.C.S. § 1658*.

Civil Rights Law > ... > Privacy Rights > Personal Information Disclosure by Government > Driver Privacy Protection Act

Governments > Legislation > Statute of Limitations > Time Limitations

*HN10*[ ] **Personal Information Disclosure by Government, Driver Privacy Protection Act**

A cause of action under the Driver's Privacy Protection Act (DPPA), *18 U.S.C.S. §§ 2721-2725*, accrues when the violation occurs, and not upon its discovery. While Eighth Circuit law generally favors the "discovery rule" in federal-question cases, given Supreme Court precedent and the nature of DPPA claims, the "occurrence rule" applies instead.

Civil Rights Law > ... > Privacy Rights > Personal Information Disclosure by Government > Driver Privacy Protection Act

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

*HN11*[ ] **Personal Information Disclosure by Government, Driver Privacy Protection Act**

*42 U.S.C.S. § 1983* does not provide a remedy for allegedly unlawful accesses of motor-vehicle records.

Civil Procedure > Parties > Joinder of Parties > Permissive Joinder

*HN12*[ ] **Joinder of Parties, Permissive Joinder**

See *Fed. R. Civ. P. 20*.

Civil Procedure > Parties > Joinder of Parties > Permissive Joinder

*HN13*[ ] **Joinder of Parties, Permissive Joinder**

The U.S. Court of Appeals for the Eighth Circuit and the U.S. Supreme Court have encouraged a broad reading of *Fed. R. Civ. P. 20* and the term "transaction," in the interests of convenience and efficiency.

Governments > Legislation > Interpretation

*HN14*[ ] **Legislation, Interpretation**

See *Fed. R. Civ. P. 1*.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

*HN15*[ ] **Judges, Discretionary Powers**

The scope of a civil action is a matter for the discretion of the district court.

**Counsel:** [*1] Jonathon A. Strauss, Kenneth H. Fukuda, Lorenz F. Fett, Jr., Sonia L. Miller-Van Oort, Sapientia Law Group, Minneapolis, Minnesota, for Plaintiff.

Margaret A. Skelton, Erin E. Benson, Timothy A. Sullivan, Ratwik, Roszak & Maloney, PA, Minneapolis, Minnesota, for Defendants Carver County and Rice County.

Jon K. Iverson, Stephanie A. Angolkar, Susan M. Tindal, Iverson Reuvers Condon, Bloomington, Minnesota, for Defendants Cities of Cottage Grove, Dundas, Farmington, Lonsdale, Northfield, and West St. Paul.

Kimberly R. Parker, Robert B. Roche, Ramsey County Attorney's Office, St. Paul, Minnesota, for Defendant Ramsey County.

Cheri M. Sisk, City of St. Paul Attorney's Office, St. Paul, Minnesota, for Defendant City of St. Paul.

Oliver J. Larson, Minnesota Attorney General's Office,

St. Paul, Minnesota, for Defendants Michael Campion and Ramona Dohman.

**Judges:** RICHARD H. KYLE, United States District Judge.

**Opinion by:** RICHARD H. KYLE

# Opinion

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

In this action, Plaintiff Angela Shambour ("Shambour") alleges numerous government employees and the cities and counties employing them violated her statutory, constitutional, and common-law privacy rights by accessing or allowing access to her **[*2]** Driver and Vehicle Services ("DVS") records. Defendants now move to dismiss Shambour's claims or, alternatively, to sever them; for the following reasons, their Motions will be granted in part.[1]

**BACKGROUND**

Shambour alleges the following facts in her First Amended Complaint.

Shambour was a law-enforcement officer with the Northfield Police Department from 1992 until 1998, and has been an Assistant County Attorney in St. Louis County, Minnesota, since 2000. In 2013, Shambour requested and received an audit report by the Department of Public Safety ("DPS"), where she discovered that her DVS records were accessed fifty-

nine times by individuals at law-enforcement and other agencies across Minnesota between 2003 and 2011.

In response to the audit report, Shambour filed this action on February 28, 2014, against the unknown individuals who accessed her information ("Individual Defendants") and their supervisors ("Supervisor Defendants"); the cities **[*3]** and counties who employed the Individual Defendants at the time of the alleged accesses ("Entity Defendants"); Mona Dohman and Michael Campion ("Commissioner Defendants"), acting in their individual capacities as Commissioners of DPS between 2003 and 2011; and unidentified officers, supervisors, employees, staff, independent contractors, and agents of DPS ("DPS Does").

In her Complaint, Shambour alleges that her records could not have been accessed for legitimate law-enforcement purposes because she was never charged with or suspected of committing a crime during the relevant time period, nor was she stopped for a traffic violation. Shambour also asserts that her motor-vehicle records were accessed through searches by name rather than by driver's license number, further suggesting that her records were viewed for a purpose unrelated to law enforcement or traffic safety. Shambour alleges that her appearance has "changed noticeably" since 1998 (Compl. ¶ 38), and hypothesizes that individuals may have viewed her driver's license information out of romantic attraction or curiosity related to this change. DVS records such as those accessed generally contain information about physical appearance, **[*4]** including a color photograph, height, weight, and eye color, as well as a home address, date of birth, driver identification number, and possibly social security and donor information.

In her Complaint, Shambour asserts five claims: violations of the Driver's Privacy Protection Act ("DPPA"), *18 U.S.C. §§ 2721-2725*, against all Defendants (Count I); violations of *42 U.S.C. § 1983* against Individual Defendants (Count II), Entity Defendants and Supervisor Defendants (Count III), and Commissioner Defendants and DPS Does (Count IV); and an invasion of privacy under Minnesota common law against all Defendants (Count V).

**STANDARD OF DECISION**

The Supreme Court set forth the standard for evaluating a motion to dismiss in *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929*

---

[1] The Motions to Dismiss will be granted as to the named Defendants but denied to the extent the named Defendants purport to move on behalf of certain John or Jane Doe Defendants (who will remain) and to the extent they seek to sever Shambour's claims.

2014 U.S. Dist. LEXIS 110267, *4

*(2007)*, and *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. **HN1**[↑] To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly, 550 U.S. at 547*. A "formulaic recitation of the elements of a cause of action" will not suffice. *Id. at 555*. "The **[*5]** plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 556*).

**HN2**[↑] When reviewing a motion to dismiss, the Court "must accept [the] plaintiff's specific factual allegations as true but [need] not . . . accept a plaintiff's legal conclusions." *Brown v. Medtronic, Inc., 628 F.3d 451, 459 (8th Cir. 2010)* (citing *Twombly, 550 U.S. at 556*). The complaint must be construed liberally, and any allegations or reasonable inferences arising therefrom must be interpreted in the light most favorable to the plaintiff. *Twombly, 550 U.S. at 554-56*. A complaint should not be dismissed simply because the Court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. *Id. at 556*. Accordingly, a well-pleaded complaint will survive a motion to dismiss even if it appears that recovery is very remote and unlikely. Id. "Finally, the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009)*.

**ANALYSIS**

**I. [*6] DPPA Claims**

**HN3**[↑] The DPPA is a federal statute restricting the use and distribution of personal information contained in motor-vehicle records. The statute was enacted in 1994 in response to growing concern about the potential for abuse of such information. One catalyst for its enactment was the 1989 murder of actress Rebecca Schaeffer, whose stalker obtained her unlisted home address through the California Department of Motor Vehicles. Maureen Maginnis, *Maintaining the Privacy of Personal Information: The DPPA and the Right of Privacy*, *51 S.C. L. REV. 807, 809 (2000)*. The DPPA outlines fourteen permissible purposes for which government employees may access motor-vehicle records, including, for example, law-enforcement

purposes. Any access for a purpose *not* enumerated by the statute constitutes a violation of the DPPA. *18 U.S.C. §§ 2721(b), 2722(a)*.

Asserting the private right of action provided by the DPPA, Shambour claims that all Defendants violated the DPPA by accessing or allowing access to her motor-vehicle records for purposes unrelated to law enforcement. For the reasons that follow, the Court will dismiss all Shambour's DPPA claims except those asserted against Individual Defendants.

**A. [*7]** *Claims Against Commissioner, Supervisor, and Entity Defendants and DPS Does*

The DPPA declares that "**HN4**[↑] [i]t shall be unlawful for any person[2] knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under *section 2721(b)* of this title." *18 U.S.C. § 2722(a)*. Shambour asserts that DPS Does, Commissioners, Supervisors, and Entity Defendants disclosed her records in violation of the DPPA by allowing the Individual Defendants to access them. These Defendants argue Shambour has failed to allege their disclosures were for an impermissible purpose and the Court agrees.

**HN5**[↑] The language of the DPPA is clear: to violate the statute, a defendant must have acted with an impermissible purpose. Shambour, however, does not allege that the Commissioners, Supervisors, DPS Does, or Entity Defendants *themselves* acted with such a purpose. Instead, Shambour alleges these Defendants violated the DPPA by allowing law-enforcement officers access to her records, and that such access opened the door for abuse by the officers. **HN6**[↑] Providing access to motor-vehicle **[*8]** records for law-enforcement purposes, however, is expressly allowed by the DPPA. *Id. § 2721(b)(1)*. And Shambour has not alleged any facts indicating law-enforcement officers were given access to DVS records for any other reason. In the absence of any factual allegations to the contrary, the only reasonable inference to be drawn is that these Defendants provided law-enforcement officers with access to the DVS database for the purpose of carrying out their jobs, which is permitted under the DPPA. See id. Accordingly, Shambour's DPPA claims against these Defendants will be dismissed.

_____

[2] The DPPA defines "person" to include organizations and entities, though not State agencies. *18 U.S.C. § 2725(2)*.

2014 U.S. Dist. LEXIS 110267, *8

## B. Claims Against Individual Defendants

Individual Defendants argue that Shambour's DPPA claims against them should also be dismissed for failure to state a claim because (1) they did not "obtain" or "disclose" Shambour's personal information by accessing her DVS records, and (2) Shambour has not alleged sufficient facts to support her allegations of impermissible purpose.

First, Individual Defendants argue that by merely viewing DVS records, they did not "obtain" or "disclose" Shambour's personal information, as required to violate the DPPA. This argument is a nonstarter, as this Court has previously held that **[*9]** "information may be 'obtained' simply through viewing" it. *Nelson v. Jesson, Civ. No. 13-340, 2013 U.S. Dist. LEXIS 156711, 2013 WL 5888235, at *8 (D. Minn. Nov. 1, 2013)* (Kyle, J.); see also *Smythe v. City of Onamia, Civ. No. 12-3149, 2013 U.S. Dist. LEXIS 78948, 2013 WL 2443849, at *6 (D. Minn. June 5, 2013)* ("HN7[↑] [S]imply retrieving records without a permitted purpose is a violation" of the DPPA.).

Second, Individual Defendants argue that Shambour's claims must be dismissed for failing to allege facts supporting a plausible inference that they accessed her information for an impermissible purpose. They argue she has provided only a "[t]hreadbare recital[] of the elements of [her] cause of action" and "mere conclusory statements," which do not suffice. *Iqbal, 556 U.S. at 678*. To the contrary, Shambour alleges specific facts that, taken together, create a plausible claim that her information was *not* accessed for law-enforcement or other government purposes.

The Complaint alleges Shambour's records were searched fifty-nine times between 2003 and 2011 despite her never having been pulled over for a traffic violation, charged with a crime, suspected of a crime, or involved in any kind of civil or arbitral proceeding during this period. It is difficult, **[*10]** then, to imagine a permissible purpose warranting such a high volume of searches. While the number of searches alone might not be sufficient to state a claim, see, e.g., *Bass v. Anoka Cnty., Civ. No. 13-860, 998 F. Supp. 2d 813, 2014 U.S. Dist. LEXIS 21846, 2014 WL 683969, at *3 (D. Minn. Feb. 21, 2014)* (court would not infer impermissible purpose based "solely [on] number of times defendants allegedly accessed the [plaintiff's] record"); *McDonough v. Al's Auto Sales, Inc., Civ. No. 13-1889, 2014 U.S. Dist. LEXIS 21847, 2014 WL 683998, at *3 (D. Minn. Feb. 21, 2014)* (same), some of the searches were also conducted at odd hours of the night, which further suggests impermissible use, see *Roschen v. Wabasha Cnty., Civ No. 13-2490, 2014 U.S. Dist. LEXIS 87005 (D. Minn. June 26, 2014)* (allegations of impermissible purposes insufficient because plaintiffs did not allege that searches were made at odd hours or by name). Additionally, although Shambour is not a celebrity, her employment as a Northfield law-enforcement officer and Assistant St. Louis County Attorney make her reasonably well-known in those communities, and could account for why officers would want to access her information. Most telling is that each search for her records was conducted by name rather than by license **[*11]** plate number. See id. Together, these facts support a reasonable inference that her records were accessed in violation of the DPPA. Cf. *Kampschroer v. Anoka Cnty., Civ. No. 13-2512, 2014 U.S. Dist. LEXIS 90830, 2014 WL 3013101, at *9 (D. Minn. July 3, 2014)* (plaintiffs alleged impermissible purpose where their collective searches numbered over 1,000, searches were by name, plaintiffs were local media personalities and were not suspected in any law-enforcement matters); *Mallak v. Aitkin Cnty., Civ. No. 13-2119, 9 F. Supp. 3d 1046, 2014 U.S. Dist. LEXIS 43349, 2014 WL 1285807, at *10 (D. Minn. Mar. 31, 2014)* (plaintiff alleged impermissible purpose where searches were made by name, the plaintiff was a well-known attorney in her community, and searches were conducted early in the morning); but cf. *Ray v. Anoka Cnty., Civ. No. 14-539, 24 F. Supp. 3d 843, 2014 U.S. Dist. LEXIS 75792, 2014 WL 2511087, at *5 (D. Minn. June 4, 2014)*; *Mitchell v. Aitkin Cnty., Civ. No. 13-2167, 2014 U.S. Dist. LEXIS 27089, 2014 WL 835129, at *9 (D. Minn. Mar. 4, 2014)*.[3]

## C. Statute of Limitations

Defendants assert that many of the DPPA claims are

---

[3] Defendants also argue they are entitled to a presumption of regularity, citing *United States v. Chemical Foundation, 272 U.S. 1, 15, 47 S. Ct. 1, 71 L. Ed. 131 (1926)*, and that such presumption merits dismissal of Shambour's claims. HN8[↑] This presumption applies to the "official acts of public officers" and provides that, "in **[*12]** the absence of evidence to the contrary," courts will "presume that [public officers] have discharged their official duties." *Id. at 14-15*. While the Court doubts whether this presumption applies to the instant case at all, it certainly does not merit dismissing the case before Shambour has had an opportunity to discover "evidence to the contrary."

2014 U.S. Dist. LEXIS 110267, *12

time-barred. Both parties agree the applicable statute of limitations is 28 U.S.C. § 1658, which provides: "HN9[↑]] Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues." The parties do not agree, however, on *when* a cause of action accrues under the DPPA. Shambour argues her cause of action accrued when she discovered or reasonably should have discovered the violations. Conversely, Defendants argue it accrued when the alleged violations occurred, in other words, when Shambour's records were accessed.

Other judges in this District have addressed the issue and unanimously concluded that HN10[↑] a cause of action under the DPPA **[*13]** accrues when the violation occurs, and not, as Shambour argues, upon its discovery. *Ray, 2014 U.S. Dist. LEXIS 75792, 2014 WL 2511087, at *3*; *Mitchell, 2014 U.S. Dist. LEXIS 27089, 2014 WL 835129, at *4*; *Potocnik v. Carlson, Civ. No. 14-2093, 9 F. Supp. 3d 981, 2014 U.S. Dist. LEXIS 38018, 2014 WL 1206403, at *8-12 (D. Minn. Mar. 24, 2014)*; *Bass, 2014 U.S. Dist. LEXIS 21846, 2014 WL 683969, at *2*; *Rasmusson v. Chisago Cnty., Civ. No. 12-632, 991 F. Supp. 2d 1065, 2014 U.S. Dist. LEXIS 3102, 2014 WL 107067, at *11-14 (D. Minn. Jan. 10, 2014)*. While Eighth Circuit law generally favors the "discovery rule" in federal-question cases such as this, the Court agrees with Potocnik that—given recent Supreme Court precedent and the nature of DPPA claims—the "occurrence rule" applies instead. *2014 U.S. Dist. LEXIS 38018, 2014 WL 1206403, at *11-12* (discussing *Gabelli v. SEC, U.S. , 133 S. Ct. 1216, 1223, 185 L. Ed. 2d 297 (2013)* and *TRW Inc. v. Andrews, 534 U.S. 19, 23, 122 S. Ct. 441, 151 L. Ed. 2d 339 (2001))*. Accordingly, the Court will dismiss Shambour's DPPA claims based on alleged violations occurring before February 28, 2010.

## II. *Section 1983* Claims

Shambour asserts claims under *42 U.S.C. § 1983*, alleging that Defendants violated her right to privacy as secured by the DPPA and by the *Fourth* and *Fourteenth Amendments of the U.S. Constitution*. In *Nelson*, the undersigned addressed this same issue of whether HN11[↑] *§ 1983* provides a remedy for allegedly **[*14]** unlawful accesses of motor-vehicle records and the Court concluded it does not. *2013 U.S. Dist. LEXIS 156711, 2013 WL 5888235, at *3-7*. Shambour has presented no additional allegations or arguments here

that persuade the Court its prior ruling was erroneous or does not apply. Accordingly, her *§ 1983* claims will be dismissed. *See also Kampschroer, 2014 U.S. Dist. LEXIS 90830, 2014 WL 3013101, at *11-12*; *Kiminski v. Hunt, Civ. No. 13-185 et al., 2013 U.S. Dist. LEXIS 157829, 2013 WL 6872425, at *10-14 (Sept. 20, 2013)*; *Bass, 2014 U.S. Dist. LEXIS 21846, 2014 WL 683969, at *6-7*; *Mallak, 2014 U.S. Dist. LEXIS 43349, 2014 WL 1285807, at *10-11*.[4]

## III. Common-Law Invasion of Privacy

Lastly, Shambour asserts a common-law claim of invasion of privacy against all Defendants, claiming that Defendants' accessing or allowing access to her DVS records intruded upon her seclusion. Once again, the Court considered this same issue in Nelson and concluded the facts alleged did not state a claim for common-law invasion of privacy. *2013 U.S. Dist. LEXIS 156711, [WL] at *8*. And once again, Shambour has presented no additional allegations or arguments that persuade the Court to abandon its prior ruling, so her claim **[*15]** will be dismissed. *See also Rasmusson, 2014 U.S. Dist. LEXIS 3102, 2014 WL 107067, at *10*; *Bass, 2014 U.S. Dist. LEXIS 21846, 2014 WL 683969, at *7*; *Mallak, 2014 U.S. Dist. LEXIS 43349, 2014 WL 1285807, at *14*.

## IV. Severance of Claims

Entity Defendants move to sever all remaining claims from one another, effectively isolating each allegation of an improper look-up. *Federal Rule of Civil Procedure 20* provides:

> HN12[↑]] All persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transactions, occurrences, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

Entity Defendants argue that because Shambour does not allege any joint action or collaboration among Defendants, the Court should sever her claims into

_____

[4] Defendants also argue they are entitled to qualified immunity, but as the Court will dismiss Shambour's *§ 1983* claims on other grounds, it need not address this argument.

Martin Trainor

2014 U.S. Dist. LEXIS 110267, *15

multiple actions—one per alleged violation. In support, they cite *Movie Systems, Inc. v. Abel, 99 F.R.D. 129, 130 (D. Minn. 1983)*, which refused to allow a plaintiff to join claims against almost two thousand defendants accused of pirating microwave signals, where no concert of action was alleged. *Movie Systems* reasoned that *Rule 20* allows joinder where a right to relief **[*16]** against all defendants arises from the *same* transaction, not merely *similar* transactions. Id.

But *HN13*[⬆] the Eighth Circuit and the U.S. Supreme Court have encouraged a broad reading of *Rule 20* and the term "transaction," in the interests of convenience and efficiency. See *United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)* ("[T]he impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder . . . is strongly encouraged."); *Moore v. N.Y. Cotton Exch., 270 U.S. 593, 610, 46 S. Ct. 367, 70 L. Ed. 750 (1926)* ("'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship."); *Mosley v. Gen. Motors, 497 F.2d 1330, 1332-33 (8th Cir. 1974)* ("The purpose of [*Rule 20*] is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits."). In Mosley, the Eighth Circuit permitted joinder of claims and parties where the defendants' individual actions served to further a system of discrimination, even though plaintiff had not alleged they acted in concert. *Id. at 1333-34* ("[A] company-wide **[*17]** policy purportedly designed to discriminate against blacks in employment similarly arises out of the same series of transactions or occurrences."); see also *United States v. Mississippi, 380 U.S. 128, 142, 85 S. Ct. 808, 13 L. Ed. 2d 717 (1965)* (joinder of defendants was proper under *Rule 20* because each defendant acted as part of a state-wide system of discrimination).

In the matter at hand, joinder is proper because the alleged acts similarly support a larger allegation of a systemic problem and the Court is persuaded that keeping Shambour's claims together is not only permissible but preferable. As the allegations against Defendants share many common issues of law and fact, litigating them jointly serves the interest of judicial economy while minimizing delay, inconvenience, and expense overall. See *Fed. R. Civ. P. 1* ("*HN14*[⬆]] [The Rules of Civil Procedure] should be construed and administered to secure the just, speedy, and inexpensive determination of every action and

proceeding.") It is therefore in the Court's and Shambour's best interests to litigate the claims in a single action, rather than create nine new actions, and the Court cannot discern any real prejudice or unfairness to Defendants as a result. As such, the **[*18]** Court declines to sever Shambour's claims. See *Mosley, 497 F.2d at 1332* ("*HN15*[⬆]] [T]he scope of a civil action is . . . a matter for the discretion of the district court.").

**CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that the Motions to Dismiss (Doc. Nos. 13, 19, 25, 27, 33, 47) are **DENIED IN PART** to the extent they seek to sever Shambour's claims and **GRANTED IN PART** as follows:

> (1) Count One is **DISMISSED WITHOUT PREJUDICE** as to Entity Defendants, Supervisor Defendants, Commissioner Defendants, and DPS does;

> (2) Count One is **DISMISSED WITH PREJUDICE** against all Jane and John Doe Defendants who allegedly accessed Shambour's records before February 28, 2010;

> (3) Counts Two, Three, Four, and Five are **DISMISSED WITH PREJUDICE**;

For the sake of clarity— Count One remains pending against John and Jane Doe Defendants who allegedly accessed Shambour's motor-vehicle records on or after February 28, 2010.

Dated: August 11, 2014

/s/ Richard H. Kyle

RICHARD H. KYLE

United States District Judge

**End of Document**


Positive
As of: October 21, 2020 9:08 PM Z

## *Slep-Tone Entm't Corp. v. Roberto*

United States District Court for the Northern District of Illinois, Eastern Division

October 22, 2013, Decided; October 22, 2013, Filed

Case No. 12-cv-5750

**Reporter**
2013 U.S. Dist. LEXIS 151923 *; 2013 WL 5748896

SLEP-TONE ENTERTAINMENT CORPORATION, Plaintiff, v. DANIEL ROBERTO, et al., Defendants.

## Core Terms

trademark, karaoke, infringement, occurrence, customers, joinder, Entertainment, unfair, join

**Counsel:** **[*1]** For Slep-Tone Entertainment Corporation, Plaintiff: Mark C. Gross, Gross & Boyle LLC, Hinsdale, IL; Brian Joseph Laurenzo, Brick Gentry, P.C., West Des Moines, IA.

For Gary DeLong, Arrowsound Entertainment, Defendants: Philip F Cuevas, LEAD ATTORNEY, Litchfield Cavo LLP, Chicago, IL; Patrick John Ruberry, Litchfield and Cavo, LLP, Chicago, IL.

For Corner Clubhouse Bar and Grill, Inc., doing business as Shanahan's Food & Spirits of Woodridge, D&R Catering Co., doing business as Shanahan's Food & Spirits, Defendants: Kevin P. O'Flaherty, LEAD ATTORNEY, O'Flaherty Law, P.C., Downers Grove, IL.

**Judges:** JOHN W. DARRAH, United States District Court Judge.

**Opinion by:** JOHN W. DARRAH

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff Slep-Tone Entertainment Corporation ("Slep-Tone") has brought this action against several Defendants, alleging, *inter alia*, infringement of Slep-Tone's trademarked karaoke discs. Defendants Gary DeLong, Arrowsound Entertainment ("Arrowsound"), and D&R Catering Co., Corner Clubhouse Bar and Grill d/b/a Shanahan's Pub, Inc. ("D&R Catering") moved to dismiss the Amended Complaint, pursuant to *Fed. R. Civ. P. 12(b)(6)*, for failure to state a claim for relief. Alternatively, Defendants moved for severance **[*2]** based on improper joinder. [1] After the Motions were filed and briefed, Slep-Tone dismissed D&R Catering with prejudice. For the reasons presented below, DeLong and Arrowsound's Motion to Dismiss is denied, and the Motion to Sever is granted. Defendants DeLong and Arrowsound are dismissed, for improper joinder, without prejudice.

### BACKGROUND

Slep-Tone, a North Carolina corporation, is a manufacturer and distributor of karaoke accompaniment tracks sold under the name "Sound Choice." (Am. Compl. ¶¶ 16-17.) [2] Slep-Tone owns federal trademark registrations for the "Sound Choice" word and design marks (the "Sound Choice trademarks"). (*Id.* ¶¶ 53-56.)

---

[1] None of the Defendants has filed a reply brief in support of their Motions.

[2] The following facts are taken from the Complaint, which are assumed to be true for the purposes of a motion to dismiss. **[*3]** *See Reger Dev., LLC v. Nat'l City Bank, 592 F.3d 759, 763 (7th Cir. 2010)*.

2013 U.S. Dist. LEXIS 151923, *3

Slep-Tone alleges that its trademarked karaoke recordings have been illegally copied, shared, distributed, sold by or to Defendants for use without paying Slep-Tone and without Slep-Tone's consent. When the Slep-Tone's pirated karaoke recordings are used to perform karaoke shows, the Sound Choice trademarks are displayed on the video screen. (*Id.* ¶ 21.)

On July 23, 2012, Slep-Tone filed its initial Complaint against twenty separately named defendants, including individual karaoke entertainers, associated corporate entities, and restaurants providing karaoke entertainment. Slep-Tone subsequently dismissed various Defendants and filed an Amended Complaint, which asserts claims for trademark and/or trade dress infringement (Count I); unfair competition in violation of the Lanham Act, *15 U.S.C. § 1125(a)* (Count II); and a state law claim under the Illinois Deceptive Trade Practices Act (Count III). DeLong is a partner-owner of Arrowsound, and both are in the business of providing karaoke entertainment. (Am. Compl. ¶ 9.) Slep-Tone has filed a number of similar cases in other jurisdictions across the country.

## LEGAL STANDARD

*Federal Rule of Civil Procedure 8(a)* requires that the plaintiff provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Rule 8* "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* **[*4]** (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. Under the Federal Rules, the defendant can assert a defense that the plaintiff failed "to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)*. To defeat a motion to dismiss under *Rule 12(b)(6)*, a plaintiff must plead sufficient factual matter to state a claim for relief that is "plausible on its face." *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 570*). To meet the plausibility standard, the plaintiff must put forth enough "facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's allegations. *Brooks v. Ross, 578 F.3d 574, 581 (7th Cir. 2009)* (quoting *Twombly, 550 U.S. at 556*). A 12(b)(6) motion does not evaluate "whether a plaintiff will ultimately prevail" but instead whether the plaintiff is entitled to present evidence in support of the claims. *AnchorBank, FSB v. Hofer, 649 F.3d 610, 614 (7th Cir. 2011)* (internal quotation and citation omitted).

## ANALYSIS

To state a claim for trademark or trade dress infringement under the Lanham Act, a plaintiff must allege that: (1) it owns a protectable trademark, and (2) the use of that mark by the defendant **[*5]** is likely to cause confusion among consumers. *Segal v. Geisha NYC LLC, 517 F.3d 501, 506 (7th Cir. 2008)*; *see also Packman v. Chicago Tribune Co., 267 F.3d 628, 638 (7th Cir. 2001)*. A service mark is "in use in commerce" when the mark "is used or displayed in the sale or advertising of services and the services are rendered in commerce." *15 U.S.C. § 1127*. Courts use the same analysis for deciding whether a plaintiff has stated a claim for unfair competition. *See, e.g., Flentye v. Kathrein, 485 F. Supp. 2d 903, 918 (N.D. Ill. 2007)* ("To state a claim of unfair competition under the Lanham Act, Plaintiffs must allege that (1) their mark is protectable, and (2) Defendants' use of the mark is likely to cause confusion among consumers."). Here, Defendants do not dispute that Slep-Tone has alleged ownership of a valid and protectable mark. Rather, Defendants argue that Slep-Tone has failed to allege Defendants used Slep-Tone's trademark in a manner likely to cause confusion.

Slep-Tone has alleged that "Defendants' use of the Sound Choice Marks, or of the Trade Dress, or both is likely to cause confusion, or to cause mistake, or to deceive the Defendants' customers and patrons into believing **[*6]** that the Defendants' services are being provided with the authorization of the Plaintiff and that the Defendants' music libraries contain bona fide Sound Choice accompaniment tracks." (Compl. ¶ 92.) Slep-Tone has likewise alleged that "Defendants display SLEP-TONE's registered trademarks to their customers or potential customers for purposes of advertising to their customers the quality and superiority that is associated with SLEP-TONE products" and that "Defendants, both [Karaoke Jockeys] and venues, directly benefit from the advertisement of SLEP-TONE's registered trademarks." (*Id.* ¶¶ 34-35.) Construing all inferences in Slep-Tone's favor, as is required on a motion to dismiss, these allegations, taken in context with the other allegations of the Amended Complaint, plausibly state a claim for trademark infringement. Likewise, Slep-Tone has stated a claim for unfair competition under *15 U.S.C. § 1125(a)*. Slep-Tone has alleged that Defendants' use of counterfeit karaoke

2013 U.S. Dist. LEXIS 151923, *6

tapes with the Sound Choice trademarks is likely to cause confusion among customers (*see* Am. Compl. ¶¶ 98-99, 104-05) and that this unfair competition has harmed Slep-Tone and Slep-Tone's legitimate customers (*id.* ¶¶ **[*7]** 106-07).

For the same reasons, Slep-Tone has also stated a claim under the Illinois Uniform Deceptive Trade Practices Act ("DTPA"), *815 ILCS 510/2*. Among other things, the DTPA provides that "[a] person engages in a deceptive trade practice when . . . the person : . . . causes a likelihood of confusion or misunderstanding as to the source, sponsorship . . . . [etc.]." *815 ILCS 510/2(a)(2)*. Slep-Tone's DTPA claim mirrors its Lanham Act claims; where factual allegations underlying a Lanham Act claim also form the basis for a claim under the DTPA, the DTPA claim "must rise or fall based on the Lanham Act claim." *MJ & Partners Rest. Ltd. P'ship v. Zadikoff, 10 F.Supp.2d 922, 929 (N.D. Ill. 1998)*. Defendants' Motion to Dismiss is denied. [3]

*Joinder*

Under *Federal Rule of Civil Procedure 20(a)(2)*, defendants "may be joined in one action as defendants" if the following two conditions are met: (1) "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions **[*8]** or occurrences," and (2) "any question of law or fact common to all defendants will arise in the action." *Fed. R. Civ. P. 20(a)(2)(A)-(B)*. "On motion or on its own, the court may at any time, on just terms, add or drop a party." *Fed. R. Civ. P. 21*.

Defendants argue that they should be severed from this action because they have no relationship with each other and were not involved in any of the same "transaction, occurrence, or series of transactions or occurrences" with any of the other Defendants. Slep-Tone responds that joinder is proper based primarily on its allegation that the infringement stems from its allegedly pirated karaoke tapes.

Courts in this district have repeatedly recognized that similarity of claims between a plaintiff and various defendants is not sufficient for joinder. *See, e.g., McDowell v. Morgan Stanley & Co., 645 F. Supp. 2d 690, 697 (N.D. Ill. 2009)* ("One or more defendants' similar conduct, without anything more, does not rise to a sufficient level that would justify joining those defendants in a single action pursuant to *Rule 20*."); *SB Designs v. Reebok Int'l, Ltd., 305 F. Supp. 2d 888, 892 (N.D. Ill. 2004)* ("The fact that the defendants allegedly violated **[*9]** the same trademark does not mean that plaintiffs' claims against them arise out of the same transaction or occurrence."); *Androphy v. Smith & Nephew, Inc., 31 F. Supp. 2d 620, 623 (N.D. Ill. 1998)* (holding that defendants in patent-infringement case who sold different products and were competitors of one another were improperly joined); *Pergo, Inc. v. Alloc, Inc., 262 F. Supp. 2d 122, 128 (S.D.N.Y. 2003)* ("The fact that two parties may manufacture or sell similar products, and that these sales or production may have infringed the identical patent owned by the plaintiffs is not sufficient to join unrelated parties as defendants in the same lawsuit pursuant to *Rule 20(a)*."). Indeed, courts in other districts addressing similar lawsuits by Slep-Tone have held that Slep-Tone's allegations of infringement are insufficient to join many defendants. *See Slep-Tone Entm't Corp. v. Ellis Island Casino & Brewery, et al., No. 2:12-CV-239-KJD-NJK, 2013 U.S. Dist. LEXIS 17967, 2013 WL 530905 (D. Nev. Feb. 11, 2013); Slep-Tone Entm't Corp. v. Mainville, et al., No. 3:11-cv-122, 2011 U.S. Dist. LEXIS 116111, 2011 WL 4713230 (W.D.N.C. Oct. 6, 2011)*.

Here, there are no allegations that Defendants DeLong or Arrowsound were involved in any "transaction, occurrence, **[*10]** or series of transactions or occurrences" with any of the other Defendants. Likewise, Slep-Tone does not allege that it engaged in any transaction with any of the Defendants; rather, it essentially admits that Defendants are virtual strangers to it and each other and that the only commonality is that Defendants at some point in time allegedly infringed on Slep-Tone's trademark. Because Slep-Tone has failed to allege a basis for joinder, it is proper to sever Defendants DeLong and Arrowsound from this matter. If Slep-Tone wishes to proceed against those Defendants, Slep-Tone must file a new action, including paying a filing fee, against DeLong and Arrowsound. If Slep-Tone so proceeds, Slep-Tone should indicate that any newly filed case is related to this matter.

**CONCLUSION**

For the reasons stated above, Defendants DeLong and Arrowsound's Motion [95] to Dismiss is denied and the Motion to Sever is granted. Defendants DeLong and

---

[3] Defendants have put forth various other arguments that will not be addressed, as they are inappropriate on a motion to dismiss.

2013 U.S. Dist. LEXIS 151923, *10

Arrowsound are dismissed without prejudice. It is further ordered that if Slep-Tone wishes to proceed against those severed Defendants, Slep-Tone must file a new action against DeLong and Arrowsound.

Defendant D&R Catering's Motion [87] is denied as moot; D&R Catering **[*11]** is dismissed with prejudice based on Slep-Tone's voluntary dismissal.

Date: October 22, 2013

/s/ John W. Darrah

JOHN W. DARRAH

United States District Court Judge

---

**End of Document**

Martin Trainor

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TOO FACED COSMETICS, LLC,

        Plaintiff,

   v.

OPERATORS OF KTKT STORE, et al.,

        Defendants.

Case No. 19-cv-07762

**Judge Joan H. Lefkow**

**Magistrate Judge Jeffrey I. Cummings**

## SEALED TEMPORARY RESTRAINING ORDER

THIS CAUSE being before the Court on Plaintiff Too Faced Cosmetics, LLC's ("Too Faced" or "Plaintiff") *Ex Parte* Motion for Entry of a Temporary Restraining Order, Including a Temporary Injunction, a Temporary Asset Restraint, and Expedited Discovery, and Motion for Electronic Service of Process Pursuant to Fed. R. Civ. P. 4(f)(3) (the "Motions") against the defendants identified in Schedule A to the Second Amended Complaint and attached hereto (collectively, the "Defendants") and using at least the seller aliases identified in Schedule A (the "Seller Aliases"), and this Court having heard the evidence before it hereby GRANTS Plaintiff's Motions in their entirety.

This Court further finds that it has personal jurisdiction over the Defendants since the Defendants directly target their business activities toward consumers in the United States, including Illinois. Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Seller Aliases through which Illinois residents can purchase products using infringing and counterfeit versions of the TOO FACED Trademarks (a list of which is included in the following chart).

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 2,265,543 | TOO FACED | For: cosmetics, namely, eyeshadows, eyeliners, eyebrow pencils, mascara, lipstick, lip gloss, lipliner, nail polish, blush, powder, and foundation in class 003. |
| 4,324,526 | TOO FACED | For: on-line retail store services featuring cosmetics and beauty accessories in class 035. |
| 4,324,570 | TOO FACED | For: cosmetic brushes in class 021. |
| 4,324,571 | TOO FACED | For: consultation services in the field of make-up, namely, in-person makeup consultation and application services; On-line makeup consultation services in class 044. |
| 4,118,677 | *Too Faced* | For: cosmetics in class 003. |
| 3,020,575 | LIP INJECTION | For: cosmetics, namely lip gloss in class 003. |
| 3,573,413 | SHADOW INSURANCE | For: eye shadow primer in class 003. |
| 4,303,547 | NATURAL EYE | For: cosmetics in class 003. |
| 4,415,977 | BETTER THAN SEX MASCARA | For: cosmetics in class 003. |
| 4,561,278 | CHOCOLATE BAR | For: cosmetics; eye shadows in class 003. |
| 4,561,298 | MELTED | For: cosmetics in class 003. |
| 4,581,586 | OWN YOUR PRETTY | For: cosmetics in class 003. |
| 4,581,661 | GLAMOUR GUIDE | For: instructional cards for application of cosmetics included as component of cosmetics and cosmetic preparations in class 003. |
| 4,694,482 | CHOCOLATE SOLEIL | For: cosmetics, namely, a skin bronzer for the face, containing cocoa. |
| 4,728,951 | HANGOVER | For: cosmetic creams for skin care; cosmetic preparations for skin care; cosmetics; facial make-up, namely, primer; lotions for skin; make-up primer; moisturizing preparations |

2

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| | | for the skin; moisturizing solutions for the skin; skin cream; skin lotion in class 003. |
| 4,782,507 | BORN THIS WAY | For: cosmetics and cosmetic preparations in class 003. |
| 4,787,121 | MELTED METAL | For: cosmetics in class 003. |
| 4,958,580 | BETTER THAN FALSE LASHES | For: cosmetics and make-up in class 003. |
| 4,994,246 | SWEET PEACH | For: cosmetics and cosmetic preparations; cosmetics and make-up in class 003. |
| 5,119,831 | CHOCOLATE CHIPS | For: cosmetics in class 003. |
| 5,156,138 | PEACH BEACH | For: blusher; cosmetics and cosmetic preparations; eye shadow in class 003. |
| 5,183,607 | PAPA DON'T PEACH | For: cosmetics and cosmetic preparations in class 003. |
| 5,196,307 | SKETCH MARKER | For: cosmetics and cosmetic preparations in class 003. |
| 5,200,706 | CHOCOLATE BROW-NIE | For: cosmetics and cosmetic preparations in class 003. |
| 5,216,323 | MELTED CANDY | For: cosmetics and cosmetic preparations in class 003. |
| 5,218,958 | MELTED CHOCOLATE | For: cosmetics and cosmetic preparations; make-up in class 003. |
| 5,261,602 | NATURAL LOVE | For: cosmetics and make-up in class 003. |
| 5,262,400 | LOVE LIGHT | For: cosmetics and cosmetic preparations in class 003. |
| 5,330,953 | PEACH MY CHEEKS | For: cosmetics and cosmetic preparations in class 003. |
| 5,342,260 | CANDY GLOW | For: cosmetics and cosmetic preparations in class 003. |

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 5,351,544 | JUST PEACHY MATTES | For: cosmetics and cosmetic preparations in class 003. |
| 5,387,061 | WHITE CHOCOLATE BAR | For: cosmetics and make-up in class 003. |
| 5,408,788 | CHOCOLATE GOLD | For: cosmetic preparations; cosmetics and make-up in class 003. |
| 5,454,591 | LIFE'S A FESTIVAL | For: cosmetic preparations; cosmetics and make-up in class 003. |

This Court also finds that issuing this Order without notice pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure is appropriate because Too Faced has presented specific facts in the Declaration of Jessica Heiss, paragraphs 21-25 [14], and the Declaration of Justin R. Gaudio [13], paragraphs 5-7, in support of the Motion for Temporary Restraining Order and accompanying evidence clearly showing that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition.  Specifically, in the absence of an *ex parte* Order, Defendants could and likely would modify content and move any assets from accounts in U.S.-based financial institutions, including PayPal accounts, to offshore accounts.  *Id.* As other courts have recognized, proceedings against those who deliberately traffic in counterfeit merchandise are often useless if notice is given to the adverse party.  Accordingly, this Court orders that:

1.  Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily enjoined and restrained from:

    a.  using the TOO FACED Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine

4

Too Faced product or not authorized by Too Faced to be sold in connection with the
TOO FACED Trademarks;

b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine
Too Faced product or any other product produced by Too Faced, that is not Plaintiff's
or not produced under the authorization, control or supervision of Too Faced and
approved by Too Faced for sale under the TOO FACED Trademarks;

c.  committing any acts calculated to cause consumers to believe that Defendants' products
are those sold under the authorization, control or supervision of Too Faced, or are
sponsored by, approved by, or otherwise connected with Too Faced;

d.  further infringing the TOO FACED Trademarks and damaging Plaintiff's goodwill;
and

e.  manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving,
storing, distributing, returning, or otherwise disposing of, in any manner, products or
inventory not manufactured by or for Too Faced, nor authorized by Too Faced to be
sold or offered for sale, and which bear any of Plaintiff's trademarks, including the
TOO FACED Trademarks, or any reproductions, counterfeit copies or colorable
imitations thereof.

2.  Defendants and any third party with actual notice of this Order who is providing services
for any of the Defendants, or in connection with any of the Seller Aliases or other seller
aliases operated by Defendants, including, without limitation, any online marketplace
platforms such as iOffer, eBay, AliExpress, Alibaba, Amazon, Wish.com, and Dhgate, web
hosts, sponsored search engine or ad-word providers, credit cards, banks, merchant account
providers, third party processors and other payment processing service providers, and

Internet search engines such as Google, Bing and Yahoo (collectively, the "Third Party Providers") shall, within five (5) business days after receipt of such notice, provide to Too Faced expedited discovery, including copies of all documents and records in such person's or entity's possession or control relating to:

a. the identities and locations of Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, including all known contact information, including any and all associated e-mail addresses;

b. the nature of Defendants' operations and all associated sales, methods of payment for services and financial information, including, without limitation, identifying information associated with the Seller Aliases and Defendants' financial accounts, as well as providing a full accounting of Defendants' sales and listing history related to their respective Seller Aliases;

c. any of the Seller Aliases;

d. any other seller aliases registered by Defendants; and

e. any financial accounts owned or controlled by Defendants, including their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, including such accounts residing with or under the control of any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, Inc. ("PayPal"), Alipay, Wish.com, Amazon Pay, or other merchant account providers, payment providers, third party processors, and credit card associations (e.g., MasterCard and VISA).

3.   Upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including the Third Party Providers as defined in Paragraph 2, shall within five (5) business days after receipt of such notice:

   a.  disable and cease providing services being used by Defendants, currently or in the future, to engage in the sale of goods using the TOO FACED Trademarks;

   b.  disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the TOO FACED Trademarks; and

   c.  take all steps necessary to prevent links to the Seller Aliases identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Seller Aliases from any search index.

4.   Defendants and any persons in active concert or participation with them who have actual notice of this Order shall be temporarily restrained and enjoined from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

5.   Any Third Party Providers, including PayPal, Inc, Alipay, Wish.com, and Amazon Pay, shall, within two (2) business days of receipt of this Order, for any Defendant or any of the Seller Aliases:

   a.  locate all accounts and funds connected to Defendants or the Seller Aliases, including, but not limited to, any financial accounts connected to the information listed in Schedule A hereto, the e-mail addresses identified in Exhibit 3 to the Declaration of Jessica Heiss, and any e-mail addresses provided for Defendants by third parties; and

b.  restrain and enjoin any such accounts or funds that are not U.S. based from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

6.  Too Faced may provide notice of these proceedings to Defendants, including notice of the preliminary injunction hearing and service of process pursuant to Fed. R. Civ. P. 4(f)(3), by electronically publishing a link to the Second Amended Complaint, this Order and other relevant documents on a website and by sending an e-mail to the e-mail addresses identified in Exhibit 3 to the Declaration of Jessica Heiss and any e-mail addresses provided for Defendants by third parties that includes a link to said website.  The Clerk of the Court is directed to issue a single original summons in the name of "OPERATORS OF KTKT STORE and all other Defendants identified in the Second Amended Complaint" that shall apply to all Defendants.  The combination of providing notice via electronic publication and e-mail, along with any notice that Defendants receive from payment processors, shall constitute notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and afford them the opportunity to present their objections.

7.  Plaintiff's Amended Complaint [10] and Exhibits 1 and 2 thereto [10-1] and [10-2], Plaintiff's Second Amended Complaint [25] and Exhibits 1, 2, and 3 thereto [25-1], [25-2], and [25-3], Schedule A to the Complaint [7], the Amended Complaint [10-3], and the Second Amended Complaint [25-4], Exhibit 3 to the Declaration of Jessica Heiss [15], and this Order shall remain sealed until further ordered by this Court.

8.  Plaintiff shall deposit with the Court ten thousand dollars ($10,000.00), either cash or surety bond, as security, which amount was determined adequate for the payment of such

damages as any person may be entitled to recover as a result of a wrongful restraint hereunder.

9.     Any Defendants that are subject to this Order may appear and move to dissolve or modify the Order on two days' notice to Plaintiff or on shorter notice as set by this Court.

10.    This Temporary Restraining Order without notice is entered at 11:25 A.M. on this 17th day of December 2019, and shall remain in effect for fourteen (14) days.

 

Joan H. Lefkow
United States District Judge

Too Faced Cosmetics, LLC v. Operators of KTKT Store, et al.,- Case No. 19-cv-07762

# Schedule A

| No. | Seller Alias | No. | Seller Alias |
|---|---|---|---|
| 1 | KTKT Store | 2 | Loumesi Official Store |
| 3 | lovemoon makeup Store | 4 | RomanticBird Febble Store |
| 5 | TEYAO Store | 6 | YaJieNa Store |
| 7 | BeautySnake Store | 8 | CharmGirls Store |
| 9 | Gesang ABUC Store | 10 | Let You Beautiful Store |
| 11 | Shop5001354 Store | 12 | Shop5003455 Store |
| 13 | Shop5029021 Store | 14 | Shop5115077 Store |
| 15 | Shop5123071 Store | 16 | Shop5249107 Store |
| 17 | Shop5366224 Store | 18 | Women's Cosmetic Store |
| 19 | Worldwide Dropship Store | 20 | ZYM Cosmetic Store |
| 21 | bettershopbetterlife | 22 | don_9340 |
| 23 | duan7274 | 24 | duannahua_9 |
| 25 | feimi-80 | 26 | gdej3115 |
| 27 | gu088317395173fs_0 | 28 | inspire7362 |
| 29 | keytimetoshow41 | 30 | listen18-69 |
| 31 | lsx56 | 32 | lzl8218 |
| 33 | moonandstar_inthesky | 34 | quit5521 |
| 35 | rxh56 | 36 | slx56 |
| 37 | ssh56 | 38 | su-554 |
| 39 | tyghf5219 | 40 | yitao64 |
| 41 | youjin89 | | |

| No. | Seller Alias URL | No. | Seller Alias URL |
|---|---|---|---|
| 1 | aliexpress.com/store/4991223 | 2 | aliexpress.com/store/2664050 |
| 3 | aliexpress.com/store/3379014 | 4 | aliexpress.com/store/4698032 |
| 5 | aliexpress.com/store/4406033 | 6 | aliexpress.com/store/1150151 |
| 7 | aliexpress.com/store/3872019 | 8 | aliexpress.com/store/5022140 |
| 9 | aliexpress.com/store/5106111 | 10 | aliexpress.com/store/1513329 |
| 11 | aliexpress.com/store/5001354 | 12 | aliexpress.com/store/5003455 |
| 13 | aliexpress.com/store/5029021 | 14 | aliexpress.com/store/5115077 |
| 15 | aliexpress.com/store/5123071 | 16 | aliexpress.com/store/5249107 |
| 17 | aliexpress.com/store/5366224 | 18 | aliexpress.com/store/5331002 |
| 19 | aliexpress.com/store/5081131 | 20 | aliexpress.com/store/4457015 |

| No. | Seller Alias URL | No. | Seller Alias URL |
|---|---|---|---|
| 21 | ebay.com/usr/bettershopbetterlife | 22 | ebay.com/usr/don_9340 |
| 23 | ebay.com/usr/duan7274 | 24 | ebay.com/usr/duannahua_9 |
| 25 | ebay.com/usr/feimi-80 | 26 | ebay.com/usr/gdej3115 |
| 27 | ebay.com/usr/gu088317395173fs_0 | 28 | ebay.com/usr/inspire7362 |
| 29 | ebay.com/usr/keytimetoshow41 | 30 | ebay.com/usr/listen18-69 |
| 31 | ebay.com/usr/lsx56 | 32 | ebay.com/usr/lzl8218 |
| 33 | ebay.com/usr/moonandstar_inthesky | 34 | ebay.com/usr/quit5521 |
| 35 | ebay.com/usr/rxh56 | 36 | ebay.com/usr/slx56 |
| 37 | ebay.com/usr/ssh56 | 38 | ebay.com/usr/su-554 |
| 39 | ebay.com/usr/tyghf5219 | 40 | ebay.com/usr/yitao64 |
| 41 | ebay.com/usr/youjin89 | | |

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.3.1
### Eastern Division

Too Faced Cosmetics, LLC

                                        Plaintiff,

v.                                                      Case No.:
                                                        1:19–cv–07762
                                                        Honorable Joan H.
                                                        Lefkow

The Partnerships and Unincorporated Associations
Identified on Schedule "A"

                                        Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, December 3, 2019:

      MINUTE entry before the Honorable Joan H. Lefkow: Motion for leave to file under seal [6] is granted. Plaintiff's ex parte motion for entry of a temporary restraining order [11] and motion for electronic service [16] are set for hearing on 12/11/2019. Plaintiff's counsel should be prepared to show cause why the case should not be dismissed for misjoinder of defendants under Fed. R. Civ. P. 21. Mailed notice (ags, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.2.2
### Eastern Division

Weifang Tengyi Jewelry Trading Co. Ltd

                      Plaintiff,

v.                                Case No.: 1:18−cv−04651

                                Honorable Gary Feinerman

ExtraFind, et al.

                      Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, December 19, 2018:

      MINUTE entry before the Honorable Gary Feinerman:Plaintiffs motion to sever [125] and Defendant Intuii and Sorensen's motion to dismiss [141] are denied. As Plaintiff clarified on the record, Plaintiff's claims against Defendants Intuii LLC and Jens Sorensen rest in substantial part on the same legal and factual grounds as Plaintiff's claims against the other defendants, including that Defendants Intuii LLC and Jens Sorensen were involved in a counterfeiting network with the other defendants. Given the nature of Plaintiff's claims, joinder is proper under Civil Rule 20(a)(2), rendering inappropriate dismissal or severance under Civil Rule 21.Mailed notice.(jlj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.